**UNITED STATES COURT OF APPEALS**

*for the*

**THIRD CIRCUIT**

**Case No. 25-01369**

**RALPH TALARICO, INDIVIDUALLY AND ON BEHALF OF THE FLSA COLLECTIVE AND THE RULE 23 CLASS,**

**Plaintiffs-Appellant,**

v.

**PUBLIC PARTNERSHIPS LLC,**

**Defendant-Appellee.**

*On Appeal from the United States District Court for the Eastern District of Pennsylvania*

**SUPPLEMENTAL APPENDIX**
**Volume I – Pages Sappx0001 to Sappx0199**

Walter M. Foster, Esq.
Matthew Barszcz, Esq.
Joan Taylor, Esq.
Emma Spero, Esq.
Cozen O'Connor
200 State Street
Boston, MA 02109
Phone: (617) 849-5012

*Attorneys for Appellee,*
*Public Partnerships LLC*

## <u>SUPPLEMENTAL APPENDIX TABLE OF CONTENTS</u>

**VOLUME I**
**Pages Sappx0001 to Sappx0199**

| <u>Document</u> | <u>Page</u> |
|---|---|
| Trial Day 1:  Skovera Tr. | Sappx0004 |
| Trial Day 1:  Talarico Tr. | Sappx0047 |
| Trial Day 2:  Cotto Tr. | Sappx0072 |
| Trial Day 2:  Ross Tr. | Sappx0113 |
| Trial Day 2:  Mandoza Tr. | Sappx0138 |
| Trial Day 3:  Barge Tr. | Sappx0148 |

1

1            UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF PENNSYLVANIA

3                        -  -  -

RALPH TALARICO,           ) CIVIL DIVISION
4  Individually and on      )
   behalf of all others     ) NO. 5:17-CV-02165-JLS
5  similarly situated,       )
                            )
6          Plaintiff,       )
                            )
7                           )
    -vs-                    )
8                           )
                            )
9                           )
   PUBLIC PARTNERSHIPS,     )
10 LLC, doing business as   )
   PCG PUBLIC              )
11 PARTNERSHIPS,            )
                            )
12         Defendant.       )
                            )
13                          )
                            )
14

15
                         -  -  -
16

17        TRIAL HELD ON MONDAY, OCTOBER 16, 2023
                      9:00 a.m.
18
                       VOLUME I
19

20

21   REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
     WITHOUT AUTHORIZATION FROM THE CERTIFYING
22   AGENCY

23

24

25

## Trial Day 1 - October 16, 2023

2

```
 1   COUNSEL PRESENT:

 2
     For the Plaintiff:
 3
     NICHOLS KASTER PLLP, Esq.
 4   By:  Rachhana Srey, Esq.
          Helen Coleman, Esq.
 5   80 South 8th Street
     4600 IDS Center
 6   Minneapolis, MN 55402
     Rsrey@nka.com
 7   Hcoleman@nka.com

 8   COHEN MILSTEIN SELLERS & TOLL, PLLC
     BY:   Christine E. Miller, Esq.
 9   1100 NEW YORK AVENUE, N.W.
     SUITE 500
10   WASHINGTON, DC 20005
     Cwebber@cohenmilstein.com

11

12   For the Defendant:

13   ECKERT SEAMANS CHERIN & MELLOTT, LLC
     BY:   Walter M. Foster, Esq.
14         Trevin C. Schmidt, Esq.
           Carson Shea, Esq.
15         Clare Gallagher, Esq.
           Laura Cottington, Esq.
16         Kevin Freitas, Esq.
     Two International Place
17   16th Floor
     Boston, MA 02110
18   Wfoster@eckertseamans.com
     Tschmidt@eckertseamans.com
19   Cshea@eckertseamans.com
     Cgallagher@eckertseamans.com
20   Lcottington@eckertseamans.com
     Kfreitas@eckertseamans.com

21

22   Also Present: Christopher Scherman

23

24

25
```

## Trial Day 1 - October 16, 2023

3

1                      I N D E X

                                               Page
2   JULIA SKOVERA
       DIRECT                                    32
3      CROSS                                      74
       REDIRECT                                 104
4   RALPH TALARICO
       DIRECT                                   109
5      CROSS                                     193
       REDIRECT                                 270
6      RECROSS                                   275
7                   E X H I B I T S
    No.                                        Page
8    1-     Plaintiff's Exhibit Nos. 1 through 93     31
     93     were marked and admitted into evidence.
9    96-    Plaintiff's Exhibit Nos. 96 through 100    31
     100    were marked and admitted into evidence.
10   101-   Defendant's Exhibit Nos. 101 through 225   31
     225    were marked and admitted into evidence.
11   300-   Defendant's Exhibit Nos. 300 through 305   31
     305    were marked and admitted into evidence.
12   325-   Joint Exhibit Nos. 325 through 398 were    31
     398    marked and admitted into evidence.
13   DX     Defendant Exhibit No. 246 was marked for   259
     246    identification
14
15
16
17
18
19
20
21
22
23
24
25

1      Q.      Okay.  When did you stop providing

2   service coordination?

3      A.      Abilities in Motion stopped, I

4   believe, in 2019.  I left Abilities in Motion

5   in 2019 and then came back in 2021.  And when I

6   came back in 2021, they had already ceased

7   contracts with all of the NCOs by the time I

8   came back in 2021.

9      Q.      Understood.  So during your work

10  with -- with Abilities in Motion, and focusing

11  on that period through 2019, have you become

12  familiar with the services provided -- to

13  provide care at home to Medicaid recipients

14  through HCBS waiver programs?

15     A.      At that time, yes.

16     Q.      Okay.  And are you, specifically,

17  familiar with the programs available through

18  the Independence Waiver under Pennsylvania's

19  Office of Long-Term Living, as they were in

20  effect through 2013 through 2019?

21     A.      Yes.

22     Q.      What types of services are provided

23  through that waiver program?

24     A.      During that time frame, consumers

25  who were under the Independence Waiver had

Trial Day 1 - October 16, 2023

36

1    access to transportation services.  They had

2    access to home modifications, home-delivered

3    meals, personal assistant services and some

4    skilled services.

5         Q.    Okay.  And when you say "skilled,"

6    is that medical care or nursing care?

7         A.    Yes.  Yes.

8         Q.    And in my questions this morning, I

9    want to focus on the personal assistant

10   services.  Okay?

11        A.    Mm-hmm.

12        Q.    For the Independence Waiver, what's

13   the general population that is served through

14   that waiver?

15        A.    That waiver was to -- was intended

16   to provide services to people with physical

17   disabilities as their primary diagnosis.

18        Q.    All right.  Are there other waiver

19   programs that were in effect through the Office

20   of Long-Term Living that followed the same

21   model as the Independence Waiver?

22        A.    Not the same model, to my knowledge.

23   There were other waivers, but they provided

24   different services.

25        Q.    Okay.

Trial Day 1 - October 16, 2023

37

1      A.    You know, different services.  They

2   might have provided the same, but not exactly

3   the same model.

4      Q.    Okay.  And do service coordinators,

5   specifically those at AIM, do they work with

6   individuals to identify the services they need

7   and how they can get them?

8      A.    Yes.

9      Q.    Are service coordinators the first

10  point of entry for those seeking such services?

11     A.    No.

12     Q.    Where do individuals begin?

13     A.    They can begin in multiple areas.  I

14  mean, in order to be enrolled and approved in

15  appropriate waivers at that time, under OLTL

16  regulations, you had to go through the

17  independent enrollment broker, who actually --

18     Q.    Okay.  And once an individual

19  contacted an independent enrollment broker,

20  what were the steps they had to go through to

21  become eligible to participate in the program?

22     A.    I don't remember all of the steps

23  because I wasn't providing -- I wasn't working

24  with ISPs at the time, but part of the process

25  was they had to meet whatever the

Trial Day 1 - October 16, 2023

38

1    qualifications were that was set forth by the

2    Office of Long-Term Living.  For example, they

3    had to meet, you know, specific diagnosis

4    criteria, they had to meet financial criteria

5    through the county assistance office, things to

6    that effect.  There were other things.

7         Q.    Okay.  So if an individual had

8    sufficient financial resources to hire their

9    own in-home assistance, would they qualify for

10   or were they eligible for the waiver program?

11                ATTORNEY FOSTER:  Objection,

12   Your Honor.  Overly broad.  What kind of

13   financial assistance?

14                THE COURT:  Overruled.  If you

15   can answer the question -- I mean, I don't

16   think it's that overly broad if the people have

17   their own -- why don't you just try to restate

18   it a little.

19                ATTORNEY WEBBER:  Sure.

20   BY ATTORNEY WEBBER:

21        Q.    Ms. Skovera, again, focusing on the

22   period from 2013 to 2019, if an individual

23   could afford to pay out of pocket for somebody

24   to provide in-home care services, would they

25   meet the financial eligibility criteria that

1    you mentioned were part of being certified to

2    participate in this waiver program?

3         A.    I can't really comment on that only

4    because I'm not -- my responsibility is not in

5    the enrollment part.  The enrollment broker's

6    responsibility was to verify income, assets.

7    So by the time we got the referral for the

8    case, those things had already been done.

9              So we would do -- they were required

10   to do an annual financial renewal to the county

11   assistance office but, again, it was not my job

12   or our job or our position to do financial

13   determinations.

14        Q.    Thank you.  And once somebody had

15   been determined eligible, how would they then

16   connect to a service coordinator?

17        A.    They had to choose.  Again, that

18   went through the -- the independent enrollment

19   broker, part of the enrollment process was for

20   them to provide the list of qualified providers

21   to the consumers so that they can choose a

22   service coordination entity.

23        Q.    And do you know how many service

24   coordinator entities were operating in

25   Pennsylvania in that time period of 2013 to

## Trial Day 1 - October 16, 2023

40

```
1   2019?
2        A.    No, I don't.
3        Q.    Okay.  But Abilities in Motion was
4   one of them?
5        A.    Yes.
6        Q.    And so once somebody selected a
7   service coordinator or a service coordination
8   entity, what would be the next step?
9        A.    As part of their enrollment?
10       Q.    Yes.
11       A.    I don't really remember.  I don't
12  know.  Again, I didn't do enrollment.  We
13  only -- once we got the case, they had already
14  gone through all of that.
15       Q.    Yes.  I'm sorry.  Once they're
16  enrolled but they need -- but do you recall
17  service coordination being involved in creating
18  a care plan for the individual?
19       A.    Yes.  So what I think I hear you
20  saying is, once they are completely enrolled
21  and they've chosen their service coordination
22  provider and we receive the actual referral?
23       Q.    Yes.  What are the next steps at
24  that point?
25       A.    The next steps is, there was time
```

1   frames where we needed to outreach the

2   participant and schedule that first

3   face-to-face visit to create a plan of care.

4       Q.    Okay.  What sorts of information did

5   you focus on in creating the care plan?

6       A.    Well, we had an assessment tool that

7   we were required to use.  It was like a

8   comprehensive tool that asked a lot of

9   questions and it was -- you know, it was a tool

10  that helped -- that aided us in identifying

11  where the needs were in terms of what types and

12  how much care they needed and, you know, what

13  -- were they full day, did they need grooming.

14  Those were the broad topics that were

15  discussed, but they were intended to be the

16  basis of what services were being provided,

17  more for those important, higher level

18  Activities of Daily Living, like bathing,

19  dressing, grooming, meals, medicating and

20  things like that.

21      Q.    And ultimately, is this plan

22  documented as an ISP, Individual Services Plan?

23      A.    I'm sorry, can you repeat that

24  question?

25      Q.    Sure.  Once you've made your -- once

42

1    the service coordinator has completed the

2    assessment and come up with that plan, is that

3    documented in something called an ISP or

4    Individual Service Plan?

5         A.    Yes.

6         Q.    Okay.  Does the care plan dictate

7    who provides the services that are described in

8    the plan?

9         A.    It would be consumer choice.  So

10   they dictate who provides the service.

11        Q.    And with respect to personal

12   assistance services, does the ISP specify the

13   number of hours a day or week that the

14   participant can receive services?

15        A.    I would say that's where the request

16   for hours is documented.  So whatever the

17   consumer is requesting is documented on that

18   ISP.

19        Q.    Okay.  And ultimately, does the ISP

20   have to get approved?

21        A.    Yes.

22        Q.    Okay.  And once the ISP is approved,

23   does that then control the number of hours of

24   service that the participant can receive?

25        A.    Yes.

Trial Day 1 - October 16, 2023

43

1      Q.    Now, does the ISP establish that in

2  terms of hours or in terms of dollars?

3      A.    I'm not sure what you mean.

4      Q.    So does the ISP give individuals a

5  pot of money to spend on personal assistance

6  services and they get whatever hours they can

7  out of that money, or does the plan give them a

8  set number of hours and that's how many hours

9  they get regardless of what the wage rate is?

10      A.    I -- I'm not really sure I

11  understand completely.  I can comment that

12  there are -- that we are -- that sounds like --

13                  THE REPORTER:  I can't hear

14  her.

15                  THE COURT:  Hold on.  Hold on.

16  The court reporter was having trouble hearing

17  you, so try to get closer to the mic and speak

18  a little louder, please.

19                  THE WITNESS:  There are

20  different models of care.  So if the consumer

21  -- there is -- there is a model of care, and I

22  cannot remember what it's called, I cannot

23  remember.  It's been several years since I have

24  been involved in service coordination.

25                  But one of the models allowed the

1    consumer X amount of money and then they

2    distributed it and spent it on their services

3    however they wanted to.

4            The models that we typically saw

5    were the consumer requested specific amount of

6    hours of time and/or services, that was

7    submitted to Office of Long-Term Living for

8    approval, and then we facilitated and supported

9    the consumer in finding appropriate providers

10   for those services.

11           So it wasn't financially driven, per

12   se.  It was driven by what their needs were.

13   So we didn't have a cap for the independent

14   waiver.  It was what do they need, we requested

15   it, based on the consumers' request.  And once

16   it was approved, we facilitated, you know,

17   getting providers.

18   BY ATTORNEY WEBBER:

19       Q.    Okay.  So once the plan had been

20   approved and the number of hours of services

21   identified, what was -- what were the

22   participants told about their options for

23   receiving those services?

24       A.    They were provided whatever model --

25   you know, whatever models were available during

Trial Day 1 - October 16, 2023

45

1   that time frame.

2       Q.    Okay.  Was one of the options they

3   had choosing an agency to provide the personal

4   care services?

5       A.    Yes.

6       Q.    And was another option called

7   Participant-Directed Services?

8       A.    Yes.

9       Q.    And whether the individual had --

10  whether the individual selected the agency or

11  the PDS model, would they receive the same type

12  of services under the care plan?

13      A.    Can you say that -- can you ask that

14  question again?

15      Q.    Sure.  If the ISP set forth the

16  number of hours of home care that a participant

17  was supposed to receive, would -- would what

18  they receive -- would the services they receive

19  change based on whether they selected an agency

20  to deliver those service or the PDS model to

21  deliver those services?

22      A.    Not to my knowledge, they wouldn't

23  change.

24      Q.    Okay.  Did service coordinators

25  provide information to participants to help

Trial Day 1 - October 16, 2023

46

1    them choose between these two models?

2        A.    Yes.

3        Q.    Okay.  What would service

4    coordinators tell participants about the PDS

5    model?

6        A.    At the time -- at the time, when I

7    was involved in service coordination, we had

8    Public Partnerships doing the consumer employer

9    model where the consumer would hire and fire

10   their own attendants so we would offer them

11   that, or the attendant, the agency model, we

12   would offer them that.

13           They were also able to -- you know,

14   if they had people in mind that they wanted to

15   do the work and they do not want to go through

16   Public Partnerships and do the consumer

17   employer model, they could also seek to have

18   said agency hire whoever they had in mind to --

19   it would still be the agency model but, you

20   know, if they have a friend or something that

21   they wanted to get hired, they could have the

22   friend get hired through the agency.

23       Q.    So under either the agency or PDS

24   model, the participant could decide who would

25   provide their care?

Trial Day 1 - October 16, 2023

47

1          A.      Potentially, under the agency model,

2    yes, they could decide.

3          Q.      Okay.  Is that information that

4    service coordinators would share with

5    participants who were deciding between these

6    two models?

7          A.      They were supposed to.

8          Q.      And would participants get the same

9    number of hours of care whether they chose the

10   agency or the PDS model?

11         A.      The authorized hours would remain

12   the same.

13         Q.      Okay.  And would the -- and in

14   either case, the ISP would dictate what types

15   of services, what activities of daily living

16   the participant would receive assistance with?

17         A.      Correct.  Whatever was authorized.

18         Q.      Okay.  And under both agency and

19   Participant-Directed Service models, if a

20   participant becomes unhappy with the care

21   worker who is providing them services, can they

22   decide they want to remove that worker and have

23   somebody else instead?

24         A.      Yes.

25         Q.      Were you aware of the MyChoice4Care

Trial Day 1 - October 16, 2023

48

1    directory of home care workers that -- during

2    this time period of 2013 through 2019?

3         A.    No.

4         Q.    Okay.  Under the PDS model, does the

5    participant give instruction day-to-day to the

6    care worker about what they want assistance

7    with or how they want things done that day?

8         A.    The expectation is that they should.

9    And if they can't, there should be somebody

10   there representing them if they were unable to.

11        Q.    Okay.  And under the agency model,

12   does the participant similarly have the ability

13   to give direction to their care worker about,

14   you know, I want my lunch now, I want you to

15   help me do this next?

16        A.    Yes, they should.  Again, the

17   expectation is that they -- they cannot

18   verbalize what their needs are, and, again, as

19   long as it's in alignment with the care plan --

20   authorized care plan, yes.

21        Q.    Under the agency model, can the

22   participant decide what days and times they

23   want the caregiver to provide the care?

24        A.    Yes.

25        Q.    And under the Participant-Directed

Trial Day 1 - October 16, 2023

49

1    Services model, can they also decide what days

2    and times they want the care worker to provide

3    services?

4         A.    Yes.

5         Q.    And would service coordinators tell

6    participants that they will have the ability to

7    control the schedule of their caregiver whether

8    they go with the agency or the PDS model?

9         A.    Yes.

10        Q.    Does the number of hours of service

11   that a participant can receive vary based on

12   the pay rate that the caregiver receives under

13   the PDS model?

14        A.    Can you repeat that again, please?

15        Q.    Does the number of hours of services

16   that a participant receives under the PDS model

17   vary based on the pay rate chosen for that care

18   worker?

19        A.    No, not to my knowledge.

20        Q.    Are there any considerations that

21   would lead a service coordinator to highlight

22   one model or the other as preferable to a

23   participant?

24        A.    I mean, I guess there could be a

25   scenario.  Yeah.  I guess.

Sappx0018

Trial Day 1 - October 16, 2023

50

```
 1        Q.    Are there --
 2        A.    I'm not really sure.  I'm not really
 3   sure how to answer that.  Can you ask me that
 4   question again, please?
 5        Q.    I didn't know if there were
 6   circumstances in which service coordinators
 7   would be inclined to recommend one program over
 8   the other to a participant.
 9        A.    One model over the other?
10        Q.    Yes.  One model over the other.
11        A.    I mean, if I'm allowed to give a
12   scenario, I could give you a scenario where I
13   might make a suggestion of one model over
14   another.
15        Q.    Yeah.  Please, if you have something
16   in mind.
17        A.    If the consumer lives in a rural
18   area and there's not a lot of providers in that
19   area to choose from or there are providers and
20   none of them have availability of a -- to come
21   to them, we might encourage them to, you know,
22   have a family member or someone nearby that
23   could provide the care hours because there's no
24   agencies available.
25              Does that make sense?
```

## Trial Day 1 - October 16, 2023

63

1       Q.      Ms. Skovera, do you recognize this

2   portion of Exhibit 364?

3       A.      Vaguely.

4       Q.      Okay.  It's titled DCW Agreement.

5   When you were or when you had people working as

6   service coordinators, was -- were -- did you

7   get questions from participants about the DCW

8   agreement?

9       A.      I'm sure.

10      Q.      Okay.  Could participants change the

11  terms of the DCW agreement?

12      A.      Not to my knowledge.

13      Q.      Okay.  Were participants required to

14  sign the DCW agreement in order to receive

15  services in the PDS model?

16              ATTORNEY FOSTER:  Objection,

17  Your Honor.  Again, these are just completion

18  of the PPL forms.  She's not PPL.

19              THE COURT:  Overruled.

20  BY ATTORNEY WEBBER:

21      Q.      So Ms. Skovera --

22              THE COURT:  To your knowledge.

23  BY ATTORNEY WEBBER:

24      Q.      -- if you know, does -- did

25  participants have to sign the DCW agreement in

Trial Day 1 - October 16, 2023

64

1    order to receive services through the PDS

2    model?

3        A.    I don't recall.

4        Q.    Do you recall if, prior to PPL

5    becoming the fiscal agent in 2013, do you

6    recall if, prior to that time, participants in

7    the Participant-Directed Services model would

8    have to sign any sort of agreement with their

9    care worker?

10        A.    I don't recall.

11        Q.    When did you learn that PPL was

12    going to become the fiscal agent for the PDS

13    program?

14        A.    I don't remember.  I don't even

15    remember.  It was in the -- it started in 2010,

16    and at that point, consumers were able to

17    choose their FMS provider.  But you had said

18    2013.  So I would say it was probably around

19    2013 that PPL became the only provider for the

20    State of Pennsylvania.

21        Q.    Okay.  Do you know how participants

22    were notified about that change?

23        A.    I don't remember how they were

24    notified.  I remember the time.

25        Q.    Prior to the change, were there

Trial Day 1 - October 16, 2023

65

```
 1   participants for whom Abilities in Motion was

 2   providing both service coordination and also

 3   fiscal agent services?

 4        A.    I don't remember.

 5        Q.    Okay.  Once PPL did come on the

 6   scene, were participants able to give direction

 7   to PPL, for example, as to which workers' comp

 8   policy they wanted?

 9        A.    I don't know.

10        Q.    Is it correct that some service

11   plans provide the participant needs more than

12   40 hours a week of care?

13        A.    Can you repeat that question,

14   please?

15        Q.    Sure.  In the Individual Service

16   Plans, is it the case that sometimes, depending

17   on the individual's circumstances, that the

18   plan will provide for more than 40 hours a week

19   of care?

20        A.    Yes.

21        Q.    Okay.  It could be as many as 60

22   hours a week, for example; is that something

23   you've seen?

24        A.    Yes.

25        Q.    If a service plan authorizes 60
```

1   hours a week of care for a participant, then

2   can one caregiver work all 60 hours; is that

3   permitted?

4       A.   I don't remember if that was

5   permitted during the time frame that you're

6   referring to.

7       Q.   Are you aware of service plans ever

8   dictating that a participant must divide the

9   hours between multiple caregivers so that none

10  of them works over 40 hours?

11      A.   I have heard that before.

12      Q.   Okay.  Is that something that, under

13  the Independence Waiver program, you recall

14  being included in any service plans in the 2013

15  to 2019 time period?

16      A.   If -- if the service plan had more

17  than 40 hours, and they didn't want just one

18  person doing them, is that -- can you repeat

19  the question or rephrase it, please?

