NO. 25-01369

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT**

_____

RALPH TALARICO, INDIVIDUALLY AND ON BEHALF OF THE FLSA
COLLECTIVE AND THE RULE 23 CLASS

*Plaintiffs-Appellants,*

v.

PUBLIC PARTNERSHIPS, LLC, D/B/A PCG PUBLIC PARTNERSHIPS,

*Defendant-Appellee.*

_____

On Appeal from the U.S. District Court
For the Eastern District of Pennsylvania
Civil Action No. 17-2165

_____

**REPLY BRIEF OF APPELLANTS**

_____

COHEN MILSTEIN SELLERS &
TOLL PLLC
Christine E. Webber
Alisa Tiwari
Dana Busgang
1100 New York Ave. NW, 8th Floor
Washington, DC 20005
Telephone: (202) 408-4600
cwebber@cohenmilstein.com

NICHOLS KASTER, PLLP
Rachhana T. Srey
H. Clara Coleman
4600 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
srey@nka.com

*Attorneys for Appellants
additional counsel on next page*

Additional counsel:

ARNOLD, BEYER & KATZ
Richard Katz, PA Bar No. 20702
2173 Embassy Drive
Lancaster, PA 17603
Telephone: (717) 394-7204
Fax: (717) 291-0992
rkatz@arnoldbeyerkatz.com

# TABLE OF CONTENTS

Page

Introduction ................................................................................. 1

Argument ..................................................................................... 2

I.  The District Court Erred as a Matter of Law in Assessing Joint
Employment. ......................................................................... 2

   A.  PPL's arguments are riddled by global legal errors. ............... 2

      1.  Whether facts are sufficient to find joint employment is a
legal determination. ...................................................... 2

      2.  Focusing on who has *more* control turns the joint
employment inquiry on its head. ................................... 5

      3.  PPL's attempt to eschew indirect control fails. ............ 6

   B.  The district court erred as a matter of law in evaluating two
*Enterprise* factors. ............................................................ 7

      1.  The district court failed to consider PPL's authority to set
work rules and conditions of employment. ................... 7

      2.  The district court erred in failing to recognize PPL's role
in hiring. ..................................................................... 14

II.  The District Court Clearly Erred in its Factual Findings. ............ 18

   A.  PPL concedes it set hourly rates in three circumstances. .......... 18

   B.  PPL also effectively set hourly rates at the transition. ........... 19

   C.  PPL co-determined hazard pay. ......................................... 20

   D.  PPL's discretionary decisions significantly impacted the costs
used to calculate the maximum pay rate. .............................. 21

III.  The Holistic Test Confirms PPL is a Joint Employer. .................... 23

   A.  PPL and the district court fail to examine the economic realities
in a holistic application of *Enterprise*. .................................. 24

   B.  *Enterprise*'s holistic analysis confirms PPL is a joint employer. .......... 27

Conclusion ................................................................................. 28

# TABLE OF AUTHORITIES

**Page(s)**

C ASES

*Antenor v. D & S Farms,*
  88 F.3d 925 (11th Cir. 1996)..........................................5, 6, 10, 11, 12, 15, 16, 26

*Baystate Alt. Staffing v. Herman,*
  163 F.3d 668 (1st Cir. 1998) ..........................................................................12, 25

*Bedrosian v. United States,*
  912 F.3d 144 (3d Cir. 2018) .................................................................................19

*Bonnette v. Cal. Health & Welfare Agency,*
  704 F.2d 1465 (9th Cir. 1983)....................................................................3, 14, 25

*Browning-Ferris v. NLRB,*
  911 F.3d 1195 (D.C. Cir. 2018) ...........................................................................15

*Cooper v. Loper,*
  923 F.2d 1045 (3d Cir. 1991) ................................................................................4

*Donovan v. Grim Hotel Co.,*
  747 F.2d 966 (5th Cir. 1984)..........................................................................1, 8, 9

*Echavarria v. Williams Sonoma, Inc.*
  No. 15-6441, 2016 WL 1047225 (D.N.J. Mar. 16, 2016) ....................................6

*In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.,*
  683 F.3d 462 (3d Cir. 2012) .........................2, 3, 4, 6, 7, 11, 12, 13, 23, 24, 25, 26

*Evans v. United Arab Shipping Co. S.A.G.,*
  4 F.3d 207 (3d Cir. 1993) ......................................................................................3

*Garcia-Celestino v. Ruiz Harvesting, Inc.,*
  843 F.3d 1276 (11th Cir. 2016)........................................................................3, 16

*Hall v. DIRECTV, LLC,*
  846 F.3d 757 (4th Cir. 2017)........................................................................6, 8, 24

*Hardgers-Powell v. Angels In Your Home LLC,*
  330 F.R.D. 89 (W.D.N.Y. 2019) .............................................................8, 25, 26

## TABLE OF AUTHORITIES

*Interpace Corp. v. Lapp, Inc.,*
721 F.2d 460 (3d Cir. 1983) .................................................................................. 3

*Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.,*
456 U.S. 844 (1982) ............................................................................................. 2

*Keating v. Pittston City Hous. Auth.,*
No. 17-465, 2018 WL 1414459 (M.D. Pa. Mar. 21, 2018) ................................... 8

*Kroeck v. UKG, Inc.,*
No. 22-66, 2022 WL 4367348 (W.D. Pa. Sept. 21, 2022) ................................. 26

*Martin v. Selker Bros.,*
949 F.2d 1286 (3d Cir. 1991) .............................................................................. 16

*McGann v. Cinemark USA, Inc.,*
873 F.3d 218 (3d Cir. 2017) ................................................................................. 4

*NLRB v. Browning-Ferris,*
691 F.2d 1117 (3d Cir. 1982) ................................................... 1, 10, 11, 15, 16, 23

*Pullman-Standard v. Swint,*
456 U.S. 273 (1982) ............................................................................................. 4

*Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.,*
52 F.4th 843 (9th Cir. 2022) .......................................................................... 10, 12

*Reich v. Gateway Press, Inc.,*
13 F.3d 685 (3d Cir. 1994) ............................................................................... 4, 18

*Ruiz v. Fernandez,*
949 F.Supp.2d 1055 (E.D. Wash. 2013) ............................................................. 25