20      Q.   I'm just asking, would the service

21  plan itself require the participants to divide

22  up their hours of care in any way?

23      A.   I don't recall.  I don't remember.

24      Q.   Okay.  If -- in 2013 through 2015,

25  if a care worker worked 60 hours, say, for one

Trial Day 1 - October 16, 2023

1    participant, would they have been paid

2    overtime, time and a half, for hours over 40?

3          A.    I don't remember.

4          Q.    Okay.  Do you remember if a

5    participant asked PPL to pay overtime rates for

6    hours over 40, whether PPL would do that at a

7    participant's request?

8          A.    I don't -- I don't believe so.  I

9    don't.

10         Q.    Do you recall any change in how the

11   service plans were put together in 20 -- in the

12   period of 2016 through 2019?

13         A.    Can you repeat that, please?

14         Q.    Sure.  Do you recall any change in

15   how the service plans were created or

16   documented in 2016 through 2019 as compared to

17   2013 through 2015?

18         A.    I don't remember.

19         Q.    Okay.  In either time period, was

20   the focus of the service coordinator on just

21   what the needs of the participant were and the

22   total number of hours?

23         A.    Can you repeat that, please?

24         Q.    Sure.  Throughout the entire time

25   period from 2013 through 20 -- that you're

1    aware of -- through 2019, is the focus of the

2    service coordinator purely on what the needs of

3    the participant are and how many hours of care

4    they need?

5        A.    I would say yes.

6        Q.    Okay.  Do service coordinators in --

7    -- let me -- sorry.  Let me back up.

8            Does the service plan -- does the

9    ISP dictate an hourly pay rate for the

10   caregiver?

11       A.    No.

12       Q.    Does the ISP dictate whether

13   individuals working more than 40 hours --

14   providing more than 40 hours of care will

15   receive overtime pay?

16       A.    I don't remember the overtime pay

17   stipulations.  I don't recall them at all.  I

18   know there was discussion, but it's been so

19   long, I don't recall.

20       Q.    Okay.  Just one last question.  Do

21   you recall if service coordinators had any

22   control over whether care workers were paid

23   time and a half when they worked over 40 hours

24   in a week?

25       A.    No.

Trial Day 1 - October 16, 2023

69

1      Q.    Okay.  Did participants ever express

2   concern to service coordinators about their

3   care workers' paychecks not being -- not being

4   the correct amount or not being paid on time?

5      A.    Yes.

6      Q.    Are you aware of the sorts of things

7   that might cause that to happen?

8      A.    Some.  Yes.

9      Q.    What sorts of issues did you have

10  come up, when you were working with service

11  coordinators and participants, with respect to

12  payroll problems?

13     A.    It could be that the responsibility

14  on the Common Law Employer or the Direct Care

15  Worker was not fulfilled.  It could be an error

16  on paperwork that would have been required of

17  either of those entities.

18     Q.    Are you familiar with an issue of

19  overlapping hours?

20     A.    I am familiar with that terminology,

21  yes.

22     Q.    Okay.  Is it correct that sometimes

23  a participant has more than one care worker?

24     A.    Yes.

25     Q.    Okay.  And if one of those care

Sappx0026

## Trial Day 1 - October 16, 2023

1    workers makes a mistake and reports hours

2    worked that overlap with the hours worked by

3    the other care worker, will those two care

4    workers be paid for the overlapping time?

5              ATTORNEY FOSTER:  Objection,

6    Your Honor.

7              THE COURT:  Sustained.

8    BY ATTORNEY WEBBER:

9        Q.    When participants are first getting

10   set up in the PDS program, do service

11   coordinators get any questions about pay rates

12   for Direct Care Workers?

13       A.    Yes.

14       Q.    And what's the most common question

15   you receive at the outset?

16       A.    What is the pay range.

17       Q.    Have participants ever expressed

18   concerns to service coordinators about the cap

19   on -- on care worker pay rates?

20       A.    Yes.

21       Q.    And has -- have -- have those

22   concerns -- let me -- sorry.

23              Have participants expressed concern

24   that they cannot find a care worker to take on

25   the job because of the rates available?

Trial Day 1 - October 16, 2023

85

1               THE COURT:  Can you see them?

2               THE WITNESS:  Yes.

3    BY ATTORNEY FOSTER:

4        Q.    And are you familiar with the State

5    filing an application, as it's called, to the

6    federal government to establish the Home and

7    Community-Based Services Waiver programs?

8        A.    Yes.

9        Q.    And I'm going to direct your

10   attention, it's TAL No. 399, it's Appendix D of

11   that document.  It talks about the service plan

12   implementation and monitoring.  So I just have

13   a few follow-up questions about the actions

14   that all the service coordinators take as

15   pursuant to the state application.

16            It says, "The service coordinator

17   plays a key role in ensuring the implementation

18   and monitoring of the ISP as follows," and the

19   very first bullet is "to monitor the health and

20   safety of the participant, and the quality of

21   services provided to the participant through

22   personal visits at a minimum of twice per year

23   and in telephone calls at least quarterly."

24            Do you recall that those were part

25   of the functions that the service coordinators

Trial Day 1 - October 16, 2023

86

1   at AIM did?

2        A.    Yes.

3        Q.    And it also mentions that the

4   service coordinator is responsible for

5   discussing the following information with the

6   participant and documenting the information in

7   the HCSIS, if I'm saying that right, service

8   notes for review by OLTL.

9             And that dovetails or is consistent

10  with your testimony about the HCSIS software

11  system?

12       A.    Yes.

13       Q.    Sorry.  Yes.  And then --

14       A.    Yes.

15       Q.    Thank you.  So just wanted to run

16  down this little bullet list of items that the

17  service coordinators play.  It says one of the

18  things the service coordinator does is to

19  ensure that the participant is receiving the

20  amount, frequency and duration of services that

21  are approved in the ISP.

22            Do you see that?

23       A.    Yes.

24       Q.    Was that part of the task that,

25  either quarterly or any time that you would

## Trial Day 1 - October 16, 2023

87

1  visit with the participant employer, you would

2  review the frequency/duration of those

3  services?

4        A.    Yes.

5                    THE COURT:  Was there -- let

6  me interrupt.  Was there a particular time

7  period that you had to actually visit them,

8  like once every quarter, once every month or --

9                    THE WITNESS:  Yes, there was.

10  They were -- it was, again, dictated by this

11  document as well as, you know, OLTL

12  requirements.  We were required -- we had time

13  frames.

14                    THE COURT:  You don't know

15  what they are?

16                    THE WITNESS:  I don't remember

17  them by heart.  It would depend on the waiver.

18  I don't remember them.  You know, looking at

19  this, it's jogging my memory, but it's -- I

20  don't remember the specifications on time

21  frames for each of the waivers that we provided

22  coordination for.

23                    THE COURT:  All right.

24                    ATTORNEY FOSTER:  Thank you,

25  Your Honor.

Trial Day 1 - October 16, 2023

1    BY ATTORNEY FOSTER:

2         Q.    And in addition, as part of that

3    process that the service coordinators would do

4    is they would ensure that participant is

5    receiving all of the authorized services that

6    are in the ISP; correct?

7         A.    Yes.

8         Q.    And that was making sure that the

9    DCWs were performing the specific job duties

10   for the hours set forth in the ISP; correct?

11        A.    Yes.

12        Q.    And one of the other duties a

13   service coordinator plays is receiving the

14   amount of support necessary -- the participant

15   makes sure they are receiving the amount and

16   support necessary to ensure health and safety.

17             Do you see that?

18        A.    Yes.

19        Q.    Were there requirements under the

20   program about reporting abuse if it occurs to

21   the participant?

22        A.    Yes.

23        Q.    What were those requirements?

24        A.    I mean, we were considered mandated

25   reporters, so if we suspected abuse and

Trial Day 1 - October 16, 2023

89

1   neglect, exploitation or abandonment, we were

2   required to contact the applicable parties.

3        Q.    And what about the Direct Care

4   Worker themselves, are they a mandatory

5   reporter of abuse?

6        A.    I don't know.

7        Q.    Do you know if, in your experience,

8   any Direct Care Worker has ever reported abuse

9   of the participant in the home, if you know?

10       A.    I don't recall any specific cases of

11  that.

12       Q.    Okay.  And one of the other

13  functions of the service coordinators is to

14  make sure that if there are any health status

15  or other events reported for the participant,

16  such as a hospitalization or scheduled surgery

17  or changes, to monitor those; correct?

18       A.    Yes.

19       Q.    And was another obligation of the

20  service coordinator to monitor the utilization

21  of the hours in the service plan?

22       A.    Yes.

23       Q.    How would a service coordinator do

24  that?

25       A.    I can give you an example of how we

1    do it for public partnership and for agency.

2    We had a portal that we were -- we had access

3    to for consumers through Public Partnerships

4    where we could see the hours that were being

5    utilized and submitted for payment on their

6    payroll.

7        Q.    Uh-huh.

8        A.    And so we could compare those hours

9    to what was authorized, and for agency

10   participants who were receiving agency

11   services, we would ask them for utilization

12   review, management review documents.  So they

13   would then forward us the amount of hours, you

14   know, the clock-ins and the clock-outs or the

15   shift, however you want to word it, for the

16   attendance for that consumer so that we can

17   make sure or ensure that there were no overages

18   or underutilization of hours.

19       Q.    And if there were overages, meaning

20   the participant might need some more hours,

21   could that affect an amendment to the

22   Individual Service Plan?

23       A.    It could.

24       Q.    Tell us how.

25       A.    In my memory, the way I recall it,

1  they were authorized for -- this care plan was

2  authorized for -- typically, unless it was

3  temporary services, the length of the care plan

4  was, you know, for a year, I believe.  If you

5  had an attendant that was overutilizing or

6  going over their set hours for the week or the

7  month or the year, you know, we -- part of this

8  that you have on the screen, part of our role

9  in ensuring the services between routine phone

10  call and visits was to have those

11  conversations, you know, why are the attendants

12  over our under the service hours.

13        If it was because there was

14  something that had gone, you know, that was --

15  the consumer's health was deteriorating, if we

16  had a new diagnosis, we call them trigger

17  events.  You know, if there was a

18  hospitalization, the expectation is that we

19  would be aware of that and then do a

20  reassessment on their return home so that we

21  could change the care plan accordingly.

22        But if you had someone who was over

23  or underutilizing hours with no reason, our

24  responsibility was to go out and find out what

25  the scenario was; did they not have enough

92

1   attendants so their hours would be

2   underutilized, was there something -- did they

3   lose a caregiver in the home, is that why now

4   they're using more hours, because the nonformal

5   services are no longer there?  So those were

6   the types of scenarios that would require a

7   potential amendment or request for change in

8   services.

9       Q.    And in your experience in doing this

10  for many years, would there often be or at

11  least occasionally be amendments to the plan

12  that would increase the hours as the care was

13  needed?

14      A.    Yes.

15      Q.    And at each and every step, it would

16  be the service coordinator in concert with the

17  participant employer to determine those

18  potentially additional hours needed in the care

19  plan?

20      A.    Yes.

21      Q.    And, ultimately, whenever the ISP

22  was amended, that would be reflected in the

23  number of hours -- hours or units conveyed to

24  OLTL for approval; is that correct?

25      A.    Yes.

93

1      Q.    And just directing your attention to

2   the bottom of the same page we're looking at,

3   at JX 396, it says, "OLTL reviews and approves

4   the ISP through HCSIS."

5           Are you familiar with OLTL and what

6   agency that is?

7      A.    Yes.

8      Q.    Can you tell us what that is in your

9   understanding?

10     A.    The Office of Long-Term Living was

11  the entity that we were responsible to.  We

12  answered to them.  They oversaw the programs

13  that we provided services to.  They were under

14  the DHS umbrella, the Department of Human

15  Services umbrella, that's who we answered to.

16     Q.    Okay.  And once you created, if you

17  will, a new ISP for a participant employer in

18  the self-directed model programs, how was that

19  sent to OLTL for approval?  Was that an

20  electronic file?

21     A.    Yes.

22     Q.    And is that through this HCSIS

23  system?

24     A.    Yes.

25     Q.    And then did you have an

Trial Day 1 - October 16, 2023

94

1   understanding that then OLTL must approve each

2   and every one of those plans?

3       A.    Their responsibility was to review

4   them.

5       Q.    And on this document, directing your

6   attention back to this JX 396, it says, "The

7   service coordinator receives an alert of

8   approval or disapproval from OLTL in HCSIS once

9   the ISP is reviewed by OLTL staff."

10          Do you recall you would receive,

11  electronically, an approval or a disapproval by

12  OLTL for each ISP?

13      A.    Yes.

14      Q.    And then it says, "The service

15  coordinator implements services once the ISP is

16  approved by OLTL."

17          Does that comport with your

18  understanding and your job duties?

19      A.    Yes.

20      Q.    And, ultimately, you talked about

21  that each of these ISP plans now approved

22  electronically by the State through this HCSIS

23  system would have a set amount of hours.  Do

24  you recall if those were expressed as 15-minute

25  units or increments of 15 minutes, if you know?

95

1          A.    It depended on the service.  For

2    example, personal assistant services was

3    represented in 15-minute increments.

4          Q.    Got it.  And so directing your

5    attention, because the PA -- I think sometimes

6    they're called the PAS, right, the Personal

7    Assistant Services -- so for those, if those

8    were allocated within an ISP, the ISP would

9    have an electronic file that denoted how many

10   units were permitted for a particular care plan

11   year; is that correct?

12         A.    Yes.

13         Q.    And if there was an amendment to

14   that, those hours or, shall we say, those units

15   might increase; correct?

16         A.    Yes.

17         Q.    Do you recall, if you know, how that

18   -- the amount of hours for an ISP was conveyed

19   to the vendor fiscal agent, in this case, PPL,

20   during the time frame '13 to '19, when you were

21   there, if you know?

22         A.    I don't remember.  I don't know if

23   it was fax or E-mail.  I don't recall.

24         Q.    Do you recall that the State then

25   sends that electronic file of the amount of

96

1    hours approved in an ISP to PPL as the vendor

2    fiscal agent in order to process payroll?

3         A.    I don't recall if OLTL did that

4    either --

5         Q.    Okay.

6         A.    -- process.

7         Q.    Do you recall that there's actually

8    an electronic file that is created by the

9    service coordinator called a demographic file

10   that has the person's name, their address, and

11   that related information?  Do you recall that?

12        A.    Yes.

13        Q.    And do you recall that in each and

14   every ISP plan, there's an authorized start

15   date that is part of that demographic

16   electronic file?

17        A.    Yes.

18        Q.    What is an authorized start date and

19   who inserts that in the file?

20        A.    If you're referring to the

21   authorized start date for services --

22        Q.    For services, I am, the PAS, yes.

23        A.    Then the start date, we would

24   propose a start date, which would be, you know,

25   for example, futuristic, and then if OLTL

Trial Day 1 - October 16, 2023

97

1    authorized it, they would be the ones to say

2    what the start date, you know, whether that

3    start date that we proposed was authorized or

4    not.

5        I don't recall who -- you know, we

6    may -- we had the ability to manipulate that

7    date if you submitted the request, but I don't

8    remember if that date was changed by OLTL when

9    they authorized it.

10       Q.    Okay.

11       A.    I don't recall.

12       Q.    Yeah.  No worries.  That's helpful.

13       And in or around 2016, do you recall

14    that the federal law changed permitting

15    overtime to be paid to certain Direct Care

16    Workers in this program, if you recall?

17       A.    I remember overtime being issued

18    back then.  I don't recall what happened

19    specifically.

20       Q.    Do you recall that after 2016, as

21    part of that ISP process that delineates and

22    allocates hours, that the service coordinator

23    also had to designate any overtime as a TU

24    authorization within the service plan itself?

25       A.    I remember now that you're saying

Sappx0040

Trial Day 1 - October 16, 2023

98

```
 1   it, yes.
 2        Q.    Okay.  And so part of the process,
 3   after a certain period of time, was that
 4   overtime became available, and the way that
 5   that would be dealt with within the HCSIS and
 6   the SAMs system was part of that ISP authorized
 7   allocated hours and it had a special
 8   designation.
 9             Is that correct?
10        A.    Yes.
11        Q.    And do you recall that there was --
12   when this was -- at the time that this change
13   took place and was implemented in the program,
14   do you recall that a specific form was also
15   developed called the live-in exemption form
16   that each of the participant employers in the
17   self-directed models had to complete for their
18   DCWs, if you know?
19        A.    I don't remember.
20        Q.    And has PPL ever communicated to you
21   that a certain DCW must be hired for a
22   particular participant employer?
23        A.    No.
24        Q.    Who has the power to decide who to
25   hire as their Direct Care Worker in the
```

Sappx0041

99

```
1   self-directed model programs?
2        A.    It would be the consumer or the
3   common law employer, if it's not the consumer.
4        Q.    Right.  So the consumer is also the
5   word -- we sometimes use the word
6   "participant"?
7        A.    Right.  Yes.
8        Q.    Okay.  Okay.  And do you know --
9   isn't it also true that PPL is never present
10  with the service coordinator when they're
11  determining the needs for the services in the
12  ISP?
13       A.    I don't believe so.  I don't recall
14  that ever being the case, that PPL was ever
15  present during a visit.
16       Q.    So, at different times, I believe
17  you were not only a service coordinator, I call
18  a front line service coordinator, but you were
19  also the supervisor of them; do you recall that
20  time frame?
21       A.    Yes, I do.
22       Q.    Okay.  And you were, in fact, the
23  service coordinator for one of the participants
24  that is related to Mr. Talarico, who
25  Mr. Talarico worked for.
```

## Trial Day 1 - October 16, 2023

1          Do you recall that?

2     A.    I do not.

3     Q.    Okay.  No worries.

4          And in the self-directed services

5   models, it is the participant who has the

6   ultimate authority about how an individual will

7   work in their home; correct?

8     A.    Yeah, yes.

9     Q.    It's the participant employer who

10  makes the ultimate determination of how they

11  will do those specific job duties listed in the

12  ISP; correct?

13    A.    Can you rephrase that?

14    Q.    Sure.

15    A.    The participant -- yes.

16    Q.    Yeah.  It's the participant employer

17  who determines how the services will be

18  performed in their home under the ISP; correct?

19    A.    Yeah, based on what the ISP -- how

20  the ISP is written and what the hours are

21  approved for.

22    Q.    Got it.  And the ISP has some, what

23  I call, program parameters as to what those

24  specific jobs are; correct?

25    A.    Yes.

1       Q.    And, in fact, the Direct Care

2    Workers are not supposed to provide services

3    that are, what I call, medical or nursing in

4    nature; correct?

5       A.    Correct.

6       Q.    And it's also true a participant

7    employer can hire multiple Direct Care Workers

8    at the same time, if they so choose; right?

9       A.    Yes.

10      Q.    And there is no requirement that a

11   participant employer terminate a Direct Care

12   Worker first before hiring a new one; correct?

13      A.    Not to my knowledge.

14      Q.    So what happens, what actions does a

15   participant employer take when they want to

16   terminate a particular Direct Care Worker?

17      A.    I don't remember what the process

18   was.  I don't.  There is a process, there was a

19   process through Public Partnerships.  I just

20   don't recall what it was.

21      Q.    And the substantive decision to

22   terminate somebody, does that ultimately rest

23   with the participant employer?

24      A.    Yes, that would be their decision,

25   unless there was something more egregious, I

Trial Day 1 - October 16, 2023

1    believe, but I -- generally speaking, yes, it

2    was the consumer's choice, you know, if they

3    were also acting as their -- as the common law

4    employer, who they hired and fired.

5         Q.    And isn't it true that PPL played no

6    role in that determination by the participant

7    employer to terminate a Direct Care Worker?

8         A.    As far as I know.

9         Q.    And PPL has no role in reviewing any

10   of the actions you took as a service

11   coordinator for a participant employer, do

12   they?

13        A.    No.

14        Q.    They have -- they're not -- you're

15   -- PPL is not required to make reports about

16   any of your communications with participant

17   employers, do they?

18        A.    Not to my knowledge.

19        Q.    And PPL doesn't require you to make

20   reports to them about your communications with

21   the participant employers you serve or work

22   with?

23        A.    I'm sorry.  You broke up there.  Can

24   you repeat that?

25        Q.    Oh, sure.  Sorry.  I can repeat

Trial Day 1 - October 16, 2023

1    that.

2            PPL does not require you to make any

3    reports about your communications with the

4    participant employers, do they?

5        A.    I don't recall that, no.

6        Q.    And certainly, PPL has no authority

7    to terminate your role as a service

8    coordinator; correct?

9        A.    Correct.

10        Q.    That always rests with AIM; correct?

11        A.    Correct.

12        Q.    One of the program parameters, and I

13    believe you were asked some questions about

14    this on direct exam, is if a DCW works more

15    hours that are outside of the hours allocated

16    in the ISP.

17            Do you recall your testimony about

18    that?

19        A.    Can you repeat that again?  I'm

20    sorry.

21        Q.    Sure.  Yeah.  I want to orient you

22    -- previously from questions from Attorney

23    Webber, you had answered some questions about

24    what happens if a Direct Care Worker works

25    hours that are above and beyond what's

## Trial Day 1 - October 16, 2023

116

1   for Abilities in Motion?

2       A.    Yes.

3       Q.    And when was that?

4       A.    2013.

5       Q.    And why did you stop working for

6   Abilities in Motion at that time?

7       A.    Everything switched over to PPL.

8       Q.    When did you first hear of PPL?

9       A.    August of the year -- of 2012.

10      Q.    What, if anything, did you have to

11  do to make the change from Abilities in Motion

12  to PPL?

13      A.    I filled out a lot of documents.

14      Q.    Okay.  Let me direct your attention

15  to Plaintiff's Exhibit 92, which has been

16  previously admitted, and specifically to Page

17  277 of Exhibit 92.

18                  ATTORNEY WEBBER:   And

19  Mr. Scherman, if you can show the next -- this

20  says Page 1 of 3 at the top.  Can you just show

21  the next couple of pages so Mr. Talarico can

22  see the full document?  Why don't you just stay

23  there on Page 3.

24  BY ATTORNEY WEBBER:

25      Q.    Mr. Talarico, do you recognize this

## Trial Day 1 - October 16, 2023

117

| | | |
|---|---|---|
| 1 | | document titled DCW Agreement? |
| 2 | A. | Yes. |
| 3 | Q. | And what's the date on this -- the |
| 4 | | last page of this agreement? |
| 5 | A. | 11/28/12. |
| 6 | Q. | Okay. |
| 7 | A. | 2012. |
| 8 | Q. | Is this one of the documents you had |
| 9 | | to fill out to make the change over from |
| 10 | | Abilities in Motion to PPL? |
| 11 | A. | Yes. |
| 12 | Q. | And whose signatures are those on |
| 13 | | Page 3? |
| 14 | A. | E███ and myself. |
| 15 | Q. | Now, did E███ require that you sign |
| 16 | | this agreement? |
| 17 | A. | No. |
| 18 | Q. | Who required that? |
| 19 | A. | PPL. |
| 20 | Q. | How did you get this form? |
| 21 | A. | It was mailed to E███ |
| 22 | Q. | And do you know where it was mailed |
| 23 | | from? |
| 24 | A. | PPL. |
| 25 | Q. | Turning back to Page 277, the first |

Trial Day 1 - October 16, 2023

118

1    page of the agreement, the -- the top half of

2    that page that has typewritten information, do

3    you see that?