*Rutherford Food Corp. v McComb,*
331 U.S. 722 (1947) ........................................................................................... 24

*Salinas v. Com. Interiors, Inc.,*
848 F.3d 125 (4th Cir. 2017) ................................................................... 3, 4, 7, 18

*Savakus-Malone v. Piramal Critical Care, Inc.,*
No. 18-5063, 2019 WL 2897697 (E.D. Pa. July 3, 2019) ................................... 26

# TABLE OF AUTHORITIES

*Schultz v. Cap. Int'l Sec., Inc.,*
    466 F.3d 298 (4th Cir. 2006) .................................................................. 4, 15, 16, 17

*Talarico v. Pub. Partnerships,*
    837 F. App'x 81 (3d Cir. 2020) ............................................................. 1, 7, 12, 13

*Torres-Lopez v. May,*
    111 F.3d 633 (9th Cir. 1997) ........................................................................ 5, 7, 10

*United States v. Igbonwa,*
    120 F.3d 437 (3d Cir. 1997) ..................................................................... 18, 20, 21

*Verma v. 3001 Castor, Inc.,*
    937 F.3d 221 (3d Cir. 2019) ............................................................................. 3, 16

*VICI Racing, LLC v. T-Mobile USA, Inc.,*
    763 F.3d 273 (3d Cir. 2014) ........................................................................... 19, 20

*Wirtz v. Barnes Grocer Co.,*
    398 F.2d 718 (8th Cir. 1968) ................................................................................. 3

## STATUTES

29 U.S.C.A. § 207 ........................................................................................................ 9

29 U.S.C.A. § 213 ........................................................................................................ 9

## OTHER AUTHORITIES

Ctrs. for Medicare & Medicaid Servs., *Application for a §1915(c) Home and
    Community-Based Waiver* (Jan. 2019), *available at* https://wms-
    mmdl.cms.gov/WMS/help/35/Instructions_TechnicalGuide_V3.6.pdf (last
    visited Nov. 5, 2025) ............................................................................................ 25

## INTRODUCTION

PPL's brief is notable for what it does not say—not for what it does.

PPL does not dispute that it established overtime eligibility rules that deprived thousands of workers of overtime pay; that the district court's findings indicate that PPL jointly determined workers' maximum wage rate; that PPL exercised its judgement to determine if timesheets complied with program rules and routinely denied payment for months; that PPL trained workers on completing complex homecare tasks and provided a mandatory orientation; and that PPL was responsible for verifying workers were qualified to provide homecare and could veto anyone who was not. Nor could it: The district court's fact findings, along with unrefuted trial evidence, compel these conclusions.

Because these conclusions "weigh[] in support of concluding that PPL is a joint employer," the district court erred in holding otherwise. *Talarico v. Pub. Partnerships*, 837 F. App'x 81, 85 (3d Cir. 2020) (that "PPL caps the maximum rate," "reviews" workers' "timesheets," and "provides orientation and training," demonstrates control); *Donovan v. Grim Hotel Co.*, 747 F.2d 966, 972 (5th Cir. 1984) (developing pay policies demonstrates control); *NLRB v. Browning-Ferris*, 691 F.2d 1117, 1119 (3d Cir. 1982) (authority to veto hiring decisions demonstrates control).

PPL's responses are either irrelevant or incorrect. Most often, PPL regurgitates the district court's reasoning without addressing Talarico's arguments about why that

reasoning is flawed. PPL also inexplicably eschews discrete legal holdings because Talarico cited cases that also discuss other *Enterprise* factors. Occasionally, PPL misrepresents this Court's and other court's holdings in refusing to acknowledge, for instance, that the power to cap wages and veto hiring decisions is control.

PPL's failure to dispute that in some circumstances it set workers' exact wage rate—and that the district court erred in finding only participants set those rates—is just icing on the cake. PPL essentially concedes that the district court erred as a matter of fact too.

Because PPL does not—and cannot—demonstrate that the district court's legal and factual findings are correct, this Court should reverse.

## ARGUMENT

## I. THE DISTRICT COURT ERRED AS A MATTER OF LAW IN ASSESSING JOINT EMPLOYMENT.

### A. PPL's arguments are riddled by global legal errors.

#### 1. Whether facts are sufficient to find joint employment is a legal determination.

PPL's frontline defense is that Talarico disputes the district court's "weighing of the evidence," which is "classic fact-finding entitled to this Court's deferential clear error standard." PPL's Response Brief ("Resp.") 25.[1] But what PPL calls "weighing

---

[1] Of course, weighing evidence can be a factual question when a court evaluates conflicting evidence to make a fact finding. The single authority PPL invokes to support its proposed standard of review involves *only* that situation. Resp. 25 (citing *Inwood Lab'ys, Inc. v. Ives Lab'ys, Inc.*, 456 U.S. 844, 855 (1982)).

evidence" here is actually just the application of law to established facts. As PPL's authorities (at 17) explain: "Once the underlying facts are established, and the rule of law is undisputed, the issue of whether the facts meet the statutory standard is an issue of law." *Evans v. United Arab Shipping Co. S.A.G.*, 4 F.3d 207, 213 (3d Cir. 1993).

Thus, *even following bench trials*, "[a]lthough the underlying facts are reviewed under the clearly erroneous standard, the legal effect of those facts—whether appellants are employers within the meaning of the FLSA—is a question of law." *Bonnette v. Cal. Health & Welfare Agency*, 704 F.2d 1465, 1469 (9th Cir. 1983); *Salinas v. Com. Interiors, Inc.*, 848 F.3d 125, 145 (4th Cir. 2017); *Garcia-Celestino v. Ruiz Harvesting, Inc.*, 843 F.3d 1276, 1284 (11th Cir. 2016) (similar); *Wirtz v. Barnes Grocer Co.*, 398 F.2d 718, 722 (8th Cir. 1968);*cf. Verma v. 3001 Castor, Inc.*, 937 F.3d 221, 229 (3d Cir. 2019) (identifying the "law component" as "the conclusion of whether [established] facts" show an employment relationship).

Talarico's appeal primarily concerns "the legal effect" of established facts. The district court made discrete factual findings that support PPL's joint control over training, the maximum wage rate, timesheets, and verifying qualifications. However, it erred by failing to properly apply the *Enterprise* test to those facts.