4         A.    Yes.

5         Q.    Was that something that you or E█████

6    added to the document?

7         A.    No, it is not.

8         Q.    Okay.  When you first saw the

9    document, was that already filled out?

10        A.    Yes.

11        Q.    Okay.  Did you receive DCW

12   agreements for the other three individuals you

13   were working with, M████  E████, and K█████?

14        A.    Yes, I did.

15        Q.    With respect to M████  E████  and

16   K█████, did -- did any of them ask you to enter

17   into a formal DCW agreement with them?

18        A.    I'm not sure what you're saying.

19        Q.    Okay.  With respect to -- let me

20   just take it one at a time.

21             With respect to M████  who asked you

22   to sign the DCW agreement?

23        A.    When I went on shift, she brought

24   the paper to me.  If I don't sign it, I won't

25   get paid.

1    Q.    Okay.  And do you know where that

2   document came from?

3    A.    PPL.

4    Q.    Turning to Page 283 of Plaintiff's

5   Exhibit 92.  Do you recognize this document?

6    A.    Yes.

7    Q.    Okay.  What's this?

8    A.    Withholding taxes, tax withholding.

9    Q.    Was this part of the packet that you

10   were sent to complete?

11   A.    Yes.

12   Q.    And who was it sent to you by?

13   A.    PPL.

14   Q.    Turning to Page 205 of Exhibit 92.

15        Do you recognize this document?

16   A.    Yes.

17   Q.    And it says at the top it's Page 1

18   of 3.

19             ATTORNEY WEBBER:  So

20   Mr. Scherman, if you could just show the next

21   couple pages so that Mr. Talarico can see the

22   whole thing.

23   BY ATTORNEY WEBBER:

24   Q.    What is "requalification"?

25   A.    You have to requalify to be a

## Trial Day 1 - October 16, 2023

1  caregiver every two years.

2  　　　Q.　　Was -- so what's the date on this

3  particular requalification form?

4  　　　A.　　10/21/2014.

5  　　　Q.　　Okay.  So this was a year after the

6  transition to PPL?

7  　　　A.　　Yes.

8  　　　Q.　　But was this -- was this just

9  required because of the transition or did you

10 have to do this on other occasions?

11 　　　A.　　Well, for the transition, but we had

12 to do it every two years, requalification.

13 　　　Q.　　Okay.  And when you say you "had to

14 do it," who told you you had to do it?

15 　　　A.　　PPL.

16 　　　Q.　　How did you know when it was time to

17 go through requalification?

18 　　　A.　　I didn't.  We get this in the mail.

19 　　　Q.　　And you say you got it in the mail

20 from whom?

21 　　　A.　　PPL.

22 　　　Q.　　Turning to Page 206 of the

23 requalification form, do you see the Section 1

24 at the top where it says "mandatory

25 qualification requirements"?

Trial Day 1 - October 16, 2023

121

```
 1        A.    Yes.

 2        Q.    Who is required -- who set those

 3   requirements?

 4        A.    They were on there when I received

 5   this paperwork.

 6        Q.    Okay.  And who did you receive it

 7   from?

 8        A.    PPL.

 9        Q.    If you had not completed the

10   requalification process, would you have been

11   permitted to continue working for PPL?

12        A.    No.

13              ATTORNEY FOSTER:  Objection.

14   Foundation, Your Honor.

15              THE COURT:  Granted.

16   Sustained.  Lay a foundation.

17   BY ATTORNEY WEBBER:

18        Q.    Turning back to Page -- let's go

19   with 251 of Exhibit 92.  Sorry.  Oh, wrong -- I

20   apologize.  It was the wrong one.

21              Turning to Page 208 of Exhibit 92.

22   Looking at the portion right above your

23   signature on Page 3 -- on Page 3 of the

24   agreement --

25        A.    Okay.
```

Trial Day 1 - October 16, 2023

1      Q.    Do you see the second sentence says

2    "I understand I must sign and return this form

3    as a condition of employment in this program --

4      A.    Yes.

5      Q.    -- and that I cannot begin working

6    until this form is completed and returned to

7    the VF/EA"?

8      A.    Yes.

9      Q.    Okay.  Okay.  Based on the documents

10   you received and signed, did you have an

11   understanding as to what would happen if you

12   did not sign the documents presented to you?

13     A.    I would not be paid.

14     Q.    Did you have to undergo a criminal

15   background check?

16     A.    Yes.

17     Q.    And who required that?

18     A.    PPL.

19              ATTORNEY FOSTER:  Objection,

20   Your Honor.  Foundation.

21   BY ATTORNEY WEBBER:

22     Q.    Let's go back to Page 205 of Exhibit

23   92.  Sorry, to 206, it's the mandatory

24   qualifications section.

25              Mr. Talarico, do you see that there

142

```
 1   pay period.
 2        Q.    Okay.  Could your participant call
 3   PPL and say, "I'm calling in to report the
 4   number of hours E      worked" -- I'm sorry --
 5   "number of hours Ralph worked," and have you
 6   paid that way?
 7        A.    No.
 8        Q.    Did you ever change the way in which
 9   you reported your time?
10        A.    I'm not sure what you mean.
11        Q.    Did you always use the paper time
12   sheets or did you start --
13        A.    No.
14        Q.    -- submitting your time some other
15   way?
16        A.    No.  We had a portal near the end.
17        Q.    And when you say "a portal," is that
18   a computer portal?
19        A.    Yes.
20        Q.    And who created that portal?
21        A.    PPL.
22        Q.    Did you keep copies of your time
23   sheets, like the one we were just looking at on
24   Page --
25        A.    Yes, I did.
```

Trial Day 1 - October 16, 2023

196

```
 1        A.      I went to ▮▮▮ through Abilities in
 2   Motion.
 3        Q.      Okay.  And the same for M▮▮▮?
 4        A.      No.  M▮▮▮ was a little bit later.
 5        Q.      Okay.  Were you still working at
 6   Abilities in Motion when you went to work for
 7   M▮▮▮?
 8        A.      Yes.
 9        Q.      Okay.
10        A.      Or either Abilities in Motion or...
11        Q.      UDS?
12        A.      UDS.
13        Q.      Okay.  And after about six months,
14   you stopped working at UDS; right?
15        A.      Yes.  I went to Abilities in Motion.
16        Q.      Okay.  And at Abilities in Motion,
17   did you know what services Abilities in Motion
18   did, what type of services they provided?
19        A.      Yes, I did.
20        Q.      Did you have to go through an
21   interview with them?
22        A.      Yes, I did.
23        Q.      And did you get hired by Abilities
24   in Motion?
25        A.      Yes, I did.
```

Sappx0055

Trial Day 1 - October 16, 2023

197

1        Q.    And did you have to fill out

2   paperwork for Abilities in Motion?

3        A.    Some, yes.

4        Q.    Like a W-4?

5        A.    Yes.

6        Q.    And did you have to go through a

7   background check?

8        A.    Yes, I did.

9        Q.    Do you remember -- did you have to

10  go through a drug and alcohol test?

11       A.    Yes, I did.

12       Q.    Do you recall if you had to go --

13  had a criminal background check done and if

14  there was a positive or negative history at

15  that time?

16       A.    Yes.

17            ATTORNEY SREY:   Objection,

18  compound.

19  BY ATTORNEY FOSTER:

20       Q.    And what was the result of that

21  background check?

22       A.    I had a summons summary.

23       Q.    So it had a positive result on the

24  background check?

25       A.    Yes.

Trial Day 1 - October 16, 2023

198

1        Q.    And in any case, did they still
2   continue to hire you despite that background
3   check?
4        A.    Yes, they did.
5        Q.    And when you were at Abilities in
6   Motion, did you have an understanding that
7   Abilities in Motion was acting as an agency
8   where they would assign you to go work in
9   somebody's home, such as B███ or M████?
10       A.    Yes.
11       Q.    And is that how you first came to
12  work for both B███ --
13       A.    Just B███.
14       Q.    Okay.  And then later on when you
15  went back to UDS, they assigned you to work for
16  M███, or M████, as you call her?
17       A.    I didn't go back to UDS.
18       Q.    Okay.  Where did you go after
19  Abilities in Motion?
20       A.    I went to PPL.
21       Q.    Okay.  So do you have an
22  understanding that you were actually working
23  for M████ before 2013?
24       A.    Yes.
25       Q.    So who -- PPL didn't start to

Sappx0057

## Trial Day 1 - October 16, 2023

```
 1   provide any vendor fiscal service agents until
 2   2013.  Who were you working with prior to 2013?
 3        A.    Abilities in Motion.
 4        Q.    So weren't you working with M██████
 5   while you were working at Abilities in Motion?
 6   Do you recall that now?
 7        A.    Yes, I do.
 8        Q.    And in terms of that, were you shown
 9   a document for -- let's take M██████, okay, and
10   then -- I know you worked for a number of
11   different people.  I'll try to be very clear
12   which of the persons that you were working for
13   that I'm directing my questions.
14             When you went to work, you were
15   assigned to work for M██████ at Abilities in
16   Motion, do you remember them showing you a
17   document about what kinds of services, the
18   specific job duties you had to do for M██████?
19        A.    I didn't go through the agency for
20   M██████.  She asked me to work for her on the
21   side when I was working with E██████
22        Q.    On the side, did you say?
23        A.    She asked me on the side, if I could
24   work with her through Abilities in Motion.
25        Q.    Okay.  So you -- she -- you were
```

Trial Day 1 - October 16, 2023

200

1  working with E█████ as of -- do you recall what

2  date you began working for E████?

3      A.    No, I don't.

4      Q.    It was some time before 2013; right?

5      A.    Yes, it was.

6      Q.    It was a number of years before

7  2013, wasn't it?

8      A.    2011, I think.

9      Q.    So a couple years?

10     A.    Yeah.

11     Q.    Okay.  And so you had been hired and

12 interviewed and assigned to work for E████

13 through AIM.  And you're living in the same

14 building; correct?

15     A.    Not at that time.

16     Q.    Okay.  How did you come -- how did

17 you come to go to work for M████, as you said,

18 on the side?

19     A.    All the handicapped people in there

20 are very close.

21     Q.    Yeah.  In the building, just to --

22     A.    In the building.

23     Q.    Yeah, I just wanted want to make the

24 record clear.

25     A.    M█████ and E████ were very good

## Trial Day 1 - October 16, 2023

```
1    friends.  And she came up to his apartment and

2    we got to talking, and she asked me if I could

3    work for her a couple hours a night, and I said

4    yes.

5         Q.    Okay.  And at that time when she

6    asked if you could work for her, did you talk

7    with PPL before you could go work for M████ at

8    that time?

9         A.    I was not employed by PPL at that

10   time.

11        Q.    It was before then; right?

12        A.    Correct.

13        Q.    So you were already working and had

14   been hired by M████ prior to PPL coming into

15   vendor fiscal services; correct?

16        A.    Yes.

17        Q.    And it's the same for E████ you had

18   already been assigned to E███ through AIM, and

19   you had been performing all those services for

20   a couple years for E███ before PPL came on the

21   scene; correct?

22        A.    That is correct.

23        Q.    So PPL had absolutely no role

24   whatsoever in your hiring job description until

25   2013; correct?
```

Trial Day 1 - October 16, 2023

211

```
 1    right?
 2                    THE WITNESS:  No.
 3                    THE COURT:  You knew that?
 4                    THE WITNESS:  Yes.
 5    BY ATTORNEY FOSTER:
 6         Q.    And at that period of time, you -- I
 7    believe you said that you were opening up the
 8    mail for E█████ correct?  That was one of the
 9    things you did?
10         A.    Yes, it is.
11         Q.    Okay.  And do you recall that he
12    received a whole packet of forms to be -- to be
13    filled out to transition to the new vendor
14    fiscal agent PPL?
15         A.    Yes.
16         Q.    And did you help him fill out those
17    forms?
18         A.    Yes.  E███ can't hold a pen.
19         Q.    Right.  So E████ has some mobility
20    issues and, at times, you would help him
21    complete forms; is that fair to say?
22         A.    That's correct.
23         Q.    Okay.  And at the time when he
24    received what was called the transition packet,
25    do you recall, specifically, what was included,
```

Sappx0061

Trial Day 1 - October 16, 2023

244

| | |
|---|---|
| 1 | THE WITNESS:  That's why I |
| 2 | said that. |
| 3 | BY ATTORNEY FOSTER: |
| 4 | Q.    Did you ever meet with the service |
| 5 | coordinator for E███, for E████? |
| 6 | A.    No. |
| 7 | Q.    Did you ever meet with the service |
| 8 | coordinator with M████? |
| 9 | A.    No. |
| 10 | Q.    And do you recall -- |
| 11 | ATTORNEY FOSTER:  If you could |
| 12 | show Mr. Talarico, please, JX 337.  It's |
| 13 | Bates-stamped 903.  And if you don't mind, |
| 14 | thank you, enlarging that a little bit. |
| 15 | BY ATTORNEY FOSTER: |
| 16 | Q.    Mr. Talarico, do you remember that |
| 17 | for each of your participant employers that you |
| 18 | worked for, you had to fill out an I-9 form? |
| 19 | A.    Employment eligibility verification. |
| 20 | Q.    Yes.  Do you recall doing that for |
| 21 | each of the four that you worked for? |
| 22 | A.    Yes.  Well, I don't remember, but |
| 23 | apparently I did. |
| 24 | Q.    Okay.  Let me show you.  That's kind |
| 25 | of why sometimes we have the documents, just to |

Trial Day 1 - October 16, 2023

245

```
 1   refresh your memory.
 2             Do you recall, is that your
 3   signature in the middle of this?
 4        A.    Yes, that's my signature.
 5        Q.    Right where it says, "employee
 6   signature"?
 7        A.    Yes.
 8        Q.    Okay.  And is that your handwriting
 9   on the top half of this document?
10        A.    Yes.
11        Q.    And could you scroll down a little
12   bit?
13             Do you know who filled in the
14   information underneath your signature?
15        A.    No, I do not.
16        Q.    Do you recall that you filled this
17   out in the presence of E█████ J█████ -- pardon
18   me -- E█████?
19        A.    I didn't fill this bottom part out.
20        Q.    Okay.  No, but -- I understand that.
21   Was E█████ with you when you filled this out?
22        A.    She handed me and said I need to
23   fill the top part out.
24        Q.    Okay.  And did --
25                  THE COURT:  So wait, just for
```

Sappx0063

Trial Day 1 - October 16, 2023

246

```
 1   the record.
 2                   ATTORNEY FOSTER:  Yes.
 3                   THE COURT:  From Section 2 on
 4   down, you did not fill that out?  Do you see
 5   where it says Section 2?
 6                   THE WITNESS:  Yes.  I did not
 7   fill any of that out.
 8                   THE COURT:  Anything below
 9   that.
10                   THE WITNESS:  Well, I only --
11   no, I did not.
12                   THE COURT:  All right.
13   BY ATTORNEY FOSTER:
14       Q.   And in Section 2, it's entitled
15   Employer Review and Verification.
16            Do you see that?
17       A.   Yes, I see it.
18       Q.   Nobody from PPL was with you or
19   filled this form out, to your knowledge; did
20   they?
21       A.   Correct.
22       Q.   And, in fact, it looks like at the
23   printed name, it's a P█████; do you see that?
24       A.   A what?
25       Q.   If you look at where it says, "print
```

Trial Day 1 - October 16, 2023

247

1   name" on this form, it looks like P████    and

2   I'm not going to say the last name, but do you

3   see that?

4        A.    Yeah.  I don't know who that is.

5        Q.    Okay.  Do you know if P███ had a

6   sister P████ or a daughter?

7        A.    No, she didn't have no sisters.

8        Q.    Okay.  And in any case, you know

9   that this isn't you filling out and verifying

10  that you are eligible to work in the United

11  States?

12       A.    Right.

13       Q.    Do you recall doing this for -- just

14  generally, if you recall doing it for E████?

15       A.    No.

16       Q.    Or for M████?

17       A.    No.

18       Q.    Okay.  Or for K████?

19       A.    No.

20       Q.    So if you could scroll down, it's

21  PPL, it's the same exhibit, JX 337, it's

22  Bates-stamped 909, please.

23            So this is one of the -- it's

24  entitled DCW Requalification Form, and Kevin is

25  going to scroll through -- there's three pages

## Trial Day 1 - October 16, 2023

248

1    to it -- so that you can see the document that

2    we're talking about.

3            Do you recall executing this

4    document with E████?

5        A.    We probably did.  I just can't

6    remember.

7        Q.    There are many, many forms you had

8    to fill out?

9        A.    Yes.

10               ATTORNEY FOSTER:  And if you

11   go to the first page, if you would, Kevin, on

12   Bates No. 909.

13   BY ATTORNEY FOSTER:

14       Q.    You recognize your signature?

15       A.    Yes.

16       Q.    And it looks like you signed this on

17   October 28th of 2014; do you recall that?

18       A.    Yes.

19       Q.    And then if you scroll to the next

20   page, there's a series -- it says, "Section 1,

21   mandatory qualification requirements."  Do you

22   see that?

23       A.    Yes.

24       Q.    And there are checked boxes next to

25   each.  Do you see that?

Trial Day 1 - October 16, 2023

249

```
 1        A.    Yes.

 2        Q.    Were you aware that the State

 3    required you to have a valid Social Security

 4    number to be a Direct Care Worker in this

 5    program?

 6                    ATTORNEY WEBBER:  Objection,

 7    foundation.

 8    BY ATTORNEY FOSTER:

 9        Q.    If you were aware.

10        A.    I wasn't aware of that, but I know

11    you need to have a Social Security number for

12    anything.

13        Q.    Okay.  And if you scroll down to the

14    second half of this document, do you see where

15    it looks like there's handwritten in E█?

16        A.    Yes.

17        Q.    Do you recall that E█ filled that

18    in?  Are those her initials, if you know?

19        A.    Those are her initials, but I wasn't

20    there present.

21        Q.    Okay.  And in situations like this,

22    you would just fill out your part of the form

23    and give them to E█ to fill out hers?

24        A.    Correct.

25        Q.    And you wouldn't necessarily be
```

250

1    present at the time she's executing these?

2         A.    That's right.

3                ATTORNEY FOSTER:  And if you

4    could turn and show Mr. Talarico, please,

5    Exhibit JX 341.

6    BY ATTORNEY FOSTER:

7         Q.    This is the packet of documents that

8    appear to be between you and E█████.

9                If you can take a look at that.  Do

10   you recall -- I believe you said that you would

11   open up the mail for E█████ and help him fill

12   out the forms because of his disability;

13   correct?

14        A.    Yes.

15        Q.    So on this form on Bates No. 801,

16   please, this is a DCW agreement.  Do you see

17   that?  And it has, at the top, E████'s name,

18   your name as the DCW, and it appears that there

19   are handwritten checks and a yes/no/yes box.

20        A.    Correct.

21        Q.    Do you recall doing those in E█████'s

22   presence?

23        A.    Yes.

24        Q.    And if you can scroll to Bates 803,

25   please.

284

```
 1            UNITED STATES DISTRICT COURT

 2           EASTERN DISTRICT OF PENNSYLVANIA

 3                      -  -  -
   RALPH TALARICO,            ) CIVIL DIVISION
 4   Individually and on      )
   behalf of all others       ) NO. 5:17-CV-02165-JLS
 5   similarly situated,      )
                              )
 6          Plaintiff,        )
                              )
 7                            )
                              )
     -vs-                     )
 8                            )
                              )
 9                            )
   PUBLIC PARTNERSHIPS,       )
10   LLC, doing business as   )
   PCG PUBLIC                 )
11   PARTNERSHIPS,            )
                              )
12          Defendant.        )
                              )
13                            )
                              )
14

15
                      -  -  -
16

17         TRIAL HELD ON TUESDAY, OCTOBER 17, 2023
                    9:30 a.m.
18
                     VOLUME II
19

20

21   REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
   WITHOUT AUTHORIZATION FROM THE CERTIFYING
22   AGENCY

23

24

25
```

## Trial Day 2 - October 17, 2023

285

```
 1   COUNSEL PRESENT:

 2
     For the Plaintiff:
 3
     NICHOLS KASTER PLLP, Esq.
 4   By:  Rachhana Srey, Esq.
           Helen Coleman, Esq.
 5   80 South 8th Street
     4600 IDS Center
 6   Minneapolis, MN 55402
     Rsrey@nka.com
 7   Hcoleman@nka.com

 8   COHEN MILSTEIN SELLERS & TOLL, PLLC
     BY:   Christine E. Miller, Esq.
 9         Christopher Scherman, Esq.
     1100 NEW YORK AVENUE, N.W.
10   SUITE 500
     WASHINGTON, DC 20005
11   Cwebber@cohenmilstein.com
     Cscherman@cohenmilstein.com
12
     For the Defendant:
13
     ECKERT SEAMANS CHERIN & MELLOTT, LLC
14   BY:   Walter M. Foster, Esq.
           Trevin C. Schmidt, Esq.
15         Carson Shea, Esq.
           Clare Gallagher, Esq.
16         Laura Cottington, Esq.
           Kevin Freitas, Esq.
17   Two International Place
     16th Floor
18   Boston, MA 02110
     Wfoster@eckertseamans.com
19   Tschmidt@eckertseamans.com
     Cshea@eckertseamans.com
20   Cgallagher@eckertseamans.com
     Lcottington@eckertseamans.com
21   Kfreitas@eckertseamans.com

22

23

24

25
```

Sappx0070

Trial Day 2 - October 17, 2023

286

```
 1                    I  N  D  E  X

                                                Page
 2   CHRISTINE COTTO
        DIRECT                                  288
 3      CROSS                                    321
        REDIRECT                                 351
 4   TONI ROSS
        DIRECT                                  353
 5      CROSS                                    389
        REDIRECT                                 429
 6   SASCHELLE MANDOZA
        DIRECT                                  434
 7      CROSS                                    457
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## Trial Day 2 - October 17, 2023

290

```
 1   Direct Care Worker in Pennsylvania?
 2        A.    January 2013.
 3        Q.    Okay.  And prior to working as a DCW
 4   in January of 2013, what industry did you spend
 5   most of your career working in?
 6        A.    Also my career was in the insurance
 7   industry.
 8        Q.    Okay.  And as a Direct Care Worker,
 9   did you provide services to a specific
10   participant?
11        A.    Yes, I did.
12        Q.    Okay.  And for purposes of today,
13   we're going to just use first names.  What was
14   your participant's first name?
15        A.    S███.
16        Q.    Okay.  Did you know S███ prior to
17   providing services to him?
18        A.    Yes.
19        Q.    How did you all know each other?
20        A.    We met through a mutual friend of
21   ours.
22        Q.    Did you provide services to any
23   other participant as a DCW?
24        A.    No, I did not.
25        Q.    Okay.  And what were your general
```

Sappx0072

## Trial Day 2 - October 17, 2023

291