This Court should consider those established facts as it applies the joint employment legal test *de novo. Cf. Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3d Cir. 1983) (relying on "district court's extensive findings of fact" because "its

findings of fact permit us to resolve this case as a matter of law"); *Cooper v. Loper*, 923 F.2d 1045, 1050–52 (3d Cir. 1991) (finding that the district court "misapplied the law" on indemnity and resolving the case by "[a]pplying these [correct] principles to the district court's findings of facts").

The second category of legal errors Talarico raises involves the "fail[ure] to make a [fact] finding because of an erroneous view of the law." *Pullman-Standard v. Swint*, 456 U.S. 273, 291–92 (1982). When that happens, any "missing findings" are oversights stemming from legal error. *Id.*

Circuits regularly rely on undisputed record evidence the district court ignored due to legal error in evaluating joint employment on appeal. *Salinas*, 848 F.3d at 145 ("[W]e conclude that any factual disputes are immaterial and, therefore, resolve the joint employment question based on the undisputed facts in the record."); *Schultz v. Cap. Int'l Sec., Inc.*, 466 F.3d 298, 306 (4th Cir. 2006) (similar); *cf. Reich v. Gateway Press, Inc.*, 13 F.3d 685, 697 (3d Cir. 1994) (reversing the district court's conclusion on FLSA exemption after a bench trial based on "undisputed" facts from the record).

Here, the district court's misunderstanding of what qualifies as control under *Enterprise* led it to ignore undisputed evidence demonstrating how PPL (1) set overtime rules, and (2) recruited workers. Because the evidence supporting these levers of control is undisputed, this Court may rely on it in its plenary review of whether PPL was a joint employer. *Cf. McGann v. Cinemark USA, Inc.*, 873 F.3d

218, 221 (3d Cir. 2017) (reversing district court's conclusions after a bench trial and applying the correct interpretation of disability law to undisputed facts).

> 2. Focusing on who has *more* control turns the joint employment inquiry on its head.

PPL—like the district court—repeatedly relies on evidence that participants exerted more control as evidence of PPL's lack of significant control. PPL spends pages arguing that participants have "more authority" than PPL in compensation; training and orientation; and recruitment. Resp. 31-37, 46-47; Appx0020-0021 (concluding that the fact "that [participants] have more authority to set work rules" indicated that PPL did not exert significant control). PPL and the district court similarly tout participant's "significant control" to wrongly imply PPL has none. Resp. 24-25, 40, 47-48.

That is a foundational legal error. *Enterprise*'s requirement of "significant control" does not mean "more control." It couldn't. That construction would always result in only a single employer, entirely defeating the concept of *joint* employment: Because one entity will almost always have "more control" than another, the second entity, by default, would never be an employer alongside them.

"[T]he question in 'joint employment' cases is not whether the worker is more economically dependent on [one entity or another], with the winner avoiding responsibility as an employer." *Antenor v. D & S Farms*, 88 F.3d 925, 932 (11th Cir. 1996); *Torres-Lopez v. May*, 111 F.3d 633, 641 (9th Cir. 1997) ("The issue is not

whether a farmworker is *more* dependent upon the farm labor contractor or the grower."). Instead, joint employment recognizes that two entities can simultaneously exercise significant control—even when one exerts more. *See Hall v. DIRECTV, LLC*, 846 F.3d 757, 770 (4th Cir. 2017) (an entity need not have "primary authority" to qualify as a joint employer).[2]

Nor does one entity having "significant control" foreclose another entity from having significant control. That's because joint employment is, by definition, two or more entities *sharing* control. *In re Enterprise*, 683 F.3d at 468 ("share or co-determine"). That shared control can be over the same *Enterprise* factor. *Echavarria v. Williams Sonoma, Inc.* No. 15-6441, 2016 WL 1047225, at *6 (D.N.J. Mar. 16, 2016) (*both* entities exercised significant control over hiring where the putative employer conducted background checks, required applicants to complete its paperwork, and barred applicants it deemed unqualified, while another entity controlled other aspects of hiring).

3. PPL's attempt to eschew indirect control fails.

PPL mischaracterizes Talarico as arguing that *some* evidence of indirect control

---

[2] PPL criticizes Talarico for citing to out-of-circuit cases (Resp. 2, 39), but *Enterprise* itself recognizes that other circuits deploy the "same factors" and approvingly cites cases from the First, Second, and Ninth Circuits. *In re Enterprise Rent-A-Car Wage & Hour Emp. Pracs. Litig.,* 683 F.3d 462, 468-69 (3d Cir. 2012). The Eleventh and Fourth Circuits use analogous factors. *See Antenor*, 88 F.3d at 929; *Hall*, 846 F.3d at 769-70.

is *always* sufficient for demonstrating joint employment. Resp. 21-23. Not so. Talarico argues that the district court erred by disregarding evidence of indirect control, because FLSA (and *Enterprise*) require consideration of both direct and indirect control. Appellant's Opening Brief ("O.B.") 30-31. Indeed, this Court already recognized that PPL's indirect control is probative of joint employment. *See Talarico v. Pub. Partnerships,* 837 F. App'x 81, 85 (3d Cir. 2020).

PPL also suggests that indirect control alone cannot suffice for showing joint employment. Resp. 23. But that's wrong too: This Court rejected a test for joint employment that "would only find joint employment where an employer had direct control over the employee" because "FLSA designates those entities with sufficient *indirect* control as well." *Enterprise*, at 683 F.3d at 469; *cf. Torres-Lopez*, 111 F.3d 633 (reversing district court that granted summary judgment because defendant's control was indirect, finding control was still significant); *Salinas*, 848 F.3d at 148 (indirect control is sufficient to render entity an "employer" under FLSA).

Regardless, PPL exerts both direct and indirect control. *See infra* § II.