```
1    job duties as a DCW?
2         A.    Medication dispension, grocery
3    shopping, housekeeping, meal prep, making
4    doctor appointments.
5         Q.    Okay.  And do you still currently
6    work as a DCW in Pennsylvania?
7         A.    No, I do not.
8         Q.    All right.  And when did you stop
9    working for PPL in Pennsylvania?
10        A.    2022.
11        Q.    Okay.  And when you first started
12   providing services to S███    in January of 2013,
13   did you live with him?
14        A.    No, I did not.
15        Q.    Did you ever live with S███   when
16   you were providing services to him through PPL?
17        A.    Yes.
18        Q.    Okay.  And what time period did you
19   live with S███ ?
20        A.    2014.
21        Q.    Okay.  Did you live with him the
22   rest of the time you were his DCW in
23   Pennsylvania?
24        A.    Yes.
25        Q.    Okay.  So let's talk about when you
```

Sappx0073

Trial Day 2 - October 17, 2023

292

1  first started working as a DCW.

2           What, if anything, did you have to

3  do to start providing services as a DCW?

4       A.   I had to fill out an enrollment

5  packet through Public Partnerships.

6       Q.   And how did you receive that packet?

7       A.   I received it through the mail.

8       Q.   Okay.  And who sent it to you in the

9  mail?

10      A.   Public Partnerships.

11      Q.   Okay.  And Ms. Cotto, do you have a

12 binder of exhibits with you today?

13      A.   Yes.  It's in a sealed envelope.

14      Q.   Okay.  Are you able to go ahead and

15 open that sealed envelope, please?

16      A.   Yes.

17      Q.   And take your time.

18      A.   Okay.  I have it here.

19      Q.   All right.  Wonderful.  If you could

20 open up that binder and turn to what's labeled

21 as JX 372, and let me know once you're there.

22      A.   Okay.  I have it open here.

23      Q.   Okay.  And then are you seeing a

24 document entitled Direct Care Worker

25 Informational Packet?

Trial Day 2 - October 17, 2023

293

1        A.    Yes.

2        Q.    Okay.  Do you recognize this

3  document?

4        A.    Yes.

5        Q.    When would you have received this

6  document?

7        A.    That would have been included in the

8  enrollment packet.

9        Q.    Okay.  And on the first page of this

10  informational packet, which at the bottom you

11  should see Bates numbers and it should say

12  1924, if you look at the second paragraph, the

13  very last sentence, it says, "Therefore, all

14  the DCW paperwork must be signed and returned

15  to PPL before payments can be issued to you."

16            Do you see that?

17        A.    Yes.

18        Q.    Okay.  And did you understand, at

19  the time you filled out PPL's enrollment

20  packet, that you had to sign and return those

21  forms to be paid for your work as a DCW?

22        A.    Yes.

23            ATTORNEY SHEA:  Objection.

24  Mischaracterizes the enrollment packet, the

25  witness' testimony about what it is.

Trial Day 2 - October 17, 2023

294

```
 1                    ATTORNEY COLEMAN:  Your Honor,
 2    the packet itself states --
 3                    THE COURT:  Yeah, your
 4    objection is overruled.  It says what it says.
 5    BY ATTORNEY COLEMAN:
 6        Q.    Okay.  And the sentence I read
 7    references all DCW paperwork, and then below,
 8    do you see a list of required forms for
 9    employment?
10        A.    Yes.
11        Q.    Okay.  And take a minute to review
12    that list of required employment forms, and
13    then I'll have a question for you once you're
14    done reviewing them.
15        A.    Okay.
16        Q.    Are those forms listed the forms you
17    had to fill out as part of the enrollment
18    packet?
19        A.    Yes.
20        Q.    Okay.  And who required you to fill
21    out and submit those forms?
22                    ATTORNEY SHEA:  Objection,
23    foundation.
24                    THE WITNESS:  Public
25    Partnerships.
```

Trial Day 2 - October 17, 2023

295

1              THE COURT:  The objection is
2    noted.  Please rephrase the question.
3                   ATTORNEY COLEMAN:  Okay.
4    BY ATTORNEY COLEMAN:
5        Q.    To your understanding, who required
6    you to fill out and submit those forms?
7        A.    To my understanding, it was Public
8    Partnerships.
9        Q.    And what's the basis for your
10   understanding that it was Public Partnerships
11   that required you to fill out those forms?
12       A.    Because they're the ones -- Public
13   Partnerships is the ones that required the
14   enrollment packet for all new DCWs to be good
15   to go to provide services.
16       Q.    Okay.  And who, to your knowledge,
17   and if you know, who drafted these forms?
18                   ATTORNEY SHEA:  Objection,
19   foundation.
20                   THE WITNESS:  I have no
21   knowledge.
22                   THE COURT:  She said if she
23   knows.
24   BY ATTORNEY COLEMAN:
25       Q.    Okay.  Whose header was listed on

## Trial Day 2 - October 17, 2023

296

```
1   all of the forms that you had to fill out?
2        A.    Public Partnerships.
3        Q.    Okay.  Did your participant draft
4   these forms?
5                   ATTORNEY SHEA:  Objection,
6   foundation.
7                   THE WITNESS:  No, he did not.
8   BY ATTORNEY COLEMAN:
9        Q.    Okay.  Do you know if your
10  participant asked PPL to create these forms?
11                  ATTORNEY SHEA:  Objection,
12  foundation.  Hearsay.
13                  THE COURT:  She said --
14  let's -- let's just stop this.  I mean, she
15  knows.
16  BY ATTORNEY COLEMAN:
17       Q.    Do you know?
18                  THE COURT:  She asked if she
19  knows if S█████ was the one who prepared these
20  forms.  So is it any secret that S████ then
21  prepared these forms?  I mean, this is a
22  nonjury trial.  There's no jury here, just me,
23  and I understand the facts.  All right?
24                  ATTORNEY COLEMAN:  Yes, Your
25  Honor.
```

Sappx0078

Trial Day 2 - October 17, 2023

297

1    BY ATTORNEY COLEMAN:

2        Q.    If you can turn to the next page,

3    Bates 1925, let me know once you're there.

4        A.    Okay.

5        Q.    In bold underneath the first

6    paragraph, it states, "This packet contains

7    instructional documents on the following topics

8    that will help you be a successful DCW."

9            Did I read that correctly?

10       A.    Yes.

11       Q.    Okay.  And those forms referenced

12   that this document states, will help you be a

13   successful DCW, were those the documents in the

14   enrollment packet?

15       A.    Yes.

16       Q.    Okay.  And at the bottom of the

17   page, again, Bates 1925, it says, "If you need

18   additional help, call PPL's customer service."

19           Did you ever call PPL's customer

20   service line for help filling out the

21   employment forms?

22       A.    Yes.

23       Q.    Okay.  How many times, if you

24   recall, did you call PPL for help filling out

25   the employment forms?

Trial Day 2 - October 17, 2023

298

1          A.      I'd say probably twice I had a

2     couple of questions regarding the forms.

3          Q.      And were they able to help you with

4     your questions?

5          A.      Yes.

6          Q.      Okay.  If you turn a few pages

7     further, it's going to be Bates stamped 1929,

8     and it should be a document entitled

9     "Instructions for DCW Employment Agreement."

10              Do you see that?

11         A.      Yes.

12         Q.      Okay.  And then under the first

13    paragraph where it says, "What is the purpose

14    of this form," it states "This agreement tells

15    you the policies, qualifications and duties of

16    the Direct Care Worker."

17              Did I read that correctly?

18         A.      Yes.

19         Q.      Okay.  Did you have to sign -- to

20    your knowledge, did you have to sign a DCW

21    agreement to be able to work as a DCW?

22         A.      Yes, I did.

23         Q.      All right.  And I'm going to have

24    you flip now to a different exhibit.  It's in

25    your binder as DX 301, so Defendant's Exhibit

299

1    301.

2         A.    Okay.

3         Q.    And I'll represent to you that this

4    is a compilation of documents that PPL's

5    attorneys produced to us relating to your work

6    as a DCW.

7              If you look at the first page, it's

8    entitled DCW Agreement; is that correct?

9         A.    Yes.

10        Q.    Okay.  And go ahead and flip to the

11   next two pages so that you can see the entire

12   agreement.

13        A.    Okay.

14        Q.    Do you recognize this document?

15        A.    Yes, I do.

16        Q.    Okay.  And to your understanding,

17   who created this agreement?

18        A.    To my understanding, it was Public

19   Partnerships.

20        Q.    Okay.  And who did you receive this

21   agreement from?

22        A.    From Public Partnerships.

23        Q.    Okay.  And is that your signature on

24   the last page of the agreement, dated January

25   12th of 2013?

Trial Day 2 - October 17, 2023

300

1          A.     Yes, it is.

2          Q.     Okay.  Were you required to sign

3     this document?

4          A.     Yes.

5          Q.     Okay.  And towards the bottom of the

6     very first page, it's right before Paragraph 1,

7     the last sentence states, "In order to

8     acknowledge the terms of my employment, I agree

9     to the following."

10              And then below that, there's 19

11    paragraphs with the terms of employment.

12              Do you see that?

13         A.     Yes.

14         Q.     Okay.  Who did you understand to

15    require those terms of employment?

16         A.     From my understanding, it was Public

17    Partnerships that required it.

18         Q.     Do you know if your participant

19    drafted any of these terms of employment?

20         A.     No, I do not.

21         Q.     Did you negotiate these terms of

22    employment with your participant?

23         A.     No, I did not.

24         Q.     Okay.  Could you change -- do you

25    know if you could change any of the terms of

Sappx0082

## Trial Day 2 - October 17, 2023

301

 1    employment?

 2         A.    No, I could not.  No.

 3         Q.    Okay.  And if you look at the very

 4    first paragraph of this agreement, it states

 5    that you had to undergo a criminal background

 6    check as a term of employment.

 7              Did you have to undergo a criminal

 8    background check before you could work as a

 9    DCW?

10         A.    Yes, I did.

11         Q.    Okay.  Do you know if your

12    participant would have wanted you to have to

13    undergo a criminal background check?

14         A.    No, he did not.

15         Q.    Once you completed all of the forms

16    in the employment packet, what did you do with

17    them?

18         A.    I had to mail them back certified

19    mail to Public Partnerships.

20         Q.    All right.  Have you heard of the

21    term "good-to-go" as it relates to PPL?

22         A.    Yes, I have.

23         Q.    Okay.  And what does "good-to-go"

24    mean in the context of PPL?

25         A.    It means all your paperwork was

1  filled out properly and your background check

2  came back clean.

3      Q.    Okay.  And what did you -- could you

4  be paid for your services prior to getting the

5  good-to-go from PPL?

6      A.    No, I could not.

7      Q.    How long did it take after you sent

8  in the required employment forms for you to get

9  a good-to-go from PPL?

10     A.    It varies but, in my example, it was

11  two months before it was completed.

12     Q.    Did you contact PPL between the time

13  you submitted the forms and the time PPL gave

14  you the good-to-go?

15     A.    Yes, I did.

16     Q.    Why did you contact them?

17     A.    I wanted to check on the status of

18  all the paperwork and the background check.

19     Q.    Okay.  And how many times did you

20  contact them about the good-to-go?

21     A.    It was about once a week, I would

22  call.

23     Q.    Did your participant also contact

24  PPL about your good-to-go status?

25     A.    Yes, he did.

Trial Day 2 - October 17, 2023

303

1      Q.    And what did you understand the
2  issue to be with your good-to-go status from
3  PPL?
4      A.    When I first filled out the
5  enrollment packet is when Public Partnerships
6  was assigned as the employer in Pennsylvania.
7  So there was a lot of transition going on and,
8  unfortunately, my original packet was misplaced
9  so I had to fill out another packet.
10     Q.    Do you know if your packet was ever
11  delivered to PPL?
12     A.    Yes, it was.  Per the certified
13  notice, somebody did sign for it at Public
14  Partnerships.
15     Q.    Okay.  And what did you have to do
16  since your enrollment packet had been lost?
17     A.    I had to fill out another one and
18  mail it again.
19     Q.    And if you had started providing
20  services prior to having to -- the good-to-go,
21  would you have been paid for that work?
22     A.    No.
23     Q.    Could your participant have paid you
24  for that work?
25     A.    No.

Trial Day 2 - October 17, 2023

304

1      Q.    Why not?

2      A.    He's on Social Security Disability.

3      Q.    Okay.  And how did you find out that

4  you had the good-to-go from PPL to start

5  providing services?

6      A.    I received a letter in the mail from

7  Public Partnerships.

8      Q.    Do you know the term "requalify" as

9  it relates to PPL?

10     A.    Yes.

11     Q.    What does that mean?

12     A.    Every two years, you would get a

13  recertification packet from Public Partnerships

14  that had to be filled out and sent back to

15  them.

16     Q.    Okay.  And if you had not taken the

17  steps to requalify with PPL, would you have

18  been permitted to continue working and getting

19  paid as a DCW?

20     A.    No.

21     Q.    Did your participant, S█████, have a

22  set number of hours for which he could receive

23  services?

24     A.    Yes.

25     Q.    Approximately how many hours was he

**Trial Day 2 - October 17, 2023**

305

1    authorized to receive?

2        A.    He was authorized to receive 80

3    hours per week.

4        Q.    Did that amount of hours ever

5    increase?

6        A.    Yes.

7        Q.    And what did it increase to?

8        A.    88 hours per week.

9        Q.    Okay.  And does S█████ have any other

10   DCWs providing services to him during the

11   period you were his DCW?

12       A.    No.

13       Q.    Okay.  So how many hours,

14   approximately, at the beginning, were you

15   working as a DCW?

16       A.    80 hours per week.

17       Q.    Okay.  And when the amount increased

18   to 88 hours per week, were you the one working

19   those hours?

20       A.    Yes.

21       Q.    Okay.  If you worked above the 80 or

22   88 hours that S█████ was authorized to receive,

23   would PPL pay you for those hours?

24              ATTORNEY SHEA:  Objection,

25   foundation.

1              THE WITNESS:  No.  No.

2    BY ATTORNEY COLEMAN:

3         Q.    Okay.  Did you have to record the

4    authorized hours that you worked as a DCW?

5         A.    Yes.

6         Q.    Who required you to record your

7    hours?

8         A.    Public Partnerships.  It was on

9    their website Better Health Online.

10        Q.    Okay.  And when you first started as

11   a DCW in January of 2013, did you do paper or

12   electronic time sheets?

13        A.    I did paper initially.

14        Q.    Okay.  How often did you have to

15   submit time sheets?

16        A.    Once per week.

17        Q.    And who set the schedule for

18   submitting time sheets?

19        A.    Public Partnerships.

20        Q.    Okay.  Could your participant change

21   that schedule, to your knowledge?

22        A.    No.

23        Q.    Okay.  And if you could turn now,

24   it's another exhibit in your binder entitled JX

25   356.  And it should say, "PPL Web Portal

Trial Day 2 - October 17, 2023

307

1  Instructional Manual."

2      A.    Okay.

3      Q.    Do you see that?

4      A.    Yes.

5      Q.    Okay.  Is the PPL web portal the

6  portal you've been referencing that you used

7  for time sheets?

8      A.    Yes.

9      Q.    Okay.  Would you use it for anything

10  other than time sheets?

11     A.    Yes.  I would use it to pull up my

12  pay stubs and eventually my W-2.

13     Q.    Okay.  And if you could turn to the

14  Bates stamp 626, it's Page 8 of the document,

15  it should have a header that says, "Direct Care

16  Worker:  How to create and submit a time

17  sheet."

18          Let me know if you see that.

19     A.    Okay.  I see that.

20     Q.    Okay.  And I know it's not the best

21  quality, but does this screen shot, under

22  Paragraph 2, look familiar to you?

23     A.    Yes.

24     Q.    Okay.  And is that what you would

25  see when you went to go submit your time sheets

Trial Day 2 - October 17, 2023

308

1  electronically?

2      A.    Yes.

3      Q.    Okay.  And do you see where it says,

4  "Time sheet status"?

5      A.    Yes.

6      Q.    Would that show whether it was --

7  what the status of your time sheets were when

8  you went to log in?

9      A.    Yes.  It would say either unpaid or

10  pending or paid.

11     Q.    Okay.  And if you could go ahead and

12  turn to Bates 633.  And I want to direct you to

13  Paragraph 22 once you're there.

14     A.    Okay.

15     Q.    Okay.  Paragraph 22 states, "On the

16  top of your time sheet, you will see red alerts

17  that tell you what is wrong with your time

18  sheet.  If you do not understand any or even

19  one of the messages, please call customer

20  service."

21           Do you see that?

22     A.    Yes.

23     Q.    Did you ever call PPL's customer

24  service related to time sheet issues?

25     A.    Yes, I did.

Trial Day 2 - October 17, 2023

309

1        Q.    Okay.  Did you and your participant

2   ever both sign off on a time sheet but then

3   have it not be paid by PPL?

4        A.    Yes.  Sometimes the system would get

5   stuck in a pending status so I would have to

6   call Public Partnerships' customer service team

7   to get that fixed.

8        Q.    Okay.  Did PPL ever require you to

9   electronically clock in and clock out as a DCW?

10        A.    Yes.

11        Q.    And, roughly, when did they start

12   requiring that?

13        A.    It was a few years down the road.

14   I'm not exactly sure of the year that it

15   started.

16        Q.    That's okay.  And how would you

17   clock in and clock out as a DCW?

18        A.    We had to download the Time4Care app

19   on our phone and then we had to turn our

20   location on.

21        Q.    Okay.  And to your knowledge, whose

22   phone application was the Time4Care app?

23        A.    To my knowledge, it was Public

24   Partnerships'.

25        Q.    Okay.  Did you receive any training

## Trial Day 2 - October 17, 2023

310

1  on how to electronically clock in and out as a

2  DCW?

3       A.    Yes.

4       Q.    Who did you receive that training

5  from?

6       A.    From Public Partnerships.

7       Q.    Okay.  How did you receive payment

8  as a DCW?

9       A.    I did direct deposit.

10      Q.    Okay.  And who made that direct

11  deposit into your bank account?

12      A.    Public Partnerships.

13      Q.    How often would you be paid as a

14  DCW?

15      A.    Every two weeks.

16      Q.    Okay.  And to your understanding,

17  who decided that you would be paid every two

18  weeks?

19      A.    Public Partnerships.

20      Q.    Did your participant have the

21  ability to require PPL to pay you, for example,

22  once a week instead of every other week?

23      A.    No.

24      Q.    Okay.  Let's turn back to DX 301.

25  And once you're there, please go to 7737.

Trial Day 2 - October 17, 2023

311

1        A.      Okay.

2        Q.      And it should be a document entitled

3   Qualified DCW Rate Sheet.  Do you see that?

4        A.      Yes.

5        Q.      Okay.  To establish or change your

6   pay rate as a DCW, did you and your participant

7   have to submit a form like this to PPL?

8        A.      Yes.

9        Q.      Did PPL have to approve the rate or

10  the change to the rate?

11       A.      Yes.

12       Q.      Okay.  And is that your signature

13  down below, listed January 12th of 2013?

14       A.      Yes.

15       Q.      Okay.  So would this have been the

16  rate sheet from when you first started as a

17  DCW?

18       A.      Yes, this would have been the new --

19  the new service.

20       Q.      Okay.  And do you see, under DCW

21  rate per hour, what does it list?

22       A.      It says $10 per hour.

23       Q.      Do you know how the $10 per hour was

24  determined to be your hourly pay rate that was

25  written down?

Trial Day 2 - October 17, 2023

312

1          A.      It was through Public Partnerships,

2    the customer service team, they were able to

3    see the max -- the minimum and maximum rates

4    for the counties.

5          Q.      Okay.  And what county were you in?

6          A.      I was in Lehigh County at the time.

7          Q.      Okay.  And if you could turn to the

8    next couple pages, it's PPL 7742.  My

9    apologies.  It's going to be back one.   7741.

10         A.      Okay.

11         Q.      Do you recognize this document?

12         A.      Yes, I do.

13         Q.      Okay.  What's the date of your

14   signature on this rate sheet?

15         A.      January 12, 2013.

16         Q.      Okay.  And do you see where there's,

17   under DCW rate per hour, it's -- there's a

18   cross-out and it lists $11.80?

19         A.      That is correct, yes.

20         Q.      Okay.  And is this rate sheet dated

21   the same as the rate sheet we just looked at

22   that was for $10 per hour?

23         A.      Yes.

24         Q.      Okay.  Do you know or can you please

25   explain the circumstances surrounding why you

Trial Day 2 - October 17, 2023

313

 1  and S████  submitted a form on the same day

 2  changing the rate to $11.80?

 3       A.    The participant, S████, he received

 4  a phone call on the same day from Public

 5  Partnerships stating that the $10 was the

 6  incorrect amount for the county, so they gave

 7  us the correct information.

 8       Q.    Okay.  And was the $11.80 the

 9  maximum amount for your county at that time?

10       A.    Yes, yes.

11       Q.    Were you paid the maximum or close

12  to the maximum wage rate the entire time you

13  were a DCW in Pennsylvania?

14       A.    Yes.

15       Q.    Okay.  And how would you know what

16  the maximum hourly wage rate was?

17       A.    We would have to call Public

18  Partnerships, the customer service team, and

19  they would alert us if there was a change in

20  the hourly rate.

21       Q.    Okay.  And go ahead and turn to the

22  next page, 7742.  It's another qualified DCW

23  rate sheet.  And is that your signature dated

24  August 13th of 2013?

25       A.    Yes, that's correct.

Trial Day 2 - October 17, 2023

314

1      Q.     Is that, approximately, eight months

2  after you submitted the rate sheet for $11.80?

3      A.     Yes.

4      Q.     Is the $11.51 rate on this sheet

5  lower than the $11.80 on the rate sheet from

6  January of 2013?

7      A.     Yes.  It was 31 cents less.

8      Q.     Okay.  And do you know why that rate

9  of $11.51 is typed instead of handwritten?

10      A.     This was received via mail from

11  Public Partnerships, and it was prefilled in.

12      Q.     Okay.  And if you know, do you know

13  why your rate was reduced from $11.80 to

14  $11.51, to the extent you know?

15      A.     I do not know why.  We just received

16  it in the mail, and then we also received a

17  phone call from the customer service team at

18  Public Partnerships stating that there was an

19  error in the initial amount.

20      Q.     Okay.  Did S█████ reduce your rate to

21  $11.51?

22      A.     No, he did not.

23      Q.     Did you request that your rate be

24  reduced by 31 cents?

25      A.     No.

Sappx0096

Trial Day 2 - October 17, 2023

315