**B.** **The district court erred as a matter of law in evaluating two *Enterprise* factors.**

    1. <u>The district court failed to consider PPL's authority to set work rules and conditions of employment.</u>

**(a) Overtime Rules.** Undisputed trial evidence demonstrates that PPL controlled compensation when it crafted and implemented the program's overtime eligibility rules. O.B. 9-10. PPL was contractually responsible for ensuring the

program complied with FLSA, and PPL invoked FLSA's live-in exemption and created a tool for applying it to prevent thousands of workers from receiving 1.5 times their regular rate when they worked more than 40 hours a week. O.B. 9-10. *Cf. Donovan*, 747 F.2d at 972 (evidence that putative employer "guided [company's] policies" and "authorize[d] compliance with the Fair Labor Standards Act" demonstrates control over pay); *Hall*, 846 F.3d at 773 ("authority to determine" what predetermined "rate" applies to hours worked reflects "integral role in setting [] compensation").

Because the FLSA violations alleged here flow from PPL's overtime eligibility decisions, PPL's control over overtime weighs strongly in favor of joint employment. *Keating v. Pittston City Hous. Auth.*, No. 17-465, 2018 WL 1414459, at *5 (M.D. Pa. Mar. 21, 2018) (in evaluating joint employment, joint control should be linked to the alleged wrongdoing); *Hardgers-Powell v. Angels In Your Home LLC*, 330 F.R.D. 89, 109-111 (W.D.N.Y. 2019) (similar); *cf. Donovan*, 747 F.2d at 972, n.7 ("We cannot easily imagine firmer proof of [] 'employer' status" than "authoriz[ing] compliance with the Fair Labors Standards Act").

The district court, however, erroneously ignored this evidence because it understood control over overtime pay to exclusively mean control over scheduling workers to work over 40 hours a week. Appx0020. And PPL doubles down on the district court's error: Instead of rebutting the evidence demonstrating how it

8

determined overtime eligibility rules, PPL implies that its authority is irrelevant because service coordinators and participants controlled whether workers worked over 40 hours per week.[3]

But authorization to work over 40 hours a week does not alone determine overtime compensation. Rather, to receive overtime pay at 1.5 times the regular rate, a worker must (1) work over 40 hours a week; *and* (2) be eligible to receive overtime pay in the first place (*i.e.* not be exempt). *See* 29 U.S.C.A. § 207 (overtime requirement); 29 U.S.C.A. § 213 (FLSA exemptions). While service coordinators and participants jointly determined the former, PPL determined the latter.

PPL attempts to distinguish *Donovan*, claiming the putative employer there exerted additional levers of control. Resp. 41-42. Putting aside that Talarico demonstrates additional levers here too, the existence of other contributing factors does not change *Donovan*'s discrete (and common sense) legal conclusion that entities control compensation when they shape policies that determine how much workers earn, as PPL did here. 747 F.2d at 966, 972.

**(b) Maximum Wage Rate.** Although the district court's fact findings demonstrate that PPL controlled compensation by setting a maximum wage rate and thus limiting the wages workers could receive, PPL argues (as a legal matter) that

---

[3] PPL's assertion (at 41) that Pennsylvania single-handedly invoked the live-in exemption is unsupported and ignores Talarico's myriad of cites to the contrary. O.B. 9-13.

because participants chose the exact rate from within that range, participants exclusively controlled workers' rate of pay. Resp. 35-36; Appx0019.

But the entity choosing a worker's exact wage does not *exclusively* control compensation when a different entity limits the money that can be allocated to workers. *Antenor*, 88 F.3d at 936 (deductions to pay rate for insurance is control over compensation); *Browning-Ferris*, 691 F.2d at 1119 (determining the maximum amount of money allocated to workers is control over compensation); *see Torres-Lopez*, 111 F.3d at 642-43; *Ray v. L.A. Cnty. Dep't of Pub. Soc. Servs.*, 52 F.4th 843, 849 (9th Cir. 2022).

Tacitly acknowledging the maximum rate does, in fact, matter, PPL's real argument is that only the state set the maximum wage rate. Resp. 35-36. But its argument cannot be squared with the district court's findings. The district court "determine[d] that [] PPL sets the range within which [participants] can pay their [workers]" by taking a number provided by the state and making "individualized deductions" for "the cost of workers' compensation insurance, unemployment insurance costs, and employer taxes." Appx0019; Appx0012. The district court also recognized that PPL helped determine the size of those deductions by, for instance, managing workers' compensation, Appx0020, and determining participants' tax deductions, Appx0016. These findings compel the conclusion that PPL also controlled the deductions' size and thus the maximum wage rate.

PPL next attempts to minimize its role in workers compensation, emphasizing that its broker (not PPL) chose the policies and that participants were the policyholders. It ignores, however, that PPL's decisions on workers' compensation had significant financial consequences. For instance, PPL reduced the insurance rates paid by 42%, which translated into a smaller deduction for workers' compensation. Appx0897. In fact, PPL's role impacting workers' compensation costs was so significant that the state paid PPL a cost savings bonus. Appx0543 (state agreeing to pay PPL part of savings from lower workers-compensation costs).

PPL also attempts to distinguish *Browning-Ferris*. According to PPL, "the putative employer there paid a rate it negotiated with the company that paid the drivers." Resp. 38. But *Browning-Ferris* says nothing of the sort. There, the putative employer paid a broker for each trash load that workers hauled, and the broker—and only the broker—selected the exact amount to pay to each driver. The broker used the putative employer's load rate as a ceiling for paying the workers—just like the maximum wage rate here. Thus, this Court should similarly hold, pursuant to *Browning-Ferris*, that participants and PPL "together determined [workers]' compensation." 691 F.2d at 1125.[4]

PPL seeks to differentiate *Antenor* too, Resp. 39, but it ignores the Eleventh

---

[4] PPL discounts *Browning-Ferris* because it precedes the *Enterprise* test. Resp. 37. But *Enterprise* itself confirms *Browning-Ferris* is good law, deeming it the "starting point" for the *Enterprise* test. *Enterprise*, 683 F.3d at 468.

Circuit's holding regarding deductions. There, the putative employer paid a contractor for each box of beans the workers picked, and the contractor then chose the exact amount to pay the workers. *Antenor*, 88 F.3d at 928. The Eleventh Circuit determined that the putative employer indirectly controlled wages because—rather than paying the contractor the negotiated per-box rate—they "deducted 11¢ per box to purchase worker's compensation insurance" and "also deducted money from the negotiated box price to cover social security taxes." *Id.* at 936. Both deductions "limited [the contractor's] freedom to allocate the money he received for his services" to the workers and thus demonstrated control. *Id.*

The same is true here: PPL's role in establishing the size of the deductions made from the state's maximum pay rate "limited" participants' "freedom to allocate" money to workers.