```
 1        Q.    Did S█████ have the ability to reject
 2   that reduction in rate?
 3        A.    No.
 4        Q.    Okay.  Did you ever receive a rate
 5   increase going forward from this date?
 6        A.    Yes.
 7        Q.    Okay.  Would you have to submit any
 8   rate increase to PPL for approval?
 9        A.    Yes.  So it's the rate sheet that
10   had to be filled out and signed and dated.
11        Q.    Okay.  And you testified earlier
12   that you worked, approximately, 88 hours per
13   week as a DCW during a certain period in
14   Pennsylvania; is that correct?
15        A.    Yes.
16        Q.    Did you receive overtime pay for the
17   hours you worked over 40 hours per week?
18        A.    No, I did not.
19        Q.    Did you ever request that PPL pay
20   you overtime for those 40 to 48 hours that were
21   above the 40 hours per week?
22        A.    Yes.
23        Q.    And how did you make that request?
24        A.    I called Public Partnerships'
25   customer service team to inquire about the
```

Trial Day 2 - October 17, 2023

316

1    overtime, and their -- the customer service

2    team of Public Partnerships' response was that

3    they do not pay overtime.

4        Q.    Okay.  Did your participant, S███,

5    request that PPL pay you overtime?

6        A.    He also called the customer service

7    team at Public Partnerships and was given the

8    same answer, that they do not pay overtime.

9        Q.    Could your participant force PPL to

10   pay you overtime?

11       A.    No.

12       Q.    And we talked briefly about your

13   submission of time sheets.  If you wanted a

14   copy of your time sheet, where would you go to

15   get that?

16       A.    I could go through the Public

17   Partnerships' Better Health Online website.

18       Q.    Okay.  And did you receive a W-2

19   form for each year you worked as a DCW?

20       A.    Yes.  In the beginning, it came

21   through the mail from Public Partnerships and

22   then eventually they loaded it onto the Better

23   Health Online website.

24       Q.    Do you know if your participant

25   reviewed your W-2 form before it was issued?

Trial Day 2 - October 17, 2023

317

1      A.    No, he did not.

2      Q.    Okay.  Did your participant provide

3  direction to PPL regarding when and how to

4  issue your tax forms?

5      A.    No, he did not.

6      Q.    Okay.  If you needed a copy of your

7  tax forms, who would you contact?

8      A.    I would call Public Partnerships.

9      Q.    During your time as a Direct Care

10 Worker, did you ever need verification of

11 employment?

12     A.    Yes.

13     Q.    For what?

14     A.    For either -- if I was buying a car

15 or had to rent an apartment.

16     Q.    Okay.  And are these just examples

17 or are those things that actually happened?

18     A.    No, those things actually happened.

19     Q.    And who did you put down as

20 verification of employment for the apartment

21 and the car?

22     A.    I put down Public Partnerships and

23 their phone number.

24     Q.    Okay.  And did you get that

25 apartment that you were applying for?

Trial Day 2 - October 17, 2023

318

```
 1        A.    Yes, I did.
 2        Q.    Did your participant, S██████, have a
 3   service coordinator?
 4        A.    Yes, he did.
 5        Q.    Who did the service coordinator
 6   mostly interact with?
 7        A.    They -- they mostly interacted with
 8   the participant, S████.
 9        Q.    Okay.  Did you ever ask the service
10   coordinator questions about your work as a
11   Direct Care Worker?
12        A.    I would -- I did reach out to them
13   in regards to the time entry, the pending
14   status, and they told me that they don't handle
15   the Direct Care Workers.  Their only
16   involvement is with the participant.
17        Q.    Okay.  Did the service coordinator
18   have control over whether you got the
19   good-to-go to provide services?
20                   ATTORNEY SHEA:  Objection,
21   foundation.
22                   THE WITNESS:  No.
23                   THE COURT:  Sustained.
24   BY ATTORNEY COLEMAN:
25        Q.    Did you submit any of the enrollment
```

Sappx0100

### Trial Day 2 - October 17, 2023

319

1   packet forms to the service coordinator?

2        A.     No.

3        Q.     Did you ever go to the service

4   coordinator to get copies of your time sheets,

5   payroll records or tax forms?

6        A.     No.

7        Q.     Did you ever submit wage rate

8   changes to the service coordinator?

9        A.     No.

10       Q.     You testified you were a DCW in

11  Pennsylvania; correct?

12       A.     Yes.

13       Q.     Okay.  Did the State of Pennsylvania

14  ever tell you that you were good to go as a

15  DCW?

16       A.     No.

17       Q.     Did you ever submit your time sheets

18  to the State of Pennsylvania?

19       A.     No.

20       Q.     Did you ever receive a paycheck from

21  the State of Pennsylvania relating to your work

22  as a DCW?

23       A.     No.

24       Q.     Did you ever access your DCW

25  employment records through a State of

320

1    Pennsylvania website?

2         A.    No.

3         Q.    Did you ever have a conversation

4    with anyone from the State of Pennsylvania

5    about your work as a DCW?

6         A.    No.

7         Q.    Ms. Cotto, did you consider PPL to

8    be your employer?

9         A.    Yes.

10        Q.    Why?

11        A.    Because everything I had to fill out

12   or interact with was Public Partnerships.  I

13   had no knowledge of what the State was -- was

14   involved with.  I only interacted with Public

15   Partnerships --

16        Q.    Okay.

17        A.    -- through the whole time that I was

18   employed.

19        Q.    Okay.  If PPL had not paid you,

20   would you have received any pay for your work

21   as a DCW?

22        A.    No.

23        Q.    Did you rely on the income that PPL

24   paid you for your 80 to 88 hours of service per

25   week?

Trial Day 2 - October 17, 2023

321

```
 1        A.    Yes.
 2        Q.    Would overtime compensation for the
 3   40 to 48 hours you worked of overtime per week
 4   have made a difference in your life?
 5        A.    I'm sorry.  Can you repeat that?
 6        Q.    Sure.  If -- would receiving
 7   overtime for the 40 to 48 hours of overtime you
 8   worked over 40 per week have made a difference
 9   in your life?
10        A.    It would.  It would have made a
11   great difference because the rate per hour is
12   so low for Direct Care Workers, it would have
13   really helped a lot.
14              ATTORNEY COLEMAN:  Okay.
15   Thank you, Ms. Cotto.  No further questions
16   from me at this time.
17              THE WITNESS:  Thank you.
18              THE COURT:  Cross-examination?
19              CROSS-EXAMINATION
20   BY ATTORNEY SHEA:
21        Q.    Good morning, Ms. Cotto.  We met at
22   your deposition --
23        A.    Good morning.
24        Q.    -- some time ago.
25        A.    Yes.  Hi.
```

Trial Day 2 - October 17, 2023

322

1      Q.    My name is Carson Shea, and I'm one

2  of the attorneys representing PPL.

3          Ms. Cotto, I want to start with when

4  you first became a care worker for S███.  You

5  stated that you were friends with S███ prior

6  to providing services to him; correct?

7      A.    Yes.

8      Q.    S███ asked you to provide help with

9  his Activities of Daily Living; correct?

10     A.    Yes, that's correct.

11     Q.    And you spoke with S███ on the

12  phone about what services he needed you to

13  provide him; correct?

14     A.    Yes, that's correct.

15          THE COURT:  Let me just

16  interrupt.  At that time, you were not living

17  with him; is that correct or not correct?

18          THE WITNESS:  That is correct.

19          THE COURT:  All right.

20  BY ATTORNEY SHEA:

21     Q.    And on this phone call that you had

22  with S███ about the services that he wanted

23  you to provide him, was anyone else on that

24  phone call?

25     A.    No, there wasn't.

**Trial Day 2 - October 17, 2023**

338

```
 1         A.     They're not my employer so --
 2                    ATTORNEY COLEMAN:  Objection.
 3                    THE WITNESS:  Public
 4   Partnerships was my employer.  All they did was
 5   change the verbiage on the forms.
 6   BY ATTORNEY SHEA:
 7         Q.     Okay.  And you signed this document;
 8   right?
 9         A.     Yes, that's correct.
10                    ATTORNEY SHEA:  All right.
11   You can take this exhibit down, please.
12   BY ATTORNEY SHEA:
13         Q.     Ms. Cotto, you began living with
14   S█████  in 2015; correct?
15         A.     Correct.
16         Q.     You filled out a live-in exemption
17   form; correct?
18         A.     Correct.
19         Q.     And that form stated that you and
20   S█████  lived at the same address; right?
21         A.     Correct.
22         Q.     And you don't know that that form is
23   based on federal law; do you?
24         A.     No, I don't -- I don't know.
25         Q.     Are you aware of a legal exception
```

Sappx0105

## Trial Day 2 - October 17, 2023

339

1    from overtime based on your live-in status with

2    S█████?

3        A.    No.

4                    ATTORNEY COLEMAN:  Objection,

5    Your Honor, asking about what laws exist.

6                    THE WITNESS:  No.

7                    THE COURT:  Overruled.  It's

8    proper cross.

9    BY ATTORNEY SHEA:

10        Q.    Did S█████ have a surgery at some

11    point in time?

12        A.    He had two different surgeries.

13        Q.    Okay.  Let's talk about, in February

14    of 2014, he had a surgery; correct?

15        A.    Correct.

16        Q.    And your hours increased at that

17    time; correct?

18        A.    Correct.

19        Q.    And at that time, S█████ required

20    additional services; correct?

21        A.    Correct.  He has epilepsy and he's

22    paralyzed from the sternum down.  He had a

23    pressure ulcer surgery at the time and it was a

24    large pressure ulcer.

25        Q.    S█████ set your weekly schedule for

### Trial Day 2 - October 17, 2023

340

```
1    you; correct?
2         A.    Correct.
3         Q.    And isn't it true that S████ told
4    you when to start your workday?
5         A.    Yes.
6         Q.    And S███ would tell you when your
7    workday was over; correct?
8         A.    Yes; correct.
9         Q.    Isn't it true that PPL never told
10   you to go to S████'s home to perform services
11   on a particular day?
12        A.    Correct.
13        Q.    If you were unavailable to provide
14   services to S███, S████'s parents would
15   provide those services for him; right?
16        A.    Yes.  Correct.
17        Q.    Isn't it true that the only training
18   that you received while working as a DCW for
19   S███ was an online training on how to use the
20   Time4Care app?
21        A.    Correct.
22        Q.    Isn't it true that, to your
23   recollection, you never attended an orientation
24   program prior to providing services to S███;
25   correct?
```

Trial Day 2 - October 17, 2023

341

```
 1        A.    Correct.
 2        Q.    You testified that you submitted
 3   time sheets on a website; correct?
 4        A.    Yes, the Better Health Online
 5   through Public Partnerships website.
 6        Q.    And S█████ would approve those time
 7   sheets in order for you to be paid; correct?
 8        A.    He approved the time sheets, but
 9   then, ultimately, I had to still go through
10   Public Partnerships.
11        Q.    You were paid an hourly rate for the
12   services that you provided to S█████; right?
13        A.    Correct.
14        Q.    Isn't it true that S█████ set your
15   hourly rate for the services?
16        A.    No.  That's not true.  No.
17        Q.    You testified that there was a pay
18   rate range by county within Pennsylvania;
19   correct?
20        A.    Correct.
21        Q.    Do you know who sets the range of
22   rates?
23        A.    Public Partnerships.
24        Q.    You believe it's Public
25   Partnerships.  Are you aware of --
```

Sappx0108

Trial Day 2 - October 17, 2023

342

```
 1        A.    To my knowledge, yes.
 2        Q.    Are you aware of --
 3        A.    To my knowledge, it's Public
 4   Partnerships.  I'm not aware of anything else.
 5        Q.    Isn't it true that S█████ decided
 6   your pay rate within the pay rate range?
 7        A.    No.
 8        Q.    That's not true?
 9        A.    That's not true.  No.
10        Q.    Do you recall being deposed in this
11   matter on October 5, 2023?
12        A.    Yes.
13        Q.    Do you recall testifying that you
14   could select a rate within the pay rate --
15   strike that.
16              Do you recall that you testified
17   that S████ could select a rate within the pay
18   rate range to pay you?
19              ATTORNEY COLEMAN:  Objection,
20   improper impeachment.
21              THE WITNESS:  Yes.
22              ATTORNEY COLEMAN:  It's not
23   the same question.
24              THE WITNESS:  He could select
25   the rate --
```

Trial Day 2 - October 17, 2023

343

```
 1                    THE COURT:  Excuse me.  Excuse
 2   me.
 3                    THE WITNESS:  -- but
 4   ultimately --
 5                    ATTORNEY COLEMAN:  Christine.
 6                    THE COURT:  Wait, wait.
 7   There's an objection.
 8                    ATTORNEY COLEMAN:  Objection,
 9   improper.
10                    THE COURT:  The objection is
11   you didn't read her the same question; is that
12   the objection?
13                    ATTORNEY COLEMAN:  It's a
14   different question.  It's her -- her answer --
15   he's not actually impeaching her on her current
16   answer.
17                    THE COURT:  Okay.  So you can
18   ask her, in your deposition, do you remember --
19   because she's not seeing it; right?  Did I ask
20   you this and did you say this?
21   BY ATTORNEY SHEA:
22        Q.   Ms. Cotto, do you recall at your
23   deposition that I asked you, "But S██████ could
24   select a rate within that range to pay you;
25   correct?"
```

Trial Day 2 - October 17, 2023

344

```
 1            And your answer was, "Within the
 2   range, yes"?
 3       A.    Correct.
 4            THE COURT:  Did you understand
 5   there was a minimum and a maximum and S███
 6   could pick somewhere within that range, but
 7   couldn't go below the minimum or above the
 8   maximum?
 9            THE WITNESS:  Yes.
10   BY ATTORNEY SHEA:
11       Q.    Ms. Cotto, you testified that your
12   pay rate increased multiple times while you
13   were a Direct Care Worker for S███; correct?
14       A.    Correct.
15       Q.    You testified that S███ never paid
16   you for services with his own money because he
17   couldn't; correct?
18       A.    Correct.
19       Q.    Isn't it true that if S███ had a
20   higher income, he could have paid you with his
21   own funds?
22       A.    No.  I don't agree with that
23   question because this program is for disabled
24   people.
25       Q.    Right.  But if S███ had the
```

Trial Day 2 - October 17, 2023

345

1    personal funds to pay you, he could have;
2    correct?
3                        ATTORNEY COLEMAN:  Objection,
4    Your Honor.  Calls for speculation.
5                        THE WITNESS:  No.
6                        THE COURT:  All right.  If
7    S███ was a millionaire, he could pay you;
8    right?
9                        THE WITNESS:  Right, if he was
10   a millionaire.
11                       THE COURT:  Okay.  Fine.
12   Let's go.
13   BY ATTORNEY SHEA:
14       Q.   Ms. Cotto, you stated that you
15   received a W-2 for the services you performed
16   for S███; right?
17       A.   Yes, correct.
18       Q.   Are you aware that S███ had
19   appointed PPL to be his agent for tax purposes?
20       A.   No.
21       Q.   You received pay stubs for the pay
22   that you received for performing services for
23   S███; correct?
24       A.   Correct.
25       Q.   You reviewed your pay stubs;

Trial Day 2 - October 17, 2023

382

```
 1                ATTORNEY WEBBER:  If we could
 2   turn to Page 7922 of Exhibit 303.
 3   BY ATTORNEY WEBBER:
 4        Q.    Ms. Ross, is that your signature on
 5   the bottom half of Page 7922?
 6        A.    Yes, it is.
 7        Q.    And what's the date on that?
 8        A.    8/19/2014.
 9        Q.    Okay.  Is that when you first
10   started in the program?
11        A.    That's the good-to-go date, yes.
12        Q.    Looking up above that where there's
13   a rate entered, do you see that?
14        A.    Yes.
15        Q.    Okay.  Is that the amount listed --
16   is the amount listed there what PPL told you
17   was the maximum?
18        A.    Yes.
19        Q.    Now, you said that you've known
20   Ms. C███████    for several years?
21        A.    Yes.
22        Q.    If you didn't have a friend like
23   Ms. C███████   who was willing to take on the
24   job for $11.25, if you were just trying to find
25   somebody in the marketplace, could you find a
```

Sappx0113

## Trial Day 2 - October 17, 2023

383

```
1    Direct Care Worker to do what Ms. C███████
2    does for 11.25?
3         A.    Never.  No.
4         Q.    What if you offered less than 11.25,
5    could you have found somebody?
6         A.    No.
7         Q.    Could you have hired any Direct Care
8    Worker if you were only going to pay the
9    minimum wage?
10        A.    No.
11        Q.    So did you understand that you could
12   pay as low as minimum wage?
13        A.    Yes.
14        Q.    So understanding the range was
15   technically from minimum wage to 11.25, as a
16   practical matter, what did you see the range
17   as?  As a practical matter, what did you
18   understand you could pay Arlene?
19        A.    11.25.
20        Q.    At any point after Ms. C███████
21   started working at the 11.25 rate, did PPL ever
22   ask you if you wanted to change it?
23        A.    No.
24        Q.    Did PPL ever tell you you could
25   change it?
```

Sappx0114

Trial Day 2 - October 17, 2023

384

```
1          A.    No.
2          Q.    Did you ever ask PPL about changing
3    the rate?
4          A.    Yes.
5          Q.    And how did that come about?  What
6    would you do?
7          A.    First, I would call the -- what is
8    her name -- the coordinator.  The coordinator
9    said I would have to contact PPL.  So I
10   contacted PPL.  And whoever answers the phone,
11   I told them who I was.  They asked me what my
12   number was.  They didn't ask me my name.  I'm
13   just a number.
14              So I gave them my number, and I
15   asked her what the -- she asked me what county
16   I lived in, I said Fayette, and she said, this
17   is the maximum.
18              At that time, whatever was the
19   maximum, that's what I put.
20              ATTORNEY WEBBER:  Okay.  Let's
21   turn to Page 7948.
22              THE COURT:  So they never --
23   PPL let you pay the maximum as long as you
24   wanted to pay the maximum?
25              THE WITNESS:  Correct.
```

Trial Day 2 - October 17, 2023

385

```
 1              THE COURT:  Okay.
 2   BY ATTORNEY WEBBER:
 3       Q.    Ms. C██████████, is Page 7948 one of
 4   the occasions when you asked PPL to change --
 5   I'm sorry, Ms. Ross.  I keep doing that.  I
 6   apologize.
 7              Ms. Ross, is Page 7948 one of the
 8   occasions when you asked PPL to change
 9   Ms. C██████████s pay rate?
10       A.    Yes.
11       Q.    And I see that the amount listed
12   under DCW rate per hour, it looks like that's
13   typed in.
14              Did you type that information onto
15   the form?
16       A.    No.
17       Q.    Did -- was that on the form when you
18   received it?
19       A.    Yes.
20       Q.    And who did you receive the form
21   from?
22       A.    PPL.
23       Q.    And after you -- after you signed
24   this rate sheet, did you -- what did you do
25   with the rate sheet after you signed it?
```

Sappx0116

Trial Day 2 - October 17, 2023

386

```
 1        A.    It had to be mailed to Wilkes-Barre.

 2        Q.    And to who in Wilkes-Barre?

 3        A.    PPL.

 4        Q.    Okay.  And did PPL have to approve

 5   the change before it went into effect?

 6        A.    Yes.

 7              ATTORNEY WEBBER:  Can we go to

 8   Page 7956?

 9              THE WITNESS:  Excuse me.

10   BY ATTORNEY WEBBER:

11        Q.    What's the date on this rate change

12   sheet?

13        A.    February 17, 2020.

14        Q.    Okay.  And how did you find out that

15   you could change the rate in February of 2020?

16        A.    I called PPL.

17        Q.    Okay.  I'd like to direct your

18   attention to the first paragraph at the top of

19   the form.

20              ATTORNEY WEBBER:  Can you zoom

21   in on that, please?

22   BY ATTORNEY WEBBER:

23        Q.    Do you see the last two sentences of

24   the instructions?  It says, "If there is no

25   rate entered, minimum wage will be entered
```

## Trial Day 2 - October 17, 2023

398

```
 1        A.    In the '90s.
 2        Q.    So you know each other for now --
 3   prior to your enrollment, you had known her for
 4   maybe close to 20 years?
 5        A.    Correct.
 6        Q.    Okay.  And you worked at Walmart
 7   together?
 8        A.    Correct.
 9        Q.    And you really became best friends;
10   right?
11        A.    Correct.
12        Q.    And so isn't it true that PPL played
13   no role in your decision to hire
14   Ms. C█████████?
15        A.    No.
16        Q.    That's not true?
17              THE COURT:  No; she agreed.
18   BY ATTORNEY SCHMIDT:
19        Q.    Do you agree that PPL played no role
20   in your decision to hire Ms. C█████████ as
21   your Direct Care Worker?
22        A.    That's correct.
23        Q.    And now, as to Ms. C████████'s
24   hours and her schedule, Ms. C████████ is only
25   permitted to work whatever hours are authorized
```

411

```
1   again.
2                   ATTORNEY SCHMIDT:  Sure.
3   BY ATTORNEY SCHMIDT:
4       Q.    Is it your understanding that an
5   agent is someone who acts on your behalf?
6                   THE COURT:  Overruled.
7                   THE WITNESS:  Do I answer?
8                   THE COURT:  Yeah.
9                   THE WITNESS:  I'm sorry.  Yes.
10  BY ATTORNEY SCHMIDT:
11      Q.    Okay.  And PPL acted as your tax and
12  payroll agent; right?
13      A.    Yes.
14                  ATTORNEY SCHMIDT:  If you
15  could go to 7914, please.
16                  ATTORNEY FREITAS:  Can you say
17  the page again?
18                  ATTORNEY SCHMIDT:  7914.
19  BY ATTORNEY SCHMIDT:
20      Q.    Okay.  Do you recognize this
21  document, Ms. Ross?
22      A.    Yes.
23      Q.    All right.  And you are listed as
24  the participant in this document?
25      A.    Yes.
```

Trial Day 2 - October 17, 2023

412