**(c) Timesheets.** The district court found that "[o]nce PPL receives a completed timesheet, it reviews the hours billed and compares them to the hours authorized in the [service plan] to ensure the timesheet follows the program rules." Appx0008-0009. But it ignored that fact in analyzing *Enterprise* factor 2.

That was legal error: This Court already ruled that processing timesheets is a sign of economic control. *Talarico*, 837 F. App'x at 85; *see Baystate Alt. Staffing v. Herman*, 163 F.3d 668, 676 (1st Cir. 1998) (similar); *cf. Ray*, 52 F.4th at 850–51 (evidence of control that putative employer considered another entity's "guidelines

prescribing a range of hours" to "authorize[]" certain "hours").

PPL does not dispute the district court's fact finding that it approved timesheets, the legal rule that authorizing timesheets indicates control, or that PPL routinely exercised its judgment to deny payment (often for months). *See, e.g.*, Appx1082-1085 (PPL denying 21 timesheets for one worker in eight months). Thus, PPL concedes that the district court erred by failing to consider PPL's timesheet processing in analyzing *Enterprise* factor 2.

(d) Training. Despite finding PPL trained workers in two ways—(1) organizing functions training and (2) conducting mandatory pre-service orientation—the district court gave short shrift to PPL's training in its legal analysis and entirely ignored its own fact finding on functions training. Appx0019-0020. That was error. As this Court itself explained, evidence that "PPL provides orientation and training" demonstrates control over work rules. *Talarico*, 837 F. App'x at 85.

Instead of defending the district court's approach, PPL makes unsupported assertions that only participants trained workers. Resp. 45. But these assertions cannot be squared with the district court's fact findings that PPL provided workers with *the only formal training* they received on homecare duties. Appx0010-0011, 0019.

PPL also argues that the orientation, specifically, did not provide "training on the day-to-day operations of how to perform the role." Resp. 46. But even if true, the district court found that PPL's formal functions trainings covered day-to-day

13

operations, "such as personal care, mobility, and nutrition feeding." Appx0011. In any event, the orientation did train workers on their day-to-day tasks, such as proper handwashing and donning and doffing gloves. Appx0686-0691.

PPL wrongly emphasizes that the orientation was time limited, that the state told PPL to conduct the orientation, and that PPL used a vendor. Resp. 45-46. To the contrary, the district court found that PPL conducted the orientation for four months in 2017, and then from 2018 *onward*. Appx0010. The district court also found that PPL had the authority decide how to complete the orientation, including choosing to use a vendor. Appx0019; Appx0010-0011. "The fact that the appellants delegated . . . various responsibilities [of employer] . . . merely makes them joint employers." *Bonnette*, 704 F.2d at 1470.

> 2. The district court erred in failing to recognize PPL's role in hiring.

**(a) Qualification checking.** The district court found that workers could not start and receive pay until PPL verified their qualifications through its "good to go" process—a review that often prevented workers from earning wages for over a month. Appx0018; Appx0006 (citing Appx0370-0371); Appx0519-0520; Appx0252; Appx0263-0264; Appx0258.

But it erred by failing to recognize that these findings demonstrated control over hiring because PPL had (1) the power to exclude unqualified workers from getting jobs (and thus receiving any wages); and (2) the power to stop workers from earning

wages until it verified compliance. *See Browning-Ferris*, 691 F.2d at 1120, 1124; *Antenor*, 88 F.3d at 934-935; *Schultz*, 466 F.3d at 306, 302.

PPL does not dispute that the district court deemed PPL responsible for checking qualifications, nor that such responsibility indicates control over hiring. Instead, PPL narrowly argues that running background checks does not demonstrate control. Resp. 49.

But PPL's argument misses the mark because PPL performed far more than background checks. For instance, PPL was responsible for verifying that applicants "[p]ossess basic math, reading, and writing skills" and "[d]emonstrate the capability to perform health maintenance activities" (or has received the "training necessary" to do so), among other things. Appx1079.[5]

PPL also contends that *Browning-Ferris* is distinguishable because the putative employer there "exercised the ultimate discretion and authority to determine who was permitted to work." Resp. 31. But in *Browning-Ferris*, brokers were primarily responsible for selecting drivers, and the putative employer then had authority to check a qualification (to ensure "a driver is []capable of handling a tractor-trailer"). 691 F.2d at 1120, 1124. Similarly, after participants select workers, PPL is authorized to ensure workers are qualified to provide homecare before they can begin. Appx0530

---

[5] The existence of that responsibility—not how PPL approached it—is what matters. *Browning-Ferris v. NLRB*, 911 F.3d 1195, 1209-11 (D.C. Cir. 2018) ("[J]oint employ[ment]...depends upon the amount of actual and potential control.").

(contract with the state); *see* Appx1056-1057; Appx0444; Appx0274-0275. Thus, this Court should hold that PPL "shared" "the right to hire" with participants. *Browning-Ferris*, 691 F.2d at 1120, 1124.

PPL takes issue with *Ruiz* and *Scantland* because they are independent contractor cases. Resp. 30. But both the independent contractor and joint employment tests evaluate economic realities by drawing on the same definitions of "employee" and "employer" in FLSA to determine the existence of an employment relationship. *Martin v. Selker Bros.*, 949 F.2d 1286, 1293 (3d Cir. 1991). And in doing so, both tests consider authority over hiring. Thus, independent-contractor cases are persuasive here. Indeed, PPL itself relies on independent contractor cases. Resp. 17 (citing *Verma*, 937 F.3d at 229).[6]

More importantly, PPL ignores *Antenor* and *Schultz,* which hold that the power to veto hiring decisions evidences joint employment. *Antenor*, 88 F.3d at 935; *Schultz*, 466 F.3d at 306, 302. PPL also fails to address that delaying workers' start dates during the qualification process significantly impacts workers' economic reality, preventing them from earning wages during that time. *Antenor*, 88 F.3d at 934. Because PPL exerted both types of authority, it jointly controlled hiring.