```
 1        Q.    Okay.  And this was a document that
 2   you executed as part of hiring Ms. C█████████;
 3   right?
 4        A.    Yes.
 5        Q.    Okay.  You never considered any
 6   other Direct Care Worker besides
 7   Ms. C████████  right?
 8        A.    No.
 9        Q.    Okay.  And, again, that is because
10   you worked at Walmart together and you became
11   best friends, and so you wanted her to be your
12   Direct Care Worker; right?
13                    ATTORNEY WEBBER:  Objection,
14   compound.
15                    THE COURT:  Overruled.  Is the
16   answer yes?
17                    THE WITNESS:  Yes.
18   BY ATTORNEY SCHMIDT:
19        Q.    PPL did not force you to hire
20   Ms. C████████; right?
21        A.    No.
22        Q.    And if you go to page -- the second
23   page of this document, okay.
24              You see, about a third of the way
25   down, it says, "DCW wage and service
```

## Trial Day 2 - October 17, 2023

413

1    information"?  Do you see that?

2        A.    Yes.

3        Q.    And it lists an hourly wage of

4    $11.25.  Do you see that?

5        A.    Yes.

6        Q.    Okay.  And that's a rate you chose;

7    right?

8        A.    That was the maximum hourly rate at

9    that time.

10       Q.    Okay.  But you could have chosen to

11   pay less than that at that time; right?

12       A.    I could have.

13       Q.    But PPL did not force you to pay the

14   maximum rate; right?

15       A.    No.

16       Q.    Okay.  If you go to 7916, please.

17             And I think this was a document that

18   you were shown by Attorney Webber.  I just have

19   some followup questions.

20             And this document looks familiar to

21   you; correct?

22       A.    Yes.

23       Q.    Okay.  And if you can just go to

24   Page 3 really quick.  And that's signed by you

25   as the Common Law Employer signature?

Trial Day 2 - October 17, 2023

414

1      A.    Yes.

2      Q.    Dated 8/19/2014?

3      A.    Yes.

4      Q.    And then is that Ms. C█████████ s

5  signature as the DCW employee signature?

6      A.    Yes.

7      Q.    And dated the same date, 8/19/2014?

8      A.    Yes.

9      Q.    Did you fill this document out

10 together?

11     A.    Yes.

12     Q.    Okay.  It would have been in your

13 home?

14     A.    Yes.

15     Q.    Okay.  If you could go to Page 2 of

16 this document.  I believe you were asked some

17 -- actually Page 1, please.

18          I believe you were asked some

19 questions regarding the background check.  Do

20 you recall that?

21     A.    I do.

22     Q.    Okay.  And Ms. C██████████ had a

23 background check done; correct?

24     A.    Yes.

25     Q.    Okay.  And you received the result

## Trial Day 2 - October 17, 2023

415

1    of that background check?

2        A.    Yes.

3        Q.    Okay.  Are you aware that state and

4    federal law require that a background check be

5    conducted on a DCW?

6        A.    No.

7        Q.    Are you aware that if a criminal

8    background check shows a criminal history, you

9    are still, as the participant, permitted to

10   hire that DCW?

11       A.    No.

12       Q.    If you can please go to the second

13   page, Paragraph 10.

14             And I believe Attorney Webber read

15   this paragraph to you.  It's "I agree to report

16   incidents to my participant service

17   coordinator."  Do you recall that being read to

18   you on direct exam?

19       A.    Yes.

20       Q.    Okay.  Isn't it true that

21   Ms. C█████████ contacted your service

22   coordinator when you were admitted to the

23   hospital?

24       A.    Yes.

25       Q.    And Ms. C█████████ notified your

Sappx0123

Trial Day 2 - October 17, 2023

416

1   service coordinator, not PPL; correct?

2       A.    Correct.

3       Q.    And if you go to Paragraph 17, "I

4   understand and acknowledge that the VF/EA is

5   not my employer," do you see that?  Did I read

6   that correctly?

7       A.    I do.

8       Q.    Okay.  And do you understand the

9   VF/EA to be PPL?

10      A.    No.

11      Q.    If you can go to the top of Page 1.

12            It says -- do you see the term

13  "vendor fiscal employer agent," VF/EA?

14      A.    Yes.

15      Q.    Do you remember us -- a little while

16  ago, I asked you some questions about the

17  application for Employer Identification Number

18  which also had a fiscal agent terminology?

19      A.    Yes.

20      Q.    Okay.  Does that refresh your memory

21  that the VF/EA being referred to in this

22  document is PPL?

23      A.    Yes.

24      Q.    If you go back to Paragraph 17 and,

25  again, it says, "I understand and acknowledge

Trial Day 2 - October 17, 2023

417

```
 1   that the VF/EA is not my employer"; right?
 2        A.    Correct.
 3        Q.    Okay.  That would be something that
 4   Ms. C███████   as your DCW, would be
 5   understanding and acknowledging; correct?
 6        A.    Yes.
 7        Q.    Okay.  So she would be understanding
 8   and acknowledging that PPL is not her employer;
 9   right?
10                   ATTORNEY WEBBER:  Objection,
11   calls for speculation as --
12                   THE COURT:  Sustained.
13                   ATTORNEY WEBBER:  -- to
14   Ms. C███████ s understanding.
15                   THE COURT:  Sustained,
16   sustained, sustained.
17                   ATTORNEY SCHMIDT:  Okay.
18   BY ATTORNEY SCHMIDT:
19        Q.    Paragraph 18 says, "I understand
20   that the participant or their appointed
21   representative is my employer."
22                   Right?
23        A.    Yes.
24        Q.    Okay.  And do you understand
25   yourself to be the participant?
```

Trial Day 2 - October 17, 2023

418

```
1        A.    Yes.

2        Q.    Okay.  And so was Ms. C████████

3   understanding that you or your appointed

4   representative is her employer?

5              ATTORNEY WEBBER:  Objection,

6   speculation.

7              THE COURT:  Sustained.

8   BY ATTORNEY SCHMIDT:

9        Q.    You filled out a number of these DCW

10  agreements after 2014; correct?

11       A.    Yes.

12       Q.    Okay.  And was that part of a -- I

13  think you testified about it on direct

14  regarding a requalification process; right?

15       A.    Correct.

16       Q.    Okay.  And that was to requalify

17  Ms. C██████████ as your DCW; correct?

18       A.    Yes.

19       Q.    Okay.  And that would be every two

20  years; does that sound right?

21       A.    I thought it was every year.

22       Q.    All right.  Can you go to 7943,

23  please?

24              All right.  Do you recognize this

25  document?
```

## Trial Day 2 - October 17, 2023

419

1      A.    I do.

2      Q.    Okay.  And if you could scroll down

3  a little bit.

4            It's dated -- date signed by DCW

5  5/12/2016.  Do you see that, right above the

6  No. 3?

7      A.    Yes.

8      Q.    Okay.  And if you could scroll to

9  the last page.

10           And it says, "signature of Common

11 Law Employer," it says, Toni Ross, and that's

12 5/12/2016; is that correct?

13     A.    Yes.

14     Q.    Okay.  Does that refresh your memory

15 that this requalification of Ms. C█████████

16 took place about two years after 2014?

17     A.    Yes.

18     Q.    Okay.  Are you aware that the

19 Commonwealth of Pennsylvania requires DCWs to

20 be requalified every two years?

21     A.    No.

22     Q.    As part of that requalification

23 process for Ms. C█████████, you were

24 responsible for confirming that Ms. C█████████

25 met the required qualifications to be your DCW;

## Trial Day 2 - October 17, 2023

420

```
1    right?
2         A.    Yes.
3         Q.    And you understood that, as part of
4    that requalification process, you were
5    responsible for confirming that she met those
6    qualifications; right?
7         A.    Yes.
8         Q.    And if she no longer met those
9    requirements, you would contact your service
10   coordinator; right?
11        A.    Correct.
12        Q.    You are responsible for evaluating
13   Ms. C█████████s performance as your DCW;
14   right?
15        A.    Yes.
16        Q.    Okay.  And you provide her feedback?
17        A.    Yes.
18        Q.    Okay.  And if she's doing a good
19   job, you tell her she's doing a good job?
20        A.    Always.
21        Q.    All right.  And it sounds like
22   rarely, if ever, is she doing a bad job?
23        A.    Correct.
24        Q.    And if she ever was doing a bad job,
25   would you have a conversation about it?
```

Trial Day 2 - October 17, 2023

421

1        A.    Absolutely.

2        Q.    Okay.  And you would tell her maybe,

3    you're doing it this way, and maybe I want it

4    done a little bit of a different way?

5        A.    Correct.

6        Q.    Okay.  PPL -- PPL never provides any

7    feedback to Ms. C████████    on her performance

8    as your DCW; right?

9        A.    No.

10       Q.    Okay.  You're the only one that

11   provides her feedback; correct?

12       A.    That's correct.

13       Q.    PPL never observes any of the

14   services that Ms. C████████    provides to you;

15   correct?

16       A.    Correct.

17       Q.    Okay.  PPL is never in your home;

18   correct?

19       A.    No.

20       Q.    Okay.  And am I correct,

21   Ms. C████████    provides some services to you

22   in your home and some outside of your home;

23   correct?

24       A.    Yes.

25       Q.    Okay.  And the outside of your home,

Sappx0129

Trial Day 2 - October 17, 2023

422

```
1    Ms. C████████ will go on vacation with you;
2    correct?
3         A.    Correct.
4         Q.    And during those times, she will
5    provide services to you while you're on
6    vacation?
7         A.    Correct.
8         Q.    And no one from PPL also attends the
9    vacation; right?
10        A.    No.
11        Q.    And you mentioned that you have
12   periodic monthly meetings with your service
13   coordinator; right?
14        A.    Correct.
15        Q.    And during those meetings, your
16   service coordinator will ask how well
17   Ms. C████████ is performing as a DCW;
18   correct?
19        A.    Correct.
20        Q.    And Ms. C████████ is at those
21   meetings?
22        A.    Correct.
23        Q.    And in response to any questions
24   that the service coordinator asks about how
25   well Ms. C████████ is performing as your DCW,
```

Trial Day 2 - October 17, 2023

423

```
 1   you let the service coordinator know; right?
 2        A.    Correct.
 3        Q.    Did you ever discipline
 4   Ms. C███████?
 5        A.    Never.
 6        Q.    Has PPL ever disciplined
 7   Ms. C██████?
 8        A.    No.
 9        Q.    The money that is paid to
10   Ms. C██████  comes from the State of
11   Pennsylvania; correct?
12        A.    I believe so.
13        Q.    Could you go to PPL 7922, please,
14   and I think you may have been shown this
15   document on direct.
16             Does that look familiar to you?
17        A.    Yes.
18        Q.    Okay.  This is dated 8/19/2014;
19   correct?
20        A.    Correct.
21        Q.    And it's signed by you as the Common
22   Law Employer?
23        A.    Yes.
24        Q.    And it's signed by Ms. C██████
25   as the Direct Care Worker?
```

Trial Day 2 - October 17, 2023

424

```
1          A.    Yes.
2          Q.    Okay.  And this is the 11.25 hourly
3    rate that we had discussed a little bit
4    earlier; right?
5          A.    Correct.
6          Q.    And you made the determination to
7    pay the -- that Ms. C██████ be paid $11.25
8    an hour; correct?
9          A.    I asked, yes.
10         Q.    Okay.  You did not have to pay her
11   that amount; correct?
12         A.    No.
13         Q.    And if you go to 7956, please.
14               This is another one of those rate
15   forms.  Do you see that?
16         A.    I do.
17         Q.    Okay.  And this one has a rate of
18   $12.19; right?
19         A.    Yes, I believe so.
20         Q.    And this is dated from February of
21   2020?
22         A.    Correct.
23         Q.    Okay.  And that's signed by
24   Ms. C██████?
25         A.    Yes.
```

Trial Day 2 - October 17, 2023

425

```
 1        Q.     And signed by you?
 2        A.     Correct.
 3        Q.     Okay.  So this would be about six
 4   years or so after --
 5        A.     That's correct.
 6        Q.     -- the last one?  Okay.
 7               And in this case, you are increasing
 8   Ms. C██████████ s hourly rate from 11.25 to
 9   12.19; correct?
10        A.     That's correct.
11        Q.     Okay.  That's -- the determination
12   to give her a raise from 11.25 to 12.19 was
13   your determination; correct?
14        A.     Yes.
15        Q.     Okay.  PPL did not force you
16   increase her pay; right?
17        A.     No.
18        Q.     If you could go to 7963, please.
19               And, again, another one of these
20   rate forms.  This one is about a year later.
21   If you scroll to the bottom, do you see that,
22   10/30/2021?
23        A.     I do.
24        Q.     And again signed by you?
25        A.     Yes.
```

Sappx0133

Trial Day 2 - October 17, 2023

426

```
 1        Q.    And signed by Ms. C█████████?
 2        A.    Yes.
 3        Q.    And there's a rate there of $12.49;
 4   do you see that?
 5        A.    I do.
 6        Q.    Okay.  So that's another increase,
 7   about a year later, from 12.19 to 12.49;
 8   correct?
 9        A.    That was put in there.
10        Q.    Okay.  Did you decide --
11        A.    I didn't put that in there.
12        Q.    Okay.  You made the determination
13   that she be paid $12.49; right?
14        A.    That's correct.
15        Q.    Okay.  And no one forced you to
16   increase her pay from --
17        A.    No.
18        Q.    -- 12.19 to 12.49; correct?
19        A.    Correct.
20        Q.    Okay.  As -- you had to review and
21   approve each of Ms. C█████████ s time sheets;
22   right?
23        A.    That's correct.
24        Q.    Okay.  And I think you mentioned
25   that you would do that through either a
```

Sappx0134

Trial Day 2 - October 17, 2023

427

1    computer or an -- or later a cell phone app?

2         A.    Correct.

3         Q.    Okay.  You have no independent

4    knowledge as to how either the computer or cell

5    phone app were created; correct?

6         A.    Correct.

7         Q.    I think on direct you testified that

8    Ms. C█████████ attended, I think, online

9    training.  Do you recall that testimony?

10        A.    Yes.

11        Q.    Okay.  You did not attend those

12   trainings; right?

13        A.    I had to be by her because she

14   didn't know how to work the computer.

15        Q.    Okay.  You have no independent

16   knowledge about the content of those trainings;

17   right?

18        A.    No.

19        Q.    You have no independent knowledge

20   about who created those trainings?

21        A.    No.

22        Q.    As you sit here today, you are not

23   aware that the State approves the content of

24   the various program documents that we've

25   received; right?

## Trial Day 2 - October 17, 2023

428

```
 1                    ATTORNEY WEBBER:  Objection,
 2    foundation.
 3                    THE COURT:  Sustained.
 4                    ATTORNEY SCHMIDT:  Okay.
 5    BY ATTORNEY SCHMIDT:
 6        Q.    Are you aware that the State
 7    approves the content of any of the program
 8    documents we reviewed?
 9                    ATTORNEY WEBBER:  Objection,
10    foundation.
11                    ATTORNEY SCHMIDT:  If you're
12    aware.
13                    THE COURT:  All right.  Do you
14    know how these documents are developed?
15                    THE WITNESS:  They would have
16    to come from PPL.
17    BY ATTORNEY SCHMIDT:
18        Q.    But I think you testified you've
19    never worked for PPL?
20        A.    No.
21        Q.    Okay.  And you have no independent
22    knowledge as to how those -- the content of
23    those forms come to be; right?
24        A.    Other than it says PPL on the top.
25        Q.    Okay.  So that's your -- that's your
```

Trial Day 2 - October 17, 2023

429

1    only basis?

2         A.    Correct.

3         Q.    And the Area on Aging program that

4    you are in is a Medicaid program; correct?

5         A.    Yes.

6         Q.    There are various polices and

7    procedures that are associated with that

8    Medicaid program?

9         A.    Yes.

10        Q.    Is it fair to say you're not

11   generally aware of what all those requirements

12   are?

13        A.    That's correct.

14        Q.    Okay.  And how those requirements

15   come to be?

16        A.    That's correct.

17               ATTORNEY SCHMIDT:  I have

18   nothing further at this time.  Thank you very

19   much, Ms. Ross.  I may be back up here again

20   but, if not, thank you for your time.

21               THE COURT:  Thank you,

22   Ms. Ross.  You're not done yet.

23               ATTORNEY WEBBER:  I'll be

24   quick.

25               REDIRECT EXAMINATION

Trial Day 2 - October 17, 2023

472

1        Q.    Did PPL ever observe you performing

2    services for your mother?

3        A.    No, they did not.

4        Q.    PPL never evaluated your performance

5    of those services for your mother; right?

6        A.    Not to my understanding.

7        Q.    PPL never disciplined you when you

8    were -- when you worked as a DCW; correct?

9        A.    Disciplined, no, not to my

10   understanding.

11       Q.    All right.  I'd like to show you

12   what has been admitted as PX 41.  Do you see

13   that, Ms. Mandoza?

14       A.    Yeah, I see it.

15       Q.    Okay.  That's the rate sheet that we

16   looked at previously; correct?

17       A.    Yeah, that's the same one from the

18   welcome packet.

19       Q.    And do you see the box that says

20   "new rate" and it's checked off?

21       A.    Yes.

22       Q.    Okay.  And it says 11.50 an hour;

23   right?

24       A.    Yes.

25       Q.    Is that your mother's handwriting?

Trial Day 2 - October 17, 2023

473

```
1          A.    My mother's --
2                      THE REPORTER:  Can you repeat
3     that?
4                      ATTORNEY SHEA:  I'll rephrase
5     the question.
6     BY ATTORNEY SHEA:
7          Q.    The $11.50 an hour, is that your
8     mother's handwriting?
9          A.    Yes.
10         Q.    So your mother chose $11.50 an hour
11    as your initial rate; correct?
12         A.    No, she did not.  She was advised
13    that you have to put that from the
14    caseworker -- or the service coordinator,
15    Janine.
16         Q.    Okay.  You received a pay raise
17    while working for your mother; correct?
18         A.    Yes, that is correct.
19                      ATTORNEY SHEA:  Okay.  Can we
20    pull up what has been admitted as Defense
21    Exhibit 155, please, specifically Page PPL
22    6416.
23    BY ATTORNEY SHEA:
24         Q.    Do you see that, Ms. Mandoza?
25         A.    Yes.
```

Trial Day 2 - October 17, 2023

474

1      Q.      Is this another DCW rate sheet?

2      A.      Yes.

3      Q.      Okay.  And this says "change of

4    existing rate" and that's checked off; correct?

5      A.      Yes.

6      Q.      Okay.  And the DCW rate per hour is

7    $12.50; correct?

8      A.      Yes.

9      Q.      And you and your mother signed this

10   document; right?

11     A.      Yes, we did.

12     Q.      And you were receiving a raise here;

13   correct?

14     A.      Yes.

15     Q.      Okay.  It was your mother's decision

16   to give you a raise; correct?

17     A.      No, it was not.  I actually -- I'm

18   the one that actually went to my mom and asked

19   about it, and my mom actually had to go through

20   her caseworker and the caseworker is the one

21   that went back to my mom.  I just gave her back

22   to my mom.

23     Q.      So you asked your mother for a raise

24   and she agreed to give you one; is that right?

25     A.      No, she did not agree to give me

475

1    one.  I said that she had to go to her

2    caseworker, the service coordinator.  I don't

3    know if it was Janine, at the time, or Joanna,

4    but she had to go to them, and they were the

5    ones that can either speak to PPL and see if I

6    can get it or not and --

7                    THE REPORTER:  I'm sorry, can

8    you say the end of your answer?

9                    THE COURT:  Can you repeat the

10   last sentence?

11                    THE WITNESS:  Okay.  She would

12   have to go to her caseworker and ask about a

13   raise, and then the caseworker would get back

14   to us in reference to a raise, after speaking

15   to PPL, and give us back an amount to put.  So

16   that's where the $12.50 came from.  It wasn't

17   from my mother.  It was from Janine, the

18   caseworker, going through PPL.

19   BY ATTORNEY SHEA:

20       Q.    Were you present for any

21   conversations between Janine and PPL?

22       A.    No, I was not.

23       Q.    Now, you mentioned, in your

24   testimony earlier, that there was a minimum

25   wage rate; correct?

Trial Day 2 - October 17, 2023

476

1        A.    Yes.

2        Q.    Okay.  Are you aware that there was

3  also a maximum wage rate?

4        A.    Well, I assume when there's a

5  minimum, there's a maximum I've worked for.

6        Q.    Are you aware that the Commonwealth

7  of Pennsylvania set a wage rate range with a

8  minimum and maximum?

9        A.    No, I did not.

10        Q.    Did you receive any benefits while

11  working as a DCW for your mother?

12        A.    Benefits as far as like health

13  insurance or something?

14        Q.    Did you receive vacation time?

15        A.    Vacation time, no.

16        Q.    Did you receive sick pay?

17        A.    No.

18        Q.    You testified that you were not paid

19  overtime.  Are you aware that federal law

20  exempts care workers who live with their

21  participant from receiving overtime?

22        A.    No, I was not made aware of that.

23              Hello?

24        Q.    You stated that you received

25  unemployment; correct?

Trial Day 2 - October 17, 2023

477

```
 1        A.    Yes.
 2        Q.    Are you still there?
 3        A.    Yes.  It was quiet for a second.
 4   Yes.
 5        Q.    You don't have any personal
 6   knowledge of how you received unemployment;
 7   right?
 8        A.    No.
 9        Q.    Okay.
10        A.    I just went on the website.
11        Q.    You only know that you received it;
12   right?
13        A.    Yes.
14        Q.    You don't know if you were paid with
15   Medicaid funds; do you?
16        A.    No, I do not.  No.
17        Q.    You mentioned good-to-go earlier;
18   correct?
19        A.    Yeah, it's called like a good-to-go
20   status.
21        Q.    All right.  You don't have any
22   personal knowledge of how good-to-go is
23   determined; do you?
24        A.    No personal knowledge, but it was
25   explained to me that it is once everything has
```

Trial Day 2 - October 17, 2023

478

1    been received from PPL, as far as like

2    paperwork and all the requirements, that was --

3         Q.    You weren't personally involved in

4    any good-to-go evaluations; correct?

5         A.    No.

6         Q.    Are you aware that the Commonwealth

7    of Pennsylvania requires certain requirements

8    to be completed in order for there to be a

9    good-to-go?

10        A.    No, I did not understand that.  I

11   thought it was just the good-to-go to work as a

12   Direct Care Worker for PPL.

13        Q.    Are you aware that you could have

14   worked for your mother prior to receiving the

15   good-to-go?

16        A.    No, I did not.  I was told that you

17   cannot do that.  You need the good-to-go

18   status.

19        Q.    Are you aware that your mother had

20   appointed PPL to be her agent for tax purposes?

21        A.    No, I did not.

22              ATTORNEY SHEA:  All right.

23   Could we pull up DX -- what has been admitted

24   as DX 155, specifically PPL 6405, please?

25              I apologize.  PPL 6402.

Sappx0144

485

```
 1              UNITED STATES DISTRICT COURT

 2            EASTERN DISTRICT OF PENNSYLVANIA

 3                        -  -  -
     RALPH TALARICO,          ) CIVIL DIVISION
 4   Individually and on      )
     behalf of all others     ) NO. 5:17-CV-02165-JLS
 5   similarly situated,      )
                              )
 6          Plaintiff,        )
                              )
 7                            )
        -vs-                  )
 8                            )
                              )
 9                            )
     PUBLIC PARTNERSHIPS,      )
10   LLC, doing business as    )
     PCG PUBLIC                )
11   PARTNERSHIPS,             )
                              )
12          Defendant.        )
                              )
13                            )
                              )
14

15
                          -  -  -
16

17       TRIAL HELD ON WEDNESDAY, OCTOBER 18, 2023
                      9:52 a.m.
18
                      VOLUME III
19

20

21    REPRODUCTION OF THIS TRANSCRIPT IS PROHIBITED
      WITHOUT AUTHORIZATION FROM THE CERTIFYING
22    AGENCY

23

24

25
```

```
 1   COUNSEL PRESENT:

 2
     For the Plaintiff:
 3
     NICHOLS KASTER PLLP, Esq.
 4   By:  Rachhana Srey, Esq.
          Helen Coleman, Esq.
 5   80 South 8th Street
     4600 IDS Center
 6   Minneapolis, MN 55402
     Rsrey@nka.com
 7   Hcoleman@nka.com