---

[6] In any event, Talarico cited independent contractor cases simply to demonstrate that PPL's qualification-checking power does not dissipate because the state set the qualifications that PPL checked. That is because PPL still had discretion in assessing whether candidates were qualified. PPL does not directly challenge that proposition.

**(b) Recruitment.** The district court erred when it ignored—because of its improperly narrow understanding of hiring power—Talarico's undisputed evidence of PPL's significant role in recruitment.

PPL does not dispute (as a legal matter) that an entity who plays a significant role in recruitment exerts control in hiring. Rather, PPL (as a factual matter) disagrees about the scope of its actions in recruitment, arguing, for instance, that it did not place job advertisements. Resp. 32.

The undisputed evidence indicates otherwise. For example, in seeking to renew its contract, PPL explained how it solicited workers "online through social media and job boards, offline [through] local advertising[,] and directly to local institutions such as churches, universities, technical schools and non-profits." Appx0445. And PPL created a database for matching applicants to participants, which PPL described as a "clear example" of it enhancing homecare opportunities because many participants successfully used PPL's database to hire long-term workers. Appx0445.

Given this undisputed evidence, cases like *Schultz* are directly on point. There, the court concluded that the putative employer exerted joint control in hiring because it "advertised for agents" in newspapers and "screened responses" for a specific license, even though it did not interview or have final say in who was hired. *Schultz,* 466 F.3d at 306, 302. PPL's role in recruitment is more extensive: It advertises via social media, job boards, educational and other institutions, and it created a successful

17

database for matching prospective workers to participants.

## II. THE DISTRICT COURT CLEARLY ERRED IN ITS FACTUAL FINDINGS.

The district court made several factual findings for which a review of "the entire evidence" results in "the definite and firm conviction that a mistake has been committed." *United States v. Igbonwa*, 120 F.3d 437, 440–41 (3d Cir. 1997). The district court made fact findings for which no evidence exists and that are contrary to undisputed evidence cited by Talarico.

Because the record evidencing PPL's control is undisputed, this Court may incorporate that undisputed evidence into its joint employment evaluation. *Salinas*, 848 F.3d at 145; *Gateway Press*, 13 F.3d at 697. This Court may remand for further findings, however, if it is unable to determine whether PPL is a joint employer after correcting for legal and factual errors.

### A. PPL concedes it set hourly rates in three circumstances.

The district court's broad conclusion that only participants could choose workers' hourly rates, Appx0020 ¶21, is clearly erroneous because unrefuted evidence shows that PPL: (1) set workers' regular hourly rate at minimum wage if participants left the amount blank on rate forms, O.B. 54; (2) sent rate forms with rates pre-filled, thus effectively choosing hourly rates, O.B. 54; and (3) chose to pay minimum wage for orientation, O.B. 56.

In fact, because the district court did not address any of these circumstances,

18

this Court need not defer to its broad conclusion that participants had exclusive rate-setting power. *Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018) (no deference to district court's determination when the court failed to make findings on the relevant elements).

PPL does not respond to these arguments, effectively conceding that it was clear error for the district court to conclude that PPL never set hourly rates.

## B.   PPL also effectively set hourly rates at the transition.

The district court concluded that, when PPL began its contract with the state, PPL required all participants to complete a transition rate form to confirm the hourly rate participants previously selected, such that participants controlled rates. Appx0011 citing Appx0702, Appx0365-0367. But the district court failed to point to "some substantial" evidence that would support that conclusion, committing clear error. *VICI Racing, LLC v. T-Mobile USA, Inc.*, 763 F.3d 273, 297 (3d Cir. 2014).

Neither the evidence the district court cited nor any other supports those findings. The transition rate sheet cited by the district court asks for the rate paid "by the existing F/EA" (prior financial agencies who chose workers' rates), *not* a rate chosen by the participant. Appx0702. The district court also relies on testimony from PPL's witness Regina Stewart, but she never testified that such forms were required as part of the transition. Appx0011 (citing Appx0365-0367). Instead, she testified just the *opposite. See* Appx0347-0348 (testifying that when PPL took over the program it did

19

*not* require participants to fill out a rate sheet at transition, but relied on data received from prior agencies); *see also* Appx0307-0310 (discussing Sappx1128 cited by PPL); Appx0314; Appx0242-0243; Appx0246; Appx1076-1077. Thus, PPL, not participants, controlled the rate at transition—and often for years, because PPL never subsequently required participants to complete rate sheets. O.B. 55-56. Fact findings like these that are "internally inconsistent" and "contradicted by external evidence" receive less deferential review and should be overturned. *Igbonwa*, 120 F.3d at 440-41.

PPL barely musters a response: It simply cites the district court's fact finding and—like the district court did—the rate sheet and the testimony from Stewart discussed above, which do not say what they claim.[7] Resp. 43-44. Because PPL does not engage with Talarico's argument, it essentially concedes that the district erred.[8]

## C.    PPL co-determined hazard pay.

The district court stated that PPL merely *distributed* hazard pay, Appx0020 ¶ 22, but it cited no evidence—let alone substantial evidence—to support that conclusion. That is legal error. *Cf. VICI Racing, LLC*, 763 F.3d at 297. And regardless, the

---

[7] PPL cites Sappx1128, which is the same as Appx0702, and Sappx0485–0487, which is the same as Appx0365-0367.

[8] PPL (though not the district court) cites Sappx0548, but that is Stewart's generic testimony that PPL did not control payrates, with no reference to the transition. PPL's remaining evidence relates only to participants' ability to change rates *after* the transition.

undisputed evidence proves otherwise. *See* Appx1074 (PPL's letter to workers explaining that PPL worked with Pennsylvania to *determine* the Hazard Pay amounts);[9] Appx0408-0411; Appx0318-0320; *cf. Igbonwa*, 120 F.3d at 440-41.

PPL relies (at 43-44) on the district court's language but offers no evidence to support the court's assertion and fails to rebut Talarico's evidence to the contrary. Thus, PPL implicitly concedes the district court erred.