 8   COHEN MILSTEIN SELLERS & TOLL, PLLC
     BY:   Christine E. Miller, Esq.
 9         Christopher Scherman, Esq.
     1100 NEW YORK AVENUE, N.W.
10   SUITE 500
     WASHINGTON, DC 20005
11   Cwebber@cohenmilstein.com
     Cscherman@cohenmilstein.com
12
     For the Defendant:
13
     ECKERT SEAMANS CHERIN & MELLOTT, LLC
14   BY:   Walter M. Foster, Esq.
           Trevin C. Schmidt, Esq.
15         Carson Shea, Esq.
           Clare Gallagher, Esq.
16         Laura Cottington, Esq.
           Kevin Freitas, Esq.
17   Two International Place
     16th Floor
18   Boston, MA 02110
     Wfoster@eckertseamans.com
19   Tschmidt@eckertseamans.com
     Cshea@eckertseamans.com
20   Cgallagher@eckertseamans.com
     Lcottington@eckertseamans.com
21   Kfreitas@eckertseamans.com

22

23

24

25
```

Sappx0146

487

1                                I N D E X

                                                              Page

2    KIMBERLY BARGE

        DIRECT                                                489

3       CROSS                                                 568

        REDIRECT                                              672

4

                              E X H I B I T S

5    No.      Description                                     Page

      DX      Exhibit No. DX 246 was marked for              553

6     246     identification and admitted into
              evidence.

7     Court   Exhibit Court No. 1 was marked for             679

      1       identification and admitted into

8             evidence.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

493

1    them as their vendor fiscal agent at that time?

2        A.    Yes.

3        Q.    And I'd like to start with kind of,

4    first, an overview of how all this works.  It's

5    not very intuitive, and so we have a chart here

6    today.  I have a couple of questions about

7    that.

8            Can you start at the very top and

9    explain to us -- what are the Home and

10   Community-Based waiver Medicaid services?

11       A.    A Home and Community-Based waiver

12   service program is a program that allows

13   individuals that would otherwise be

14   institutionalized to stay in their home and

15   receive long-term service and supports in their

16   homes.  It waives, you know, federal Medicaid

17   regulations in order to allow to do that and

18   for those services to be funded for individuals

19   to receive services in their homes.

20       Q.    Got it.  And who administers those

21   programs?

22       A.    At the federal level, the Center for

23   Medicaid and Medicare Services, CMS, would

24   approve the state's application in order to

25   administer such a program.

Sappx0148

494

1         Q.    And so tell us about this

2     application that the State submits to CMS.

3     What is that?

4         A.    So in order to operate a program,

5     the state would submit an application, in this

6     case, it would be a 1915(c) application, in

7     order to administer the program to establish

8     the services and program guidelines to operate

9     a program within the Commonwealth.

10        Q.    And is the program structure,

11    meaning the various entities that would help

12    support that program, is that part of the

13    application process?

14        A.    Yes.

15        Q.    Tell us a bit about how that works

16    in the application process.

17        A.    The application is structured and

18    outlines all the services that are allowable in

19    the program, the vendors and entities that come

20    together to manage and operate the program.

21        Q.    And does the State have any

22    selection or discretion about what minimum

23    qualifications it would like to adopt for those

24    programs?

25        A.    Yes.

495

1          Q.    Tell us about those.

2          A.    Provider qualifications or program

3    qualifications are all outlined in the 1915(c)

4    waiver application that CMS would approve.

5          Q.    Okay.  And does that become then

6    part of a framework, if you will, under which

7    then the program is implemented by the State?

8          A.    Yes.

9          Q.    Okay.  Now, are there federal

10   statutes setting forth any frameworks or

11   requirements within the programs themselves?

12         A.    Yes.

13         Q.    Tell us about those.

14         A.    There's federal guidelines, 1915 of

15   the Social Security Act, and as outlined in the

16   waiver application and state statute, outlines

17   the framework for the program.

18         Q.    Great.  So the next set of questions

19   I want to have -- we're now at the Commonwealth

20   of Pennsylvania part here -- is what I call the

21   implementation part.  So I have a couple of

22   questions just to orient us all as to what the

23   various entities and the players are within

24   this particular program.

25               So what is the Participant-Directed

1    Services model?  Can you tell us first about

2    that?

3          A.    Sure.  It's a model in the program

4    where a participant is able to self-direct

5    their services and they become the participant

6    employer of their Direct Care Worker that they

7    recruit, hire, supervise, that would provide

8    the services that they require in their home.

9          Q.    Got it.  And is this also referred

10   to as -- sometimes as the self-directed

11   services program?

12         A.    Yes.

13         Q.    So PDS and self-directed services

14   program, those are synonymous terms?

15         A.    Yes.

16         Q.    And in this instance, the State

17   applied for -- detailed all of the details of

18   this particular program and its applications

19   now about to implement --

20                    ATTORNEY WEBBER:  Objection,

21   leading.

22                    THE COURT:  Yeah.  Objection

23   is noted.  Just rephrase the question.

24                    ATTORNEY FOSTER:  Sure.

25                    THE COURT:  A little less

497

1   compound.

2                 ATTORNEY FOSTER:   No worries.

3   BY ATTORNEY FOSTER:

4       Q.    For the next step, tell us about

5   what the enrollment broker does.

6       A.    So the State works with an

7   enrollment broker where a participant -- that

8   would be the first stop for a participant to

9   participate in the program, where they help

10  with the enrollment process to see if an

11  individual, you know, functionally -- their

12  functional eligibility and financial

13  eligibility align so they can participate in

14  the program.

15      Q.    Okay.  And what happens after they,

16  if you will, perform their function; what

17  happens to the participant after that?

18      A.    When a participant is able to

19  participate in the program, the enrollment

20  broker would then provide a listing of service

21  coordination providers from which the

22  participant can select to help coordinate their

23  services.

24      Q.    And tell us a little about, then,

25  the service coordinator role as a provider.

1        A.    A service coordinator would meet

2   with the participant.  They would already have

3   been assessed needs based on, you know,

4   services that they would need.  They would help

5   coordinate with the participant and sit down

6   and develop a person-centered service plan and

7   give, you know, options of different models of

8   service which would also include the

9   self-directed model of service.

10       Q.    And do you have an understanding of

11  what goes -- what goes into that process for

12  the plan itself or what is often called the

13  ISP?

14       A.    Yes.

15       Q.    Tells us about that.

16       A.    The ISP is developed -- it's a

17  combination of, you know, the services someone

18  is assessed to need, whether it's personal

19  assistance services, they need someone to come

20  in their home and help with the daily

21  activities of living.  It's determined, you

22  know, an allocated amount of hours,

23  potentially, a week that that person would need

24  based on other available supports such as, you

25  know, informal supports they may have.  And

1   that's determined.  The hours and units are

2   allocated and all laid out in detail, and what

3   tasks associated with the services, are all

4   developed in part of that service plan and

5   documented on that Individual Service Plan.

6        Q.    And the very next question I have

7   for you is after the service coordinator

8   creates the ISP, and do they go -- they've met

9   with the participant employer?

10       A.    Yes.

11                ATTORNEY WEBBER:  Objection,

12  leading.

13                THE COURT:  Sustained.

14  BY ATTORNEY FOSTER:

15       Q.    So at -- what is their first step

16  after basically the enrollment coordinator

17  refers them over in terms of developing the

18  ISP?

19       A.    For service plan development, the

20  service coordinator meets with the participant

21  and other individuals of their support team

22  that they would designate in order to develop

23  that person-centered service plan that lays out

24  all of the services and things needed to

25  support that individual in their home.

500

1          Q.    And are you familiar with the term

2    "agency model"?

3          A.    Yes.

4          Q.    Tell us about what the agency model

5    is.

6          A.    An agency provider would be a

7    provider that hires, fires their own workers.

8    They would send in a worker of their choosing

9    by matching a worker to send into someone's

10   home to provide the services rendered.

11         Q.    And is the agency model available

12   under the Home and Community-Based waiver

13   Medicaid services?

14         A.    Yes.

15         Q.    And are you familiar with the term

16   "self-directed model"?

17         A.    Yes.

18         Q.    Tell us about that.

19         A.    The self-directed model, the

20   participant is the employer, and they recruit

21   and hire and train their worker to perform the

22   services and duties of the services that they

23   need in their home.

24         Q.    And under this self-directed model,

25   I believe you stated that the participant

Sappx0155

501

1    serves as the employer.

2              Does any other entity serve as the

3    employer under that model?

4         A.    No.

5         Q.    And tell us about the vendor fiscal

6    agent and basically their role and structure

7    within this program.  How does the vendor

8    fiscal agent work?

9         A.    For self-directed services, a vendor

10   fiscal agent is procured through a competitive

11   bidding process, the Commonwealth procurement

12   process, in order to act as a fiscal

13   intermediary to process payroll, broker

14   workers' compensation, and pay out the time

15   sheets, those fiscal responsibilities.

16        Q.    And as part of your duties at OLTL,

17   would you interact with all of the entities

18   under this program?

19        A.    Yes.

20        Q.    And then, if somebody -- do you know

21   how somebody makes a decision to go into the

22   agency or the self-directed model?

23        A.    They would choose to do so as part

24   of the person-centered service -- service

25   planning process.

502

1      Q.    And who would be presenting them

2    that choice?

3      A.    They would be presented that choice

4    and described at enrollment, as well as when

5    the service coordinator meets with them to

6    develop the person-centered service plan.

7      Q.    And if somebody elects the

8    self-directed model, what is the next step for

9    them to, I guess, engage or hire their own

10   workers?

11     A.    There would be a referral made to

12   Public Partnerships where they could select

13   their worker and go through that process and be

14   onboarded.

15               ATTORNEY FOSTER:  So I would

16   like to have DX 107, please.  And if you can

17   show Ms. Barge.

18   BY ATTORNEY FOSTER:

19     Q.    Ms. Barge, I'm showing you a

20   document that has 233 pages.  So I'm going to

21   have you take a look at the first, and just for

22   right now, the second and third page, and just

23   ask if you are familiar with what this document

24   is?

25     A.    Yes.

503

1          Q.    What is this document?

2          A.    It's the 1915(c) waiver application

3    that would be approved by the Center for

4    Medicare and Medicaid Services, CMS.

5                    ATTORNEY FOSTER:  Okay.  And

6    you could show Ms. Barge Page 3 of 228.

7    BY ATTORNEY FOSTER:

8          Q.    And under Section 2, it's entitled

9    Brief Waiver Description towards the bottom of

10   that page.

11              Do you see that language?  Do you

12   need that blown up at all or is that okay?

13         A.    That's better, increased.  Thank

14   you.

15         Q.    Yeah.  Yeah.  So at the very bottom

16   of the page, it reads "The Department of Human

17   Services department and the state Medicaid

18   Agency, SMA, retains authority over the

19   administration and implementation of the

20   Independence Waiver."

21              Do you see that part?

22         A.    Yes.

23         Q.    And what role did OLTL play in the

24   administration and implementation of the

25   Independence Waiver?

504

1          A.    The Office of Long-Term Living

2    oversees and administers the program within the

3    Commonwealth of Pennsylvania.

4          Q.    And if you scroll a little bit down,

5    this paragraph goes on to the top of the next

6    page.  And the full first sentence on this page

7    says that "OLTL maintains oversight of

8    contracted and local regional entity functions

9    and the development in distribution of

10   policies, procedures and rules related to

11   waiver operations."

12              Do you see that?

13         A.    Yes.

14         Q.    And did OLTL do that under this

15   program?

16         A.    Yes.

17         Q.    What did it do in terms of

18   implementing and developing and distributing

19   policies, procedures and rules relating to the

20   program?

21         A.    As part of the program, it

22   administers -- it releases policy bulletins, we

23   have regulations as to how the programs

24   operate.

25         Q.    Okay.  And how are those, I guess,

505

1    distributed or publicized to the various

2    entities in the program?

3         A.    Through different means.  There's

4    public policy bulletins.  There's regulations,

5    program rules, and the waiver application

6    outlines different program rules as well.

7         Q.    Okay.  And if you could turn to --

8    it's Appendix E of this document, and it is

9    Page 169 of 228.  I have a few questions for

10   you on that page.

11            Do you see where it as "Appendix E,

12   participant direction of services," Ms. Barge?

13        A.    Yes.

14        Q.    And is this a part of the

15   application that describes the self-directed

16   model that you just testified to?

17        A.    Yes.

18        Q.    And on the second paragraph, or I

19   guess it's -- I guess it's the third paragraph,

20   it starts "All participants in the Independence

21   Waiver."

22            Do you see that part?

23        A.    Yes.

24        Q.    It says "All participants in the

25   Independence Waiver have the right to make

1    decisions about and self-direct their own

2    waiver services and they choose to hire and

3    manage staff using employer authority."

4            What is your understanding of the

5    term "employer authority" under that

6    application?

7        A.    As stated in the waiver application,

8    employer authority is when a participant serves

9    as the common law employer of their Direct Care

10   Worker and they're responsible for hiring,

11   firing, training, supervising, scheduling their

12   service support workers.

13       Q.    And in the implementation of this

14   program, through the various entities that you

15   described, is it your understanding that's

16   exactly how this program works?

17       A.    Yes.

18       Q.    Towards the very last part of the

19   last sentence of that paragraph, it says,

20   "Participants are encouraged to self-direct

21   their services to the highest degree possible."

22           Do you see that?

23       A.    Yes.

24       Q.    Is that a purpose that is carried

25   throughout every aspect of OLTL's policies and

507

1    procedures?

2         A.    Yes.   Participant choice is a big

3    focus of our programs.

4         Q.    And the last sentence of this

5    paragraph reads "During the actual provision of

6    services, the participant is responsible for

7    directing the activities of their support

8    worker."

9              Do you see that?

10        A.    Yes.

11        Q.    And do you understand that the

12   participants do that in this program?

13        A.    Yes.

14              ATTORNEY WEBBER:   Objection,

15   leading.

16              THE COURT:   Sustained.

17   BY ATTORNEY FOSTER:

18        Q.    In your experience, have you seen

19   participants act in the way to be responsible

20   for the direction of their activities of their

21   Direct Care Workers?

22              ATTORNEY WEBBER:   Objection,

23   foundation.

24              THE COURT:   Rephrase the

25   question.

508

1    BY ATTORNEY FOSTER:

2         Q.    So in terms of implementing the

3    program, do the participants then hire Direct

4    Care Workers?

5         A.    Yes.

6         Q.    And how -- what type of steps do

7    they take to orient and to direct their

8    services?

9                   ATTORNEY WEBBER:  Objection,

10   foundation that they orient or direct.

11                  THE COURT:  Overruled.

12   BY ATTORNEY FOSTER:

13        Q.    You may answer, Ms. Barge.

14        A.    Okay.  They work with their Direct

15   Care Worker and establish what services they

16   need and what tasks they need that worker to

17   perform for the services within their home, and

18   they guide that worker and orient them and

19   train them to what they need to perform in

20   their home to support them as their employee.

21        Q.    And is there a separate written

22   contract outlining how the vendor fiscal agent

23   acts under this program?

24        A.    Yes.  The Commonwealth Office of

25   Long-Term Living holds a grant agreement with

Sappx0163

1    the vendor fiscal employer agent outlining the

2    requirements related to what they're required

3    to do to operate the program.

4                       ATTORNEY FOSTER:  And if I

5    could have JX 357 pulled up, please.  Thank

6    you.  Thank you.

7    BY ATTORNEY FOSTER:

8        Q.    And do you recognize this document,

9    Ms. Barge?

10       A.    Yes.

11       Q.    And what is this document?

12       A.    This is the grant agreement with the

13   fiscal vendor employer agent Public

14   Partnerships.

15       Q.    Okay.  And if you could turn to --

16   it's Bates Page 751, please.  In the second to

17   last whereas clause, it references the RFA

18   permitted interested parties to submit

19   applications in up to three different regions

20   of the Commonwealth.

21                    What is the RFA being referenced

22   here?

23       A.    The Request For Application refers

24   to the competitive bidding process that the

25   Commonwealth utilizes to secure a vendor to

510

```
 1   fulfill the financial management services

 2   needed for the program.

 3        Q.    So in the 2012-2013 time frame, did

 4   the Commonwealth do that?

 5        A.    Yes.

 6        Q.    And who did they select?

 7        A.    Public Partnerships.

 8        Q.    And was Public Partnerships selected

 9   for a particular region?

10        A.    All of the region.  They became the

11   statewide fiscal employer agent vendor for

12   Office of Long-Term Living.

13        Q.    And prior to the award of that -- of

14   the grant agreement here to PPL, how were the

15   vendor fiscal agents -- who were the vendor

16   fiscal agents?  How was that handled prior to

17   PPL?

18        A.    There were many different agencies

19   that were responsible for the functions prior

20   to securing a vendor that was statewide.

21                THE COURT:  Secured what?

22                THE WITNESS:  Prior to

23   secure -- procuring a statewide vendor.

24                THE COURT:  So the State

25   decided it would be better to have one vendor
```

1    or three vendors?

2              THE WITNESS:  Yes.

3              THE COURT:  So you could have

4    picked three different vendors; right?

5              THE WITNESS:  Could have, yes.

6    BY ATTORNEY FOSTER:

7        Q.   And prior to PPL, was the vendor

8    fiscal agent role awarded to other entities,

9    including -- that did other services under the

10   program?

11       A.   Yes.

12       Q.   Tell us about that.

13       A.   They could have been other -- from

14   my understanding.  It was prior to my time.

15       Q.   Understood.

16       A.   But they could have done other

17   functions.

18             ATTORNEY WEBBER:  Objection,

19   foundation.

20             THE COURT:  Objection

21   sustained.  Prior to her time, she would have

22   no knowledge of.

23             ATTORNEY FOSTER:  No worries,

24   Your Honor.

25   BY ATTORNEY FOSTER:

512

1        Q.    We'll move on, Ms. Barge.

2        A.    Sure.

3        Q.    So if you could take a look at the

4   next page.  It's Bates stamped 752.

5              Paragraph 1 talks about the terms of

6   the agreement.  What was the first term of the

7   agreement with PPL under the vendor fiscal

8   agent?

9        A.    It was the term of the contract for

10  October 2012 through December 31, 2014.

11       Q.    And in Paragraph 2, it references

12  this is -- this being the grant agreement, as

13  it's referred to, what is referenced in --

14  under Paragraph 2 and incorporated into this

15  agreement?

16       A.    The application, the submittal, the

17  request for application is incorporated into

18  that.

19       Q.    And so if there were terms and

20  conditions set forth in that RFA, did those

21  become part of this agreement?

22       A.    Yes.

23       Q.    And if you could turn, please, to --

24  it's Rider No. 1, Bates stamped 756 of this

25  document.

513

1           Under payment -- the very -- this

2    Rider 1 is entitled Payment Provisions.  I have

3    a question for you about 1, Subpart A, the

4    payroll payment, to direct your attention to

5    that area.

6           A.    Okay.

7           Q.    Did the grant agreement in this

8    rider detail the timing on the schedule of when

9    payroll was to be made?

10          A.    It detailed how the funding would

11   occur and for the biweekly pay period.

12          Q.    And was that a determination made by

13   the Commonwealth to include as part of this

14   provision of that contract?

15          A.    Yes.

16          Q.    And if you could turn to the next

17   page, please, it's Bates stamped 757 at the top

18   of the page.

19          The D, monthly administrative fee,

20   how was PPL compensated for its services under

21   the grant agreement?

22          A.    There's a monthly administrative fee

23   paid per member per month for the

24   administrative functions performed by the

25   fiscal employer agent.

514

1      Q.    And so would it matter -- strike

2   that.

3            Let's go to Page 759, if you would.

4   That's subpart F on that page.  Subpart F is

5   entitled The Common Law Employer Orientation

6   and Skills Training.

7            Can you tell us what the obligations

8   under this paragraph were for PPL?

9      A.    As the grant agreement read, the

10  fiscal intermediary was required to provide the

11  common law employer orientation and skills

12  training as part of the program.

13     Q.    And were you aware of an orientation

14  program that was created for the CLEs in this

15  program?

16     A.    Yes.

17     Q.    And did that get implemented through

18  PPL in this program?

19     A.    Yes.

20     Q.    And if you could turn to Page 760,

21  please, and under J.

22            There's a provision there about

23  workers' comp insurance.  It says "All workers'

24  compensation policies must be issued in the

25  name of each respective common law employer."

515

1           Were you aware of this provision as

2   part of the grant agreement?

3       A.    Yes.

4       Q.    And were you aware if that occurred

5   as part of the implementation of the grant

6   agreement?

7       A.    Yes.

8       Q.    And does the Office of Long-Term

9   Living have either auditing or monitoring

10  rights and obligations under the grant

11  agreement?

12      A.    Yes.  Under the grant agreement, the

13  Office of Long-Term Living would monitor

14  vendors that we would procure to perform

15  services.

16      Q.    And did you perform that function,

17  in terms of your job title, with PPL as the

18  vendor fiscal agent in this program?

19      A.    In more recent years, yes.

20      Q.    Yes.  Not at this time?

21      A.    Not at this time.

22      Q.    Understood.

23            And if you could look down and

24  scroll down just slightly to, I think it's

25  provision L, it reads "United States Department

516

1    of Labor Home Care Companionship Exemption."

2    So I just have a couple of questions for you

3    about this provision.

4              It says "In the event that the

5    United States Department of Labor applies the

6    overtime provision of the Fair Labor Standards

7    Act to Direct Care Workers that are employed by

8    FMS recipients, the grantee" -- in that case,

9    is that PPL is your understanding?

10        A.    Yes.

11        Q.    "As directed by DPW" -- and is

12   that -- what does DPW stand for?

13        A.    Department of Public Welfare, now

14   known as Department of Human Services.

15        Q.    Thank you.  -- "will implement any

16   and all reasonable changes as may be necessary

17   or that are required as a result of this

18   change."  And then it talks about the possible

19   changes.

20              One of those is capping the maximum

21   amount of 40 hours per week per worker.  And

22   then if you scroll on to the next page, it's

23   whether or not to implement overtime as part of

24   that.

25              Do you recall this being part of the

1    provision of the grant agreement?

2         A.    Yes.

3         Q.    And subsequently, at some point in

4    time, did OLTL make a determination about

5    implementation of overtime due to the FLSA

6    change or rule change?

7         A.    Yes.

8         Q.    And, Ms. Barge, are there certain

9    protections built into the federal program to

10   protect participants from physical abuse and

11   neglect?

12        A.    Yes.

13        Q.    Can you tell us about those?

14        A.    There's federal protections related

15   to fraud, waste and abuse in the program.  If

16   somebody is on the federal exclusion list,

17   they're not able to participate in the program

18   in any way, shape or form, as required by

19   federal law.

20        Q.    Thank you.  So I'm going to show you

21   a second chalk that we have.

22        A.    Okay.

23        Q.    And I'm going to direct your

24   attention -- thank you, Trevin -- to the very

25   first -- the first box at the top of the chart

1    that is labeled Self-Directed Services.

2              So you talked about being on the

3    Medicaid fraud list.  What is that requirement?

4    Where does that come from?

5         A.   It's a federal exclusion list that

6    prohibits individuals or entities from being

7    part of federally funded healthcare programs.

8         Q.   And do you happen to know where

9    that's maintained or who maintains it?

10        A.   The federal OIG.

11        Q.   And how does the program ensure that

12   participants do not employ individuals on the

13   Medicaid fraud list?

14        A.   Part of the program requirements are

15   that the list is checked upon hiring a worker

16   or anyone participating in the program.

17        Q.   And does the vendor fiscal agent

18   play a role in implementing this federal

19   requirement?

20        A.   Yes.

21        Q.   What do they do?

22        A.   They're required by grant agreement

23   to perform the check.

24        Q.   And if you know, does PPL have any

25   authority to put somebody on that fraud list?

519

1        A.    No.

2        Q.    Does PPL have any authority to

3   remove somebody from that fraud list?

4        A.    No.

5        Q.    And then are you aware of any

6   requirements regarding criminal background

7   checks?

8        A.    Yes.

9        Q.    Tell us about those.

10       A.    Background checks are required as a

11  programmatic rule for workers in a program.

12       Q.    And what entity is responsible,

13  under the implementation, for conducting those

14  criminal background checks?

15       A.    For self-directed services, the

16  fiscal intermediary/fiscal employer agent is

17  required to perform those checks as part of

18  their duties.

19              ATTORNEY FOSTER:  And if I

20  could please have back up Exhibit 107, please.

21  BY ATTORNEY FOSTER:

22       Q.    And I'm going to direct your

23  attention, it's to Page 141 of 228, and this is

24  the application that we've been talking about

25  here this morning, Ms. Barge.

520

1              And if you can scroll down a little

2      bit, it begins -- the paragraph that begins

3      "Criminal history checks are required."  Do you

4      see that provision?

5          A.    Yes.

6          Q.    So it talks about criminal history

7      checks are required for all support service

8      workers and must be conducted in accordance

9      with 55 PA Code Chapter 52, Sections 52.19 and

10     52.20.  And are you aware of what the

11     obligations under that state law are,

12     Ms. Barge?

13         A.    Yes.

14         Q.    Was that one of the options selected

15     by the Commonwealth to include as part of the

16     program minimum qualifications?

17         A.    Yes.

18         Q.    And individuals -- it goes on to

19     read, "Individuals choosing to self-direct

20     their services have the right to employee

21     worker regardless of the outcome of the

22     background check."

23              Do you see that?

24         A.    Yes.

25         Q.    So is this distinct -- is this in

Sappx0175

521

1    any way related to the Medicaid fraud list that

2    we were just discussing?

3        A.    No.

4        Q.    This is an independent check?

5                    ATTORNEY WEBBER:  Objection,

6    leading.

7                    THE COURT:  Sustained.

8    BY ATTORNEY FOSTER:

9        Q.    What does this check involve?  What

10   does this background check involve?

11       A.    Criminal -- criminal history

12   background check as outlined in the

13   application.

14       Q.    And in the bottom paragraph on this

15   very same page, it talks about the "fiscal

16   employer agent or F/EA" -- is that PPL?

17       A.    Yes.

18       Q.    -- "is responsible for securing

19   criminal history background checks for

20   prospective support service workers prior to

21   hiring the workers."

22             Do you see that?

23       A.    Yes.

24       Q.    And to your knowledge, did PPL carry

25   out that role as delegated in the contract?

Sappx0176

1        A.    Yes.

2        Q.    And then I want to have some

3   questions for you about reporting of physical

4   abuse or neglect in the program.  Whose role is

5   it in the program to report such abuse?

6        A.    Basically all that participate with

7   the program have a responsibility, as mandated

8   reporters, to report suspected cases of

9   neglect, abuse within the program.

10       Q.    And if you can turn to Page 183 of

11  228 of the application, please.

12            And in the middle of this page,

13  about the center, where it starts

14  "Individuals/entities that are required to

15  report critical events."  Is this the section

16  of the application that talks about the

17  obligations to reporting physical abuse and

18  incidents?

19       A.    Yes.  It outlines the critical

20  incident management requirements.

21       Q.    And on the very first paragraph, it

22  says, "Per 55 PA Code Chapter 52 and OLTL's

23  critical incident management bulletin."

24            What is a critical incident

25  management bulletin?

523

1    A.    It's a policy bulletin that details

2    the responsibilities related to the reporting

3    requirements.

4    Q.    And is -- are those periodically

5    updated if need be?

6    A.    Yes.

7    Q.    And in the middle of this paragraph,

8    it talks -- it has a sentence that reads "In

9    the event providers/service coordination

10   entities have reasonable suspicion that a

11   participant between the ages of 18 to 59 is the

12   victim of abandonment, abuse, exploitation,

13   intimidation, neglect, serious injury or bodily

14   injury or sexual abuse, the provider must

15   report," and it then has a couple of entities.

16        Can you tell us what is the

17   obligation of the provider and to whom do they

18   report?

19   A.    Yes.  It would have -- it should be

20   reported, whether it be to, you know, Adult

21   Protective Services or to the service

22   coordinator, depending on who is doing the

23   reporting.

24   Q.    And does that obligation encompass

25   the service coordinator?

524