### D.    PPL's discretionary decisions significantly impacted the costs used to calculate the maximum pay rate.

If the district court's statement that PPL "has no discretion" in calculating "the costs of deductions" when "applying [the state's] algorithm" for setting the maximum wage rate is construed as a fact finding that PPL acted only ministerially in establishing the costs of employment taxes, workers' compensation, or unemployment insurance, that finding would be clear error. O.B. 36-37, nn.7, 8.

The trial record demonstrates that PPL exercised substantial discretion that materially influenced costs impacting the maximum wage rate. O.B. 12-13. PPL alone determined the individualized tax deductions that factored into every such rate. O.B. 14. It decided whether any tax exemptions applied and required they be taken—consistent with the district court's finding PPL acted as participants' agent for taxes.

---

[9] This letter also contradicts PPL's unsupported assertion that it merely processed hazard payments to workers "according to their hours." Resp. 44. PPL did *not* pay according to hours worked if a worker worked more than 40 hours per week. Appx1074.

Appx0016.

PPL also controlled nearly every aspect of worker's compensation costs. The district court vaguely stated that PPL had no role in overseeing individual insurance policies, or claims made under those policies. Appx0013 (citing Sappx0404). What the district court meant is not clear. But what is clear is that the testimony it cited from PPL's witness does not support that statement. Rather, it confirms, consistent with the district court's recognition that PPL engaged a broker, Appx0020 ¶25, that PPL—not participants or the state—"offer[ed]...competitive premium rates . . . while working with insurance underwriters." Sappx0404.

Looking beyond that single page of testimony, the evidence shows that PPL was the only entity controlling the workers' compensation program—and it did so systematically. It selected the carrier and broker; oversaw the broker and the review of claims, touting that its method of claim review led to a "34% reduction" in claims; and ultimately cutting costs by 42%. O.B. 13-14; Apppx0896-900; Appx0541; Appx0337; Appx0343-0345. PPL unilaterally established designated health care providers, analyzed how to reduce claims, and received financial incentives from the state for lowering workers-compensation costs.  Appx0484; Appx0897; Appx0337-0338; Appx0543 (detailing a $90,000 base payment to PPL, followed by varying quarterly payments). This control eviscerates any conclusion that PPL had no role in oversight over participants' policies or claims.

PPL also impacted unemployment costs. It advised terminated workers on unemployment insurance eligibility, directed participants to report to PPL reasons for terminations, and then communicated directly with the unemployment commission about termination reasons and payroll data that determined claim outcomes and affected coverage costs. Appx0374-0375; Appx0483; Appx0865; Appx0890-0891; Appx1205-1208.

PPL responds by emphasizing that the district court found that participants were notified of unemployment claims, but that does not undermine PPL's role. Resp. 37 n.17. PPL also cites Stewart's vague testimony that the unemployment office directly notifies participants of claims, and that PPL would simply forward claims it received to participants. *See* Sappx0411; Sappx0547. But that testimony cannot be reconciled with: the contracts PPL signed and handbooks it issued confirming PPL was responsible for responding to the unemployment commission; documents showing PPL responded as required; or Stewart's subsequent admission that PPL worked directly with the unemployment office. Appx0374-0375; Appx0483; Appx0865; Appx0890-0891; Appx1205-1208.

## III.   THE HOLISTIC TEST CONFIRMS PPL IS A JOINT EMPLOYER.

The *Enterprise* test holistically considers all evidence of control to determine whether entities "share or co-determine those matters governing essential terms and conditions of employment." *Enterprise*, 683 F.3d at 468 (quoting *Browning-Ferris*,

691 F.2d at 1124); *Hall*, 846 F.3d at 770 (analysis must consider "shared levers of influence" over workers). The touchstone is economic reality, not labels, technical concepts, or "narrow legalistic definitions." *Enterprise*, 683 F.3d at 467, 469. And the economic reality here is that PPL had significant control over hiring, training, pay, and employment records, such that workers were economically dependent on PPL.

A.    **PPL and the district court fail to examine the economic realities in a holistic application of *Enterprise*.**

PPL defends the district court's supposed consideration of "the totality of the circumstances." But the district court's "totality of the circumstances" analysis amounted to it tallying the *Enterprise* factors and concluding: "The Court truly sees PPL as more of a fiscal manager for the [participants] than a joint employer. Therefore, PPL cannot be jointly liable for the payment of unpaid overtime under the FLSA." Appx0022.

That is legal error. The joint employment test does not turn on whether an entity is a "fiscal manager." Nor is the test a mathematical exercise of counting factors. Rather, it is a qualitative assessment evaluating "the total employment situation and the economic realities of the work relationship." *Enterprise*, 683 F.3d at 467-69; *Rutherford Food Corp. v McComb*, 331 U.S. 722, 730 (1947).

The "total employment situation" is such that participants cannot function as sole employers. Because most participants cannot fulfill all employer responsibilities, participant-directed homecare programs seek to *avoid* placing all employer burdens

on participants. O.B. 8. Thus,

> the statutory and regulatory scheme under which participants, fiscal intermediaries, and [workers] operate is not one where overall operational control can be readily isolated to one actor . . . . [T]he responsibilities that would be traditionally associated with one employer are divided between the participant and fiscal intermediary, who work in tandem to control each [worker's] working conditions and to ensure the delivery of home health care services.

*Hardgers-Powell*, 330 F.R.D. at 111.

What's more, PPL's supposedly holistic evaluation improperly fixates on the third *Enterprise* factor: day-to-day supervision. Resp. 48-49. But "the absence of direct, on-site supervision does not preclude a determination that [an entity is an employer under] FLSA." *Baystate*, 163 F.3d at 676; *cf. Bonnette*, 704 F.2d at 1470 (state was employer even though recipient of services provided day-to-day supervision); *Ruiz v. Fernandez*, 949 F.Supp.2d 1055 (E.D. Wash. 2013), order clarified, No. 11-3088, 2013 WL 12167930 (E.D. Wash. June 24, 2013).[10] And for good reason: "This factor . . . has more to do with common-law employment concepts

---

[10] PPL argues that recognizing it is a joint employer will undermine the participants' control envisioned by HCBS programs. O.B. 3 n.1. Not so. As joint employers alongside PPL, participants can retain exactly their current level of control. Indeed, the HCBS program makes clear that co-employment, with the participant sharing responsibility with an agency, satisfies the PDS directive to provide for participant control. *See* Ctrs. for Medicare & Medicaid Servs., *Application for a §1915(c) Home and Community-Based Waiver* (Jan. 2019) at 223–24, *available at* https://wms-nmmdl.cms.gov/WMS/help/35/Instructions_ TechnicalGuide_V3.6.pdf (last visited Nov. 5, 2025); Sappx1486.

of control than with economic dependence." *Antenor*, 88 F.3d at 934–35.

PPL is also incorrect that the district court's decision is "consistent with how other district courts . . . have applied *Enterprise* in the context of third-party providers." PPL cites *Kroeck v. UKG, Inc.*, No. 22-66, 2022 WL 4367348 (W.D. Pa. Sept. 21, 2022), but there, unlike here, the plaintiff alleged employer status based on one *Enterprise* factor alone. *Id.* at *3-4. PPL cites *Savakus-Malone v. Piramal Critical Care, Inc.*, No. 18-5063, 2019 WL 2897697 (E.D. Pa. July 3, 2019), but there, unlike here, the complaint's allegations lacked factual support and were instead "simply a recitation" of the *Enterprise* factors. *Id.* at *3, 6.

Meanwhile, PPL ignores the only case directly on point: *Hardgers-Powell*, which assesses New York's participant-directed homecare program. The court held that the fiscal intermediary was a joint employer where, like PPL, it processed each worker's wages, benefits, taxes and wage withholdings, complied with worker's compensation, disability, and unemployment insurance requirements, and maintained personnel records. *Hardgers-Powell*, 330 F.R.D. at 109–111. The fiscal intermediary there, like PPL, also screened applicants to ensure compliance with state requirements, calculated each worker's wages, decided whether workers would be paid overtime, and audited the workers' timesheets, while the participant was responsible for "recruiting, hiring, training, supervising, scheduling, and firing each" worker. *Id.*

**B.** *Enterprise*'s holistic analysis confirms PPL is a joint employer.

Accounting for the district court's legal errors, *see supra* § I, the following is clear: Many workers would never be hired if not for PPL. As PPL acknowledges, many participants cannot find their own worker, so PPL created a sophisticated plan to solicit candidates and database to match them to participants. O.B. 15-16. After participants find workers, PPL reviews, and must confirm, their qualifications before anyone can be hired. O.B. 18-19. PPL's verification process could take months, depriving workers of thousands of dollars in wages. O.B. 19. Once workers are verified, PPL organized a mandatory orientation that informed workers of their job duties and trained them on completing important homecare tasks. O.B. 19. PPL then administered functions trainings to instruct workers on more complex tasks. O.B. 20.

PPL controlled workers' pay too. First, it decided whether a worker would be eligible for overtime premiums—depriving thousands of workers of overtime pay and, importantly, giving rise to the claims filed in this lawsuit. O.B. 9-12. PPL also set workers' maximum wage rate via its discretion to control the size of the deductions that factored into that rate. *Supra* §§ I.B.1, II.D; O.B. 12-15. And, because unrefuted evidence demonstrates that most participants had to pay the maximum to attract qualified workers, PPL's setting of the maximum rate often translated into workers' *actual* rate. O.B. 17. PPL then dictated whether workers got paid *at all* through its review (and frequent rejection) of timesheets. O.B. 20-21. Accounting for factual

errors makes PPL's control over pay starker. *Supra* § II. It shows that PPL directly controlled compensation by at times determining workers' *exact pay rate*.

Finally, "PPL controls [workers'] employment records, tax forms, employment enrollment packet, and time sheets." Appx0021. Workers had to rely on PPL any time they needed to verify their employment, such as for loan and rental applications. Appx0254-0255; Appx0507.

Because PPL exerted significant authority in key elements of employment—from recruiting, hiring, and training, to determining pay rates and access to overtime pay, to employment records—PPL is a joint employer.

## CONCLUSION

This Court should reverse.

November 21, 2025                    Respectfully submitted,

                                    */s/ Christine E. Webber*
                                    Christine E. Webber (DC #439368)
                                    Alisa Tiwari (DC #1780961)
                                    Dana Busgang (DC #90006138)
                                    COHEN MILSTEIN SELLERS & TOLL PLLC
                                    1100 New York Ave. NW, Suite 800
                                    Washington, DC 20005
                                    (202) 408-4600
                                    cwebber@cohenmilstein.com

                                    NICHOLS KASTER, PLLP
                                    Rachhana T. Srey, MN Bar No. 340133
                                    H. Clara Coleman, MN Bar No. 0401743
                                    4600 IDS Center, 80 South 8th Street

Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870
srey@nka.com


**ARNOLD, BEYER & KATZ**
Richard Katz, PA Bar No. 20702
2173 Embassy Drive
Lancaster, PA 17603

Telephone: (717) 394-7204
Fax: (717) 291-0992
rkatz@arnoldbeyerkatz.com

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Appellate Rule 46.1(e), the undersigned hereby certifies that she is counsel of record and is a member of the bar of the Unites States Court of Appeals for the Third Circuit.

Dated:    November 21, 2025        */s/ Christine E. Webber*
Christine E. Webber

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

I.     This brief complies with the type-volume limitation of Fed. R. App. P. 37(a)(7)(B) because the brief contains 6471 words, excluding the parts of the brief exempted by Fed. R. App. 32(f).

II.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Baskerville Old Face.


Dated:   November 21, 2025                    */s/ Christine E. Webber*
                                             Christine E. Webber

## CERTIFICATE OF IDENTICAL COMPLIANCE OF BRIEFS

I, Christine E. Webber, hereby certify that the text of the electronically filed brief is identical to the text of the hard copies that will be prepared and submitted to the Clerk of the Court of the United States Court of Appeals for the Third Circuit.

Dated:   November 21, 2025                    */s/ Christine E. Webber*
                                             Christine E. Webber

## CERTIFICATE OF PERFORMANCE OF VIRUS CHECK

I, Christine E. Webber, hereby certify that on November 21, 2025, I caused a virus check to be performed on the electronically filed copy of this brief using the following virus software: SentinelOne (version v25.1.3.334). No virus was detected.

Dated:    November 21, 2025

*/s/ Christine E. Webber*
Christine E. Webber