```
 1        A.    Yes.

 2        Q.    Does that obligation also encompass

 3   the Direct Care Worker in the program?

 4        A.    Yes.

 5                    ATTORNEY FOSTER:  And if we

 6   could turn to and put up as an exhibit, it's

 7   Exhibit DX 310, please.

 8   BY ATTORNEY FOSTER:

 9        Q.    And, Ms. Barge, do you recognize

10   this document?

11        A.    Yes.

12        Q.    Okay.  And what is this document?

13        A.    This is a critical incident

14   management policy bulletin issued by the Office

15   of Long-Term Living.

16        Q.    And this one is dated in April of

17   '15; correct?

18        A.    Yes.

19        Q.    And is -- who -- to whom is the

20   bulletin distributed or publicized to?

21        A.    To providers, program participants.

22        Q.    And under -- if you could scroll

23   down to the -- towards the bottom of the page,

24   there's a heading called Background.

25                    It says "Under the HCBS waivers in
```

Case: 25-1369    Document: 47-1    Page: 182    Date Filed: 10/03/2025

Talarico vs
Public Partnerships

Trial Day 3
October 18, 2023

525

1    the Act 150 Program, OLTL is responsible for

2    establishing a process that protects the health

3    and welfare of waiver participants."

4              Do you see that?

5        A.    Yes.

6        Q.    And is that process delineated in

7    bulletin?

8        A.    Yes.

9        Q.    Were there updates to the bulletin?

10       A.    Yes.  There's a more recent

11   bulletin, I believe, in '22 or '23 that was

12   issued.

13       Q.    If you could scroll down, I believe

14   it's part of this exhibit.  It's Bates stamped

15   8151, please.

16             And is this the updated bulletin

17   that you were just referring to?

18       A.    Yes.

19       Q.    What was the purpose to update or

20   what updates were made in 2023?

21       A.    To provide additional clarification

22   on the process.

23       Q.    Okay.  And is that the same process

24   you just described under the application that

25   we saw?

526

```
 1        A.    Yes.

 2        Q.    So I have a couple of questions now

 3   about the implementation of the program through

 4   the various entities that you've now described.

 5              You talked about that the -- the

 6   role of the enrollment broker, the role of the

 7   service coordinator, and how some participants

 8   select the self-directed models.

 9              On the -- in terms of developing the

10   ISP, what specific job duties are included

11   within an ISP; if you know?

12        A.    Could you clarify?

13        Q.    Sure.

14        A.    Job duties for whom?

15        Q.    Sure.  So you had mentioned that the

16   service coordinator meets with the participant

17   to develop the ISP; correct?

18        A.    Correct.

19        Q.    And are there -- there are certain

20   permitted job duties within the program?

21              ATTORNEY WEBBER:  Objection,

22   leading.

23              THE COURT:  Overruled.

24              THE WITNESS:  So the waiver

25   application identifies the services that are
```

1    allowable under the program.  In each of the

2    service definitions in the waiver application,

3    it outlines the different tasks and, you know,

4    qualifications for a provider rendering that

5    service, but it outlines what that service is

6    and what can be performed as part of that

7    service.

8              It's very detailed in its

9    application, and as part of the person-centered

10   service planning process, it's developed the

11   tasks in those different things that are to be

12   performed and it's detailed throughout the

13   service plan.

14   BY ATTORNEY FOSTER:

15        Q.    Is there an individualized

16   assessment made for each participant employer

17   who elects that program?

18        A.    Yes.  It's a person-centered process

19   around the person needing the services, the

20   team, and the folks needing to develop that

21   process.  It's very focused around the

22   individual needing those services within their

23   home.

24        Q.    And as part of that process, is an

25   assessment made of how many hours or, you know,

528

1    they need that service on a day or weekly

2    basis?

3         A.    Yes.

4         Q.    Tell us about how that happens.

5         A.    So based on assessed needs

6    developed, you know, say somebody needs ten

7    hours of service a week, that's determined, and

8    based on other services and supports that

9    exist, that's all compiled into that.

10             So if it's ten hours a week, it

11   would equal -- be broken down into units of

12   service, and that's all laid out within the

13   service plan.

14        Q.    And what role does OLTL play once an

15   individualized assessment is made, an ISP is

16   developed for a particular participant

17   employer, what role does OLTL play regarding

18   that first draft sent to them by the service

19   coordinator?

20        A.    For Fee-For-Service programs, when

21   an Individual Service Plan is developed, it

22   would be submitted to the Office of Long-Term

23   Living for review and approval.

24        Q.    And do they do that for every ISP?

25        A.    Yes.

529

1          Q.    And do they do that if the ISP is

2     amended in any way?

3          A.    Yes.

4          Q.    What happens next after OLTL

5     provides its approval?

6          A.    Then the program -- then the plan

7     can be put into place and services begin.

8          Q.    And how is the -- if you will, the

9     -- you described that each ISP has a certain

10    amount of hours; correct?  Are they expressed

11    as hours in the plan or do they use other kind

12    of nomenclature?

13         A.    Depending on the type of service,

14    it's a unit of service.

15         Q.    And what do we mean by "a unit of

16    service"?

17         A.    So for personal assistant services,

18    it would be 15-minute increments is the unit

19    base of service.

20         Q.    And is that information conveyed to

21    the vendor fiscal agent at some point in time?

22         A.    Yes.

23         Q.    How does that happen?

24         A.    There's secure file exchanges where

25    the vendor fiscal agent is provided the units

530

1    of service, the volume, through that file

2    exchange.

3         Q.    And are you familiar with HCSIS or

4    SAMs software applications?

5         A.    Yes.

6         Q.    Are those the secure transfer or

7    software applications used by the State for the

8    ISPs?

9         A.    Yes.  They're the case management

10   systems.

11        Q.    And is the ISP shared with anybody

12   else other than the service coordinator?

13        A.    The participant.

14        Q.    Anybody else in the program?

15        A.    Anybody that the participant would

16   see fit.

17        Q.    And is a copy of the ISP ever

18   provided to PPL?

19        A.    No.

20        Q.    And once somebody is elected,

21   they've now got their ISP approved by the

22   State, how does a participant go about setting

23   a wage rate for their worker?

24             ATTORNEY WEBBER:  Objection,

25   foundation.

531

1           THE COURT:  If she knows.

2    BY ATTORNEY FOSTER:

3         Q.    If you know.

4         A.    Under the self-directed services

5    model, a participant within program rules would

6    set the wage rate above the federal minimum

7    wage and state minimum wage, but within the

8    range of the Home and Community-Based fee

9    schedule for services.

10        Q.    And what is this fee schedule?

11        A.    For our Fee-For-Service programs, we

12   have a Home and Community-Based fee schedule

13   that's published that has the unit rates for

14   service based on different geographical regions

15   throughout the Commonwealth.

16              ATTORNEY FOSTER:  And could I

17   have Exhibit DX 127, please.

18   BY ATTORNEY FOSTER:

19        Q.    Yes, this one is very hard to read.

20   And do you recognize this document, Ms. Barge?

21        A.    Yes.

22        Q.    What is this document?

23        A.    This is our Office of Long-Term

24   Living Home and Community-Based Waiver Fee

25   Schedule.

532

1        Q.    And can you describe for the Court

2    how the fee schedule is arrived -- who

3    determines or calculates those numbers in the

4    fees?

5        A.    It's outlined in our waiver

6    application, the CMS, Appendix I, I believe it

7    is, details the rate methodology about how

8    market-based rates are developed for the

9    program.

10       Q.    And are those updated periodically?

11       A.    Yes.

12       Q.    What role does OLTL play in helping

13   to set the fee schedule?

14       A.    OLTL would evaluate the rates every

15   so often.  It would find incomes available in

16   order to establish any kind of rate change.

17       Q.    And on this sheet towards the -- I

18   guess in the middle, looking at the columns, it

19   says Region 1, 2, 3 and 4.  Can you describe

20   for the Court what those are?

21       A.    The regions would be the different

22   regions made up of different county groupings

23   within the Commonwealth.

24       Q.    Okay.  And do you know what Region 1

25   is or what the regions are like,

1    geographically, within the state?

2        A.    With the counties, not off the top

3    of my head.

4        Q.    Okay.  No worries.

5                    ATTORNEY FOSTER:  And if you

6    could kind of enlarge this, if you will.

7    BY ATTORNEY FOSTER:

8        Q.    In the left-hand column is a listing

9    of what the service is.  Do you see where it

10   says "PAS agency"?

11       A.    Yes.

12       Q.    And "PAS consumer"?

13       A.    Yes.

14       Q.    Can you tell us about what those two

15   rows are about?

16       A.    PAS agency would be the regional

17   rates for the agency model of service.  PAS

18   consumer would be the consumer regional rates

19   for the self-directed model of service.

20       Q.    Okay.  And down below, under

21   respite, it has the same, it has "respite

22   agency" and "respite consumer."

23               Do you see that?

24       A.    Yes.

25       Q.    Can you tell us the distinction or

534

1    what those two rows are about?

2         A.    That would be the same distinction

3    as above for agency versus consumer.  Respite

4    is more of a temporary-based need of care based

5    on the service definition in the waiver

6    application.

7         Q.    And are you aware of a federal

8    change in overtime requirements that came in

9    applicable to home care workers?

10        A.    Yes.

11        Q.    Tell us about when that occurred.

12        A.    Around 2015, '16.

13        Q.    And do you recall what the change

14   was?

15        A.    Yes.  Individuals that didn't

16   necessarily qualify for overtime previously

17   would now potentially qualify for overtime

18   payment based on the federal rule change.

19        Q.    And what steps did OLTL take in

20   light of that federal rule change?

21        A.    The office formed a work group in

22   order to discuss how to operationalize the

23   change within the program.

24              ATTORNEY FOSTER:  If I could

25   have up Exhibit JX 349, please.

Sappx0189

535

1   BY ATTORNEY FOSTER:

2        Q.    And, Ms. Barge, do you recognize

3   this document?

4        A.    Yes.

5        Q.    What is this document?

6        A.    This is a work group agenda from a

7   work group that was formed.

8        Q.    And the date on this one is December

9   2 of 2014, and the topic reads "PA DHS FLSA

10  Implementation."

11             Do you see that?

12       A.    Yes.

13       Q.    Is this the group that you were

14  talking about that you just described?

15       A.    Yes.

16       Q.    And what was included in the agenda

17  items for this particular meeting?

18       A.    FLSA program design specifications,

19  discussion around the live-in exemption,

20  discussion about billing codes and business

21  rule development.

22       Q.    And on E, where you mentioned the

23  billing codes, can you tell me about that

24  section, EA, which seems -- has these numbers

25  TU, the billable at 1.5.

536

1              What was that all about?

2       A.    That would be service procedure

3   codes that are used to process claims related

4   to services under the self-directed program.

5       Q.    And if you scroll down a little bit

6   further under 2, it's 2, and then in the middle

7   under subpart Roman numeral A2, and then in No.

8   1, in bold, it says, "OLTL will allows DCWs to

9   work over 40 hours for a participant on and

10  after 1/1/2015 until it provides notice of a

11  change."

12             Do you see that?

13      A.    Yes.

14      Q.    Had OLTL at this point made a

15  decision about how to implement overtime?

16      A.    I interpret that to mean that there

17  won't be a limit on 40 hours a week.

18      Q.    Okay.

19      A.    Within the program.

20             ATTORNEY FOSTER:  And if you

21  can turn to the next page, it's Bates stamped

22  526, at the top subpart E of this document.

23  BY ATTORNEY FOSTER:

24      Q.    It says, OLTL has created two

25  service code modifiers, PAS" -- with some

537

1    numbers -- "at the 1.5, the respite with some

2    numbers for overtime premium pay."

3              Do you see that?

4         A.    Yes.

5         Q.    And was OLTL working closely with

6    its vendor fiscal agent to implement this

7    change?

8         A.    Yes.

9         Q.    And how were these TU authorizations

10   going to be included into the already existing

11   program?

12        A.    There was a development of a new

13   code modifier combination in order to authorize

14   the overtime and rate of pay on the service

15   plan.  That is what the TU modifier stands for.

16        Q.    Got it.  And did that occur?

17        A.    Yes, those systemic and operational

18   changes did occur.

19        Q.    And in terms -- was that -- how was

20   that integrated into the ISP process in the

21   allocation of hours that you described earlier?

22                  ATTORNEY WEBBER:  Objection,

23   assumes facts.

24                  THE COURT:  Rephrase the

25   question.

538

1              ATTORNEY FOSTER:  Sure.

2      BY ATTORNEY FOSTER:

3          Q.    After OLTL implemented this new

4      change, which entity under the program was

5      going to help to implement that overtime?

6          A.    Our fiscal intermediary, fiscal

7      employer agent, Public Partnership, worked with

8      OLTL to operationalize the change.

9          Q.    And for the service coordinator role

10     that you described, did the service coordinator

11     play a role regarding any amendments to the

12     ISP?

13         A.    Yes.  The service coordinator was

14     directed through policy bulletins how to modify

15     the service plan for the new service code

16     structure that existed to allow for the plan to

17     be structured so the services could be billed

18     with the new overtime service codes.

19         Q.    And did the working group at OLTL

20     and PPL and other entities that you involved in

21     that, did that continue to meet over a period

22     of time?

23         A.    Yes.

24         Q.    Can you describe what period of time

25     that they met?

539

1          A.    I believe all throughout 2015 the

2    group met to discuss systemic changes and how

3    to operationalize the change and put it into

4    place.

5                    ATTORNEY FOSTER:  If I could

6    have JX 331, please.

7                    THE COURT:  When you use the

8    term "fiscal intermediary," who are you

9    referring to?

10                   THE WITNESS:  Public

11   Partnerships, our fiscal vendor.

12                   THE COURT:  The reason I ask

13   is because normally you call them fiscal

14   vendor.  You say fiscal --

15                   THE WITNESS:  Yeah, so fiscal

16   intermediary, fiscal employer agent, those are

17   the -- that's the terminology used.

18                   THE COURT:  Okay.

19   BY ATTORNEY FOSTER:

20        Q.    And do you recognize this document,

21   Ms. Barge?

22        A.    Yes.

23        Q.    And this -- it says DHS OLTL FLSA

24   Working Group, and it's dated November of '15.

25   Did you attend these meetings?

1    funding would be subject to recoupment by the

2    program rules, and we would pursue that

3    recoupment to recover that overpayment of

4    Medicaid funding.

5        Q.    Thank you.

6                ATTORNEY FOSTER:  If I could

7    have Exhibit No. PX 44, please.

8    BY ATTORNEY FOSTER:

9        Q.    And do you recognize this document,

10   Ms. Barge?

11       A.    Yes.

12       Q.    And it talks about an effective date

13   of December 1 of 2018.

14                Can you just remind the Court of

15   what your role is at this period in time?

16       A.    I was a section chief within the

17   provider operations division at the Office of

18   Long-Term Living overseeing provider enrollment

19   and claims processing activities, various other

20   functions within the office.

21       Q.    And this has a Pennsylvania

22   Department of Human Services Office of

23   Long-Term Living logo on it; do you see that?

24       A.    Yes.

25                ATTORNEY FOSTER:  And if you

1    could scroll down, Kevin, so she can see the

2    whole document.

3    BY ATTORNEY FOSTER:

4        Q.    I just have a few questions for you

5    about this.

6            Do you recall the circumstances that

7    the Office of Long-Term Living sent out or

8    created this document?

9                ATTORNEY FOSTER:  If you can

10   scroll up to the first page.  Thank you.

11                THE WITNESS:  Yes.

12   BY ATTORNEY FOSTER:

13       Q.    What were those circumstances?

14       A.    It was a development of a

15   pre-service orientation to acclimate program

16   participants with the program.

17       Q.    And was that part of the

18   implementation under the program as described

19   by OLTL?

20       A.    Yes.

21       Q.    And who was going to implement that

22   provision?

23       A.    So as part of this, as the fact

24   sheet laid out, it was through the fiscal

25   vendor, Public Partnerships, and a

1    subcontractor, Frontline Healthcare, that would

2    put together -- that would operationalize this

3    preservice orientation.

4         Q.    And prior to this time, was there

5    any preservice orientation that was either

6    mandatory or required in the program?

7         A.    Not of this nature.

8         Q.    Okay.  And this one talks about it

9    being a mandatory-type preservice orientation;

10   correct?

11        A.    Yes.

12        Q.    So who had to attend this?

13        A.    Any newly enrolled Direct Care

14   Worker coming into the program to serve our

15   participants.

16        Q.    So what about those Direct Care

17   Workers that were already enrolled and already

18   working in the program?  Did they have to

19   attend?

20        A.    No.

21        Q.    Was there -- other than this

22   preservice orientation one time, was there any

23   continuing obligation for orientation of any

24   sort?

25        A.    No.

1              ATTORNEY FOSTER:  And if you

2    scroll down to where -- "How is the orientation

3    advertised."

4    BY ATTORNEY FOSTER:

5         Q.    Do you see that?

6         A.    Mm-hmm.  Yes.

7         Q.    It reads "The new CLE instructions

8    will include the requirement for their DCW in

9    the new hire application."

10             What are the CLE instructions being

11   referred to here?

12        A.    It would be the instructions as part

13   of the common law employer program rule

14   documents.

15        Q.    And that's a packet that goes to the

16   participant CLE?

17        A.    Yes.

18        Q.    And then the next sentence reads,

19   "The new DCW packets will also include the

20   requirement."

21             And that requirement is the

22   preservice orientation?

23        A.    Yes.

24        Q.    And towards the bottom, it says, "In

25   early November 2018, PPL added it to the

562

1    message of the day on the customer service

2    line."

3              What is the message of the day?

4        A.    So when you would call a hotline,

5    you know, calling any kind of service hotline,

6    Verizon or Comcast, you hear the automated

7    messaging, that would be the automated

8    messaging that would play for the day when

9    calling the PPL customer service line.

10       Q.    And then the next line talks about

11   "PPL posted the new requirement postcard on the

12   website prior to implementation on December 1,

13   2018."

14             Do you see that?

15       A.    Yes.

16       Q.    And what is this -- do you know what

17   the postcard on the website is referring to?

18       A.    Basically, a block on a website

19   where communications would be issued or laid

20   out on a web page.

21             ATTORNEY FOSTER:  And if you

22   could turn to the next page.

23             THE COURT:  Counsel, the Court

24   has to break now for a telephone call.  So

25   we'll take our morning recess at this time